Noah G. Purcell, WSBA #43492
Solicitor General
Colleen M. Melody, WSBA #42275
Division Chief, Civil Rights Unit
Laura K. Clinton, WSBA #29846
Megan D. Lin, WSBA #53716
Assistant Attorneys General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-5342

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON; COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF MARYLAND; STATE OF OREGON; STATE OF NEW MEXICO; COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF IOWA; STATE OF ILLINOIS; STATE OF MINNESOTA; STATE OF RHODE ISLAND; COMMONWEALTH OF VIRGINIA; STATE OF NEW YORK; STATE OF VERMONT; STATE OF NORTH CAROLINA; STATE OF DELAWARE; and THE DISTRICT OF COLUMBIA, | NO. |
| | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| Plaintiffs, | |
| v. | |
| THE UNITED STATES OF AMERICA; DONALD TRUMP, in his official capacity as President of the United States of America; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. CUSTOMS AND BORDER PROTECTION; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. DEPARTMENT OF HEALTH AND | |

1  HUMAN SERVICES; OFFICE OF
   REFUGEE RESETTLEMENT; KIRSTJEN
2  NIELSEN, in her official capacity as
   Secretary of the U.S. Department of
3  Homeland Security; THOMAS HOMAN, in
   his official capacity as Acting Director of
4  U.S. Immigration and Customs
   Enforcement; KEVIN K. MCALEENAN, in
5  his official capacity as Commissioner of
   U.S. Customs and Border Protection; ALEX
6  AZAR, in his official capacity as Secretary
   of U.S. Department of Health and Human
7  Services; SCOTT LLOYD, in his official
   capacity as Director of Office of Refugee
8  Resettlement; and JEFFERSON
   BEAUREGARD SESSIONS III, in his
9  official capacity as the Attorney General of
   the United States,
10                        Defendants.

11

## I.    INTRODUCTION

12

13     1.     The States of Washington, California, Maryland, Oregon, New Mexico, New

14 Jersey, Iowa, Illinois, Minnesota, Rhode Island, New York, Vermont, North Carolina, and

15 Delaware; the Commonwealths of Massachusetts, Pennsylvania, and Virginia; and the District

16 of Columbia (collectively, the States) bring this action to protect the States and their residents

17 against the Trump Administration's practice of refusing entry to asylum applicants who present

18 at Southwestern border ports of entry and its cruel and unlawful policy of forcibly separating

19 families who enter the country along our Southwestern border.

20     2.     Widespread news reports, as well as interviews of detainees in Seattle and

21 elsewhere, confirm that families fleeing violence and persecution in their home countries who

22 try to present themselves at Southwestern ports of entry to seek asylum are being refused entry

23 into the United States.  Border officials are unlawfully turning away these families on the pretext

24 that the United States is "full" or no longer accepting asylum seekers.  This unlawful practice

25

26

exacerbates the trauma already suffered by refugee families while simultaneously artificially increasing illegal entry violations.

3.      For those families that do enter the United States along the Southwestern border, immigration officials have implemented the Trump Administration's policy of forcibly separating parents from their children – regardless of the family's circumstances or the needs of the children.  As of June 20, 2018, the new policy had already resulted in the separation of over two thousand children from their parents at the Southwestern border, most recently at a rate of 50-70 families separated *every day*.  Defendants have taken children as young as infants from their parents, often with no warning or opportunity to say goodbye, and providing no information about where the children are being taken or when they will next see each other.  The States' interviews of detainees in their respective jurisdictions confirm the gratuitous harm that this policy inflicts on parents and children and the immediate and deleterious impact it has on families and communities.

4.      As of June 25, 2018, emerging reports suggest that immigration officials are now using the children taken from their parents as leverage to coerce parents to withdraw their asylum claims.

5.      Defendants have repeatedly and publicly admitted that a policy of intentionally separating immigrant children from their parents would be "cruel, "horrible," and "antithetical to child welfare."  But they have alternately claimed that they have no such policy, or that it is somehow mandated by federal law or prior court decisions.

6.      In truth, however, Defendants have embraced a policy of separating parents from their children for the express purpose of deterring immigration along the Southwestern border

(the "Policy"). No law or court decision requires such separation. Rather, Defendants have chosen to adopt the Policy as part of their "zero tolerance" or "100 percent prosecution" approach to individuals who enter the country unlawfully, irrespective of circumstances, and to then use such misdemeanor criminal charges to detain parents indefinitely in federal facilities that cannot accommodate families.

7.       Hundreds of children are left to languish in makeshift detention facilities – where staff are sometimes told not to comfort them – until a placement is found for the child. Defendants have moved the children and parents to different locations all over the country. While the parents are held in federal facilities to await further immigration proceedings, their children are sent elsewhere to group shelters or family placements.

8.       Defendants have made clear that the purpose of separating families is not to protect children, but rather to create a public spectacle designed to deter potential immigrants from coming to the United States. As Counselor to the President Kellyanne Conway said recently:  "Nobody likes seeing babies ripped from their mothers' arms . . . but we have to make sure that DHS' laws are understood through the soundbite culture that we live in." *KellyAnne Conway: 'Nobody likes' Policy Separating Migrant Kids at the Border* (June 17, 2018) *available at*      https://www.nbcnews.com/politics/first-read/conway-nobody-likes-policy-separating-migrant-kids-border-n884016*, attached hereto as Ex. 1. Defendants' Policy is causing severe, intentional, and permanent trauma to the children and parents who are separated in furtherance of an illegitimate deterrence objective.

9.       On June 20, 2018, President Trump signed an Executive Order purporting to suspend the Policy, but any relief offered by the Order is illusory. The Order says nothing about

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

4

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

reuniting the families already ripped apart by the federal government, and Trump Administration officials have made clear the Order will have no impact on the thousands of families who have already been traumatized.

10.     Moreover, based on its text and contemporaneous statements by Administration officials, it is clear the Order does not require the end of family separation. In fact, the Administration currently lacks both the capacity and the legal authority to detain families together for indefinite periods of time, which is what the Order contemplates as the alternative to separating families.

11.     On June 21, 2018, as required by the Order, Attorney General Sessions filed an *Ex Parte* Application for relief from the *Flores* Settlement (a 1997 agreement which sets national standards regarding the detention, release, and treatment of all children in DHS custody). That request seeks rescission of *Flores'* protections so that families may be detained indefinitely during the pendency of any immigration proceedings involving their members, a plan that raises the specter of internment camps.

12.     Moreover, the *Flores* application seeks a "determin[ation] that the Agreement's state licensure requirement does not apply to ICE family residential facilities." The government's attempt to modify the *Flores* settlement terms by removing States' licensing authority and jurisdiction over such facilities is a direct attack on the States' sovereign powers.

13.     Neither the Order nor the Administration's *Flores* application offer any assurance that the Administration will not return to a family separation policy when its efforts to intern families together fail.  In response to the public outcry against family separation, in recent days President Trump has proposed that Homeland Security simply deport immigrants without

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

5

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

hearing or legal process instead of, or perhaps in addition to, interning thousands of families in military facilities.

14.     The Policy, and the Trump Administration's subsequent attempt to shield their facilities from state licensing standards, is an affront to States' sovereign interests in enforcing their laws governing minimum standards of care for children, declaring the family unit to be a fundamental resource of American life that should be nurtured, and requiring the preservation of the parent-child relationship unless the child's right to basic nurture, health, or safety is jeopardized. The Policy also adversely affects the States' proprietary interests, forcing States to expend resources to remediate the harms inflicted by the Policy, some of which are likely to be permanent. State programs, including child welfare services, social and health services, courts, and public schools are all experiencing fiscal impacts due to family separation that will only increase. The Policy, and the Administration's related conduct, has caused severe and immediate harm to the States and their residents, including parents who are detained, released, or otherwise reside in the States after being forcibly separated from their children; children who are placed in facilities, shelters, sponsor homes, foster care, or who otherwise reside in the States after being separated from their parents; extended families and sponsors in the States; and the States' immigrant communities.

15.     The Court should declare the practice of refusing to accept asylum seekers who present at Southwestern points of entry and the related Policy of family separation illegal and order Defendants to stop implementing them immediately. The Court should order Defendants to reunite every family separated by these unlawful acts immediately, and to take such other actions as are warranted by the time of hearing. Defendants' conduct has caused real harms to

the States and our residents, harms that will only increase unless Defendants are enjoined from continuing.

## II.    JURISDICTION AND VENUE

16.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a). The United States' sovereign immunity is waived by 5 U.S.C. § 702.

17.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are the United States of America and United States agencies or officers sued in their official capacities. The State of Washington is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within the Western District of Washington. For example, as of June 18, 2018, parents who were recently refused entry and then victimized by the Policy were being detained at the Federal Detention Center – SeaTac, which is located in King County. At that time, a number of children who were separated from their parents pursuant to the Policy also were being detained in Seattle and other nearby locations.

18.    The States bring this action to redress harms to their sovereign, proprietary, and *parens patriae* interests.

## III.    PARTIES

### A.    Plaintiffs

19.    The Plaintiff States of Washington, California, Maryland, Oregon, New Mexico, New Jersey, Iowa, Illinois, Minnesota, Rhode Island, New York, Vermont, North Carolina, Delaware, and the Commonwealths of Massachusetts, Pennsylvania, and Virginia, represented by and through their Attorneys General, are sovereign states of the United States of America.

The District of Columbia, represented by and through its Attorney General, is a municipal corporation organized under the Constitution of the United States and the local government for the territory constituting the permanent seat of the federal government.

20.     The States are aggrieved and have standing to bring this action because of the injuries to the States caused by the Policy, including immediate and irreparable injuries to their sovereign, proprietary, and quasi-sovereign interests.

21.     Nothing in the June 20 Executive Order remedies these harms, and the June 21 application to modify *Flores* is a direct attack on the sovereign powers of the States.

**B.      Defendant Federal Agencies and Officers**

22.     Defendant the United States of America includes government agencies and departments responsible for the implementation of the Immigration and Nationality Act (INA) and the admission, detention, and removal of non-citizens who are traveling or returning to the United States via air, land, and sea ports across the United States.

23.     Defendant Donald Trump is the President of the United States, and he is sued in his official capacity.

24.     Defendant Department of Homeland Security (DHS) is a federal cabinet agency responsible for implementing and enforcing the INA.  DHS is a Department of the Executive Branch of the U.S. Government, and is an agency within the meaning of 5 U.S.C. § 552(f).

25.     Defendant Immigration and Customs Enforcement (ICE) is the component agency of DHS that is responsible for carrying out removal orders; operating adult immigration detention facilities; and contracting for the detention of immigrants in removal proceedings, including with public and private operators of detention centers, jails, and prisons.

26.     The U.S. Customs and Border Protection (CBP) is an Operational and Support Component agency within DHS.  CBP is responsible for detaining and/or removing non-citizens arriving at air, land, and sea ports across the United States.

27.     Defendant U.S. Citizenship and Immigration Services (USCIS) is a component agency of DHS that, through its Asylum Officers, conducts interviews of certain individuals apprehended at the border to determine whether they have a credible fear of persecution and should be permitted to apply for asylum.

28.     Defendant U.S. Department of Health and Human Services (HHS) is a department of the executive branch of the U.S. government.

29.     Defendant Office of Refugee Resettlement (ORR) is a component of HHS which provides care for and placement for unaccompanied noncitizen children.

30.     Defendant Kirstjen Nielsen is the Secretary of DHS. She is sued in her official capacity.

31.     Defendant Thomas Homan is the acting Director of ICE and is sued in his official capacity.

32.     Defendant Kevin K. McAleenan is the Commissioner of CBP and is sued in his official capacity.

33.     Defendant Alex Azar is the Secretary of HHS and is sued in his official capacity.

34.     Defendant Scott Lloyd is Director of ORR and is sued in his official capacity.

35.     Defendant Jefferson Beauregard Sessions III is sued in his official capacity as the Attorney General of the United States.   In this capacity, he has responsibility for the

9

administration of the immigration laws pursuant to 8 U.S.C. § 1103 and oversees the Executive Office of Immigration Review.

## IV.    ALLEGATIONS

**A.    Federal Immigration Policy Has Traditionally Emphasized Family Reunification, Recognizing that Children Belong with their Families**

36.    When DHS, typically through ICE or CBP, detains an undocumented child who is traveling alone, *i.e.*, unaccompanied by a parent, the relevant federal agencies follow an established process.  Specifically, ICE or CBP may detain an unaccompanied alien child (UAC) for up to 72 hours, as other federal agencies locate an appropriate shelter facility for that child. 8 U.S.C. § 1232(b)(3).   ICE or CBP then must turn the child over to the ORR for shelter placement. *Id.*

37.    Once in ORR custody, children are placed in ORR-funded and supervised shelters, where staff must attempt to locate a parent and determine if family reunification is possible.  If ORR is unable to find a parent, ORR staff will try to locate another family member, relative, family friend, or caretaker in the United States to serve as a sponsor who can care for the child during the pendency of any subsequent immigration proceeding.

38.    Unaccompanied children in ORR custody for whom no sponsor placement can be made are moved to secondary ORR-contracted and state-licensed group care facilities, which can be anywhere in the country.  In such cases, if ORR assesses that the child has a pathway to legal immigration status, ORR will place the child in an ORR-contracted and state-licensed long term foster care program while the immigration process continues.  If ORR determines that a pathway does not exist, the child may remain in a shelter or ORR-contracted and state-licensed group care during removal proceedings.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

10

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

39.     Thus, unaccompanied children typically arrive in the individual states in three ways:  they may be placed initially in a state-licensed shelter located in the state while ORR determines if a family member can be found in the country; they may arrive when ORR releases them to the care of an in-state sponsor while their immigration proceeding goes forward; or they can be moved into a placement in an ORR-contracted and state-licensed long term foster care program as they await their immigration proceeding.

40.     While ORR's initial shelter care placement and long term foster care programs are largely federally funded, an unaccompanied child's in-state placements impose burdens on the receiving state, discussed below.

**B.      After Almost a Year of Threats, Defendants Adopted an Official Policy of Separating Families Who Cross the Southwestern Border, Creating a New Class of "Unaccompanied" Children**

41.     For over a year, the Trump Administration has made clear in numerous public statements that it was considering an official Policy to separate families at the Southwestern border in an effort to deter immigrants from Latin America from coming to the United States.

42.     As early as March 2017, a senior DHS official stated that Defendants were considering a proposal to separate children from their parents at the Southwestern border.  *See* Mary Kay Mallonee, *DHS Considering Proposal to Separate Children From Adults at Border* (March 4, 2017) *available at*  https://www.cnn.com/2017/03/03/politics/dhs-children-adults-border/, attached hereto as Ex. 2.

43.     On March 7, 2017, John Kelly, the then-Secretary of DHS, confirmed that DHS was considering a policy of separating children from their parents:  "I am considering that. They will be well cared for as we deal with their parents." *See* Daniella Diaz, *Kelly: DHS Considering*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

11

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

*Separating Undocumented Children From Their Parents at the Border* (March 7, 2017) *available at* https://www.cnn.com/2017/03/06/politics/john-kelly-separating-children-from-parents-immigration-border/index.html, attached hereto as Ex. 3.

44.    Then-Secretary Kelly publicly backed away from those statements after harsh criticism from the press, human-rights advocates, and members of Congress.  *See* Tal Kopan, *Kelly Says DHS Won't Separate Families at the Border* (March 29, 2017) *available at* https://www.cnn.com/2017/03/29/politics/border-families-separation-kelly/index.html    and attached hereto as Ex. 4.  An inside source, however, reported that the family separation proposal was still on the table for discussion at DHS as of August 2017.  *See* Jonathan Blitzer, *How the Trump Administration Got Comfortable Separating Immigrant Kids From Their Parents*, The New Yorker (May 30, 2018) *available at* https://www.newyorker.com/news/news-desk/how-the-trump-administration-got-comfortable-separating-immigrant-kids-from-their-parents, attached hereto as Ex. 5.

45.    In fact, DHS secretly piloted the Policy in the El Paso sector of the border in western Texas from July to November 2017.  *See* Dara Lind, *Trump's DHS is Using an Extremely Dubious Statistic to Justify Splitting up Families at the Border*, Vox (May 8, 2018) *available at* https://www.vox.com/policy-and-politics/2018/5/8/17327512/sessions-illegal-immigration-border-asylum-families, attached hereto as Ex. 6.

46.    It was later reported that between October 2017 and April 2018, 700 families were separated at the Southwestern border, including at least 100 children under the age of four. *See* Ex. 3.

47.     On February 12, 2018, 33 U.S. Senators also a letter to DHS Secretary Nielsen, concerned that DHS was carrying out "a systematic and blanket policy to separate a child from a parent" upon arrival to the United States—a policy the Senators condemned as "cruel" and "grotesquely inhumane." The letter is attached hereto as Ex. 7. The letter notes that Secretary Nielsen "failed to repudiate" such a policy during a recent Senate Judiciary Committee hearing, and points to "numerous [documented] cases in which parents have been separated from their children." *Id.*

48.     In the spring of 2018, an influx of families seeking to enter the United States may have catalyzed the Administration to finally embrace the Policy.  In March and April of 2018, the number of families from Latin America apprehended at the Southwestern border increased dramatically, going from 5,475 in February to 8,873 in March (a 62% increase) and 9,653 in April (a 76% increase from February).  *See* Southwest Border Migration FY2018, U.S. Dept. of Homeland Security *available at* https://www.cbp.gov/newsroom/stats/sw-border-migration, attached hereto as Ex. 8 *and* Southwest Border Migration FY2017, U.S. Dept. of Homeland Security *available at* https://www.cbp.gov/newsroom/stats/sw-border-migration-fy2017#, attached hereto as Ex. 9[1].

_____

[1] CBP tracks "apprehensions" and "inadmissibles" separately and adds these together to count "total enforcement actions."  *See* CBP Enforcement Statistics FY2018, U.S. Customs and Border Protection *available at* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics, attached hereto as Ex. 10.  "Inadmissibles refers to individuals encountered at ports of entry who are seeking lawful admission into the United States but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe." *Id.* "Apprehensions refers to the physical control or temporary detainment of a person who is not lawfully in the U.S. which may or may not result in an arrest."  *Id.*

49.     The number of family units deemed to be inadmissible went from 3,941 in February to 5,162 in March (a 31% increase) and 5,445 in April (a 38% increase from February). *See* Ex. 8.  These numbers include all persons who enter at ports of entry but are deemed to be inadmissible; asylum seekers; and individuals who apply for admission but subsequently return to their countries of origin within a short time frame.  *See* Ex. 9.  The numbers reflected an increase of 672% in March 2018 in comparison to March 2017, and 697% in April 2018 in comparison to April 2017.  *Compare* Exs. 8 and 9.

50.     According to at least one source, the President's frustration with the rising numbers of Latino immigrants at the Southwestern border in March and April of 2018 was the impetus for publicly adopting the Policy.  *See* Ex. 5.  When asked what had changed since the prior year – when the Administration backed away from adopting such a policy – the person pointed to the President:  "What you're seeing now is a President's frustration with the fact that the numbers are back up." *Id*.

51.     In early April 2018, President Trump reportedly expressed frustration with DHS Secretary Nielsen for failing to stop or decrease immigration at the Southwestern border.  Several officials stated that one persistent issue was President Trump's belief that Secretary Nielsen and DHS were resisting his direction that parents be separated from their children when crossing unlawfully at the US-Mexico border.  *See* Shear and Pearlroth, *Kirstjen Nielsen, Chief of Homeland Security, Almost Resigned After Trump Tirade* (May 10, 2018) *available at* https://www.nytimes.com/2018/05/10/us/politics/trump-homeland-security-secretary-resign.html, attached hereto as Ex. 11.  The President and his aides had been pushing a family

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

14

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

separation policy for weeks as a way to deter families from crossing the Southwestern border illegally. *Id.*

52.     On April 6, 2018, President Trump issued a memorandum directing Attorney General Sessions and DHS Secretary Nielsen to detail all measures and identify any resources or steps "needed to expeditiously end 'catch and release' practices" that allow undocumented immigrants to be released into the community pending resolution of their immigration cases.

53.     That same day, Attorney General Sessions formally announced a "zero-tolerance" policy "for offenses under 8 U.S.C. § 1325(a), which prohibits both attempted illegal entry and illegal entry into the United States by an alien." *See* Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry, U.S. Department of Justice (April 6, 2018) *available at* https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry, attached hereto as Ex. 12.

54.     In a memorandum also issued April 6, Attorney General Sessions "direct[ed] each United States Attorney's Office along the Southwest Border . . . to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under section 1325(a)" and made clear that this directive "superseded any existing policy." *See* Memorandum for Federal Prosecutors Along the Southwest Border (April 6, 2018), attached hereto as Ex. 13.

55.     On May 7, 2018, DHS adopted an official Policy of "referring 100 percent of illegal Southwest Border crossings to the Department of Justice for prosecution," and Attorney General Sessions publicized that children would be automatically separated from parents or other adults with whom they were traveling. *See Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration*, Justice News

(May 7, 2018) available at https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions, attached hereto as Ex. 14.

56.     With that, Attorney General Sessions and Secretary Nielsen carried out President Trump's directive:  Under the new federal law enforcement priority, all undocumented adults crossing the U.S.-Mexico border at unauthorized locations would be referred by DHS to the Department of Justice.  DOJ would then charge each adult with misdemeanor illegal entry or reentry.  Everyone so referred would be prosecuted and detained regardless of familial circumstances or asylum claims, and children would be automatically separated from their parents and transferred to the custody of ORR for placement elsewhere.

57.     Accordingly, Defendants have thus created a new category of "unaccompanied" children – those who came into the country with a parent but were, pursuant to the Policy, forcibly separated by ICE or CBP immediately thereafter.

58.     Perhaps emboldened by the directive, DHS officers at ports of entry along the Southwestern border have been refusing to let immigrants present themselves and request asylum, turning people away because the United States is "full."  *See* Alfredo Corchado, *Asylum Seekers Reportedly Denied Entry at Border as Trump Tightens 'Zero Tolerance' Immigration Policies* (June 6, 2018) *available at* https://www.dallasnews.com/news/immigration/2018/06/06/reports-turning-back-asylum-seekers-border-crossings-trump-tightens-grip-zero-tolerance-immigration-policies, attached hereto as Ex. 15.

59.     One report describes immigrants who were turned away on the bridge in El Paso by CBP officers before they reached the border checkpoint, so they were unable to make their

16

asylum request at the port of entry.  *Id*.  Ruben Garcia, founder of a nonprofit that assists immigrants in El Paso explains: "If you look indigenous and you look Central American, they will stop you . . .  They never ask why they are coming.  They just say we can't receive you."  *Id*.  When asked why they are refusing to allow immigrants to reach checkpoints to request asylum, CBP officials state that centers are "full."  *Id*.

60.     Recent interviews with detained parents held in federal facilities in Seattle confirm these reports.  For example, one mother presented herself and her 15-year old son at the Laredo, Texas port of entry and requested asylum for herself and safe passage for her American-citizen son.  Officials at the port of entry detained her, separated her from her son, and told her that the United Sates "will not give [her] asylum" and that she "w[ould] not see [her] son again until he turns 18" because he would be taken to a shelter or given to an American family for adoption.  Another mother claiming asylum was told, in front of her 14-year-old daughter, that she would be "punished with jail time" for having come to the United States.

61.     The effect of this conduct is an increasing influx of entrants at locations other than ports of entry, which Defendants construe as violations of 8 U.S.C. § 1325 and its implementing regulations.  The adults are then routed into the criminal system while the children are turned over to ORR for placement – thereby separating the family and implementing the Policy.

62.     Since announcing the Policy, Defendants have repeatedly acknowledged its existence and cruelty.  For example, President Trump, tweeting on May 26, 2018, referred to the Policy as a "horrible law."  The May 26, 2018 tweet is attached hereto as Ex. 16.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

17

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

63.     On May 29, 2018, Devin O'Malley, a Justice Department spokesman, recapped the Policy, telling reporters that suspected crossers "will not be given a free pass," and will face criminal prosecution and federal detention "irrespective of whether or not they have brought a child with them."  *See* Ted Hesson, *White House's Miller blames Democrats for border crisis*, Politico (May 29, 2018) *available at* *https://www.politico.com/story/2018/05/29/stephen-miller-democrats-border-574537*, attached hereto as Ex. 17.

64.     On June 16, 2018, it was reported that Senior Advisor to the President Stephen Miller was a driving force in adoption and implementation of the Policy.  *See* Chas Danner, *Separating Families at the Border Was Always Part of the Plan* (June 17, 2018) *available at* http://nymag.com/daily/intelligencer/2018/06/separating-families-at-border-was-always-part-of-the-plan.html, attached hereto as Ex. 18.  While others acknowledge the controversial nature of the Policy, Mr. Miller unapologetically embraced it, calling it "a simple decision by the administration . . . . The message is that no one is exempt from immigration law." *Id.*

65.     On June 17, 2018, Counselor to the President Kellyanne Conway acknowledged the existence of the Policy in an interview with NBC's "Meet the Press," stating, "As a mother, as a Catholic, as somebody who has a conscience . . . I will tell you that nobody likes this policy." *See* Ex. 1.  She continued, "Nobody likes seeing babies ripped from their mothers' arms, from their mothers' wombs, frankly, but we have to make sure that DHS' laws are understood through the soundbite culture that we live in."  *Id*.

66.     On June 18, 2018, President Trump characterized the Policy as one of the United States' "horrible and tough" immigration laws.  *See* Hains, Tim, *President Trump: "The United States Will Not be a Migrant Camp", "Not On My Watch"* (June 18, 2018) *available at*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

18

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

https://www.realclearpolitics.com/video/2018/06/18/president_trump_the_united_states_will_not_be_a_migrant_camp.html, attached hereto as Ex. 19.

67.     Also on June 18, 2018, in remarks before the National Sheriffs' Association (NSA), Attorney General Sessions promoted the deterrent effect of family separation: "We cannot and will not encourage people to bring their children or other children to the country unlawfully by giving them immunity in the process." *See* Luis Sanchez, *Sessions on separating families: If we build a wall and pass legislation, we won't have these 'terrible choices'*, The Hill (June 18, 2018) *available at* http://thehill.com/homenews/administration/392785-sessions-on-separating-families-if-we-build-a-wall-and-pass, attached hereto as Ex. 20.

68.     And in her remarks to the NSA, DHS Secretary Nielsen also confirmed the existence of the Policy, stating: "Illegal actions have and must have consequences. No more free passes, no more get out of jail free cards." *See* Tal Kopan, *'We will not apologize': Trump DHS chief defends immigration policy* (June 18, 2018) *available at* https://www.cnn.com/2018/06/18/politics/kirstjen-nielsen-immigration-policy/index.html, attached hereto as Ex. 21.

69.     The Policy has resulted in thousands of brutal familial separations.

70.     For example, during a briefing call on June 15, 2018, DHS officials admitted that 1,995 children were separated from 1,940 adults at the U.S.-Mexico border from April 19 through May 31, 2018. The adults were all referred for prosecution. *See How Trump Family Separation Policy Became What it is Today* (June 14, 2018) *available at* https://www.pbs.org/newshour/nation/how-trumps-family-separation-policy-has-become-what-it-is-today, attached hereto as Ex. 22.

71.     According to DHS data released on June 18, 2018 by Senator Dianne Feinstein, federal immigration officials separated 2,342 children from adults at the border between May 5 and June 9, 2018.   *See* Louis Nelson, *Defiant Trump refuses to back off migrant family separations*, Politico (June 18, 2018) *available at https://www.politico.com/story/2018/06/18/trump-immigration-child-separations-650875*, attached hereto as Ex. 23.

**C.     The President's Executive Order Does Not End Family Separation**

72.     On June 20, 2018, President Trump issued an Executive Order entitled, "Affording Congress an Opportunity to Address Family Separation" (the Order).   The Order is attached hereto as Ex. 24.   While purporting to suspend the practice of separating families, the Order offers illusory relief.   Indeed, the language of the Order itself does not actually require an end to family separation, and in fact, it implicitly recognizes that the Policy will continue.

73.     By its own terms, the Order states that it does not confer any enforceable right or benefit on any person.

74.     The Order appears to direct the Secretary of Homeland Security to detain families together "during the pendency of any criminal proceedings for improper entry or immigration proceedings involving their members," while continuing the practice of prosecuting and detaining all unauthorized border crossers.

75.     At the same time, the Order acknowledges that Defendants do not have the resources or facilities necessary to effectuate its terms.   Indeed, every provision of the Order is to be carried out only "where appropriate and consistent with law and available resources."   These terms are undefined, leaving familial detention largely discretionary.  Likewise, the Order

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

20

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

repeatedly affirms that family unity is "subject to the availability of appropriations," but provides no parameters on when appropriations will be sought or even how much funding is needed.

76.     Similarly, the Order directs the Secretary of Defense to provide existing available facilities to house immigrant families, or to construct them, but again there is no indication that appropriate federal facilities exist and are available, or that construction of new family internment facilities is feasible.

77.     The Order also acknowledges that Defendants cannot lawfully carry out its terms until they receive a court order "that would permit" the family detention scheme contemplated. Because almost every provision in the Order is subject to the availability of non-existent resources and legal authority for indefinite detention that is contrary to settled law, it fails to provide any actual relief.

78.     The Order also is silent as to the thousands of families already separated by the Policy.  It does nothing to require their reunification or redress the harms inflicted on those families.  As a spokesperson for HHS' Administration for Children and Families explained, "There will not be a grandfathering of existing cases … I can tell you definitively that is going to be policy."  *See* Michael D. Shear, Abby Goodnough and Maggie Haberman, *Trump Retreats on Separating Families, but Thousands May Remain Apart,* (June 20, 2018) *available at* https://www.nytimes.com/2018/06/20/us/politics/trump-immigration-children-executive-order.html?hp&action=click&pgtype=Homepage&clickSource=story-heading&module=a-lede-package-region&region=top-news&WT.nav=top-news, attached as Ex. 25.

79.     Defendants have confirmed that the Order will not end family separation, ostensibly because only Congress can reverse the Policy.  Notably, the Order poses a striking

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

21

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

contrast with the Administration's previous statements that Congressional legislation is the sole means of ending family separation, including President Trump's explicit statement that "You can't do it through executive order." *See "Trump said only legislation could stop family separation. He just issued an executive order,"* the Washington Post (June 20, 2018) *clip available at* https://www.washingtonpost.com/video/politics/trump-said-only-legislation-could-stop-family-separation-hes-about-to-issue-an-executive-order/2018/06/20/c4f93aea-74a9-11e8-bda1-18e53a448a14_video.html?utm_term=.d6843e5acc54, and Adam Edelman, *Trump signs order stopping his policy of separating families at border* (June 20, 2018) *available at* https://www.nbcnews.com/politics/immigration/trump-says-he-ll-sign-order-stopping-separation-families-border-n885061, attached hereto as Ex. 26.

80.     Likewise, just days prior to issuance of the Order, Defendants stated numerous times their position that only Congress could end a policy of separating families.  For example, on June 18, 2018, Secretary Nielsen announced: "Until these loopholes are closed by Congress, it is not possible, as a matter of law, to detain and remove whole family units who arrive illegally in the United States.  Congress and the courts created this problem, and Congress alone can fix it.  Until then, we will enforce every law we have on the books to defend the sovereignty and security of the United States." *See* Matthew Nussbaum, *Trump falsely claimed for days that he couldn't end family separations* (June 20, 2018) *available at* https://www.politico.com/story/2018/06/20/trump-false-claims-family-separations-656011, attached hereto as Ex. 27.

81.     Also on June 18, 2018, White House Press Secretary Sarah Huckabee Sanders stated: "There's only one body here that gets to create legislation and it's Congress.  Our job is

to enforce it, and we would like to see Congress fix it.  That's why the President has repeatedly called on them to work with him to do just that." *Id.*

82.     And on June 20, 2018, contemporaneous with announcing the Order, Vice President Pence claimed that changing the law was the only way to end family separation: "I think the American people want the Democrats to stop the obstruction, to stop standing in the way of the kind of reforms at our border that will end the crisis of illegal immigration.  We can solve this issue of separation." *See Vice President Mike Pence: Democrats Can Fix Family Separation at Border* (June 20, 2018) available at https://kdkaradio.radio.com/articles/vice-president-mike-pence-democrats-can-fix-family-separation-border, attached hereto as Ex. 28.

83.     When President Trump signed the Order, Vice President Pence and Secretary Nielsen again called on Congress to end separating families at the border; Vice President Pence suggested that the Order is only applicable "in the immediate days forward" and "call[ed] on Congress to change the laws" for a more permanent fix.  *See* clip at https://www.c-span.org/video/?447373-1/president-trump-signs-executive-order-halting-family-separation-policy.

84.     Later that day, at a briefing organized by the White House, Gene Hamilton, a counselor to Attorney General Sessions, sidestepped a question about whether a family that crosses the border now would be separated, stating that an "implementation phase" would occur, but that he was not sure precisely what DHS or HHS would do in the immediate future. Mr. Hamilton echoed President Trump's, Nielsen's, and Sessions' statements that "Congress needs to provide a permanent fix for this situation."  Mr. Hamilton stated that if Congress does not act, it would be up to the *Flores* judge to decide whether the Administration could keep families

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

23

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

together.  *See* Charlie Savage, *Explaining Trump's Executive Order on Family Separation*, (June 20, 2018) available at https://www.nytimes.com/2018/06/20/us/politics/family-separation-executive-order.html, attached hereto as Ex. 29.

**D.    Pursuant to the Order, the Attorney General Has Launched an Attack on State Sovereignty**

85.    The Order directs the Attorney General to "promptly file a request with the U.S. District Court for the Central District of California to modify the Settlement Agreement in *Flores v. Sessions*," making rescission of *Flores'* protections a predicate to the maintenance of family unity.

86.    The *Flores* Agreement, which has been in place since 1997, "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS," including both accompanied and unaccompanied minors.  Stipulated Settlement Agreement, ¶ 9, attached hereto as Ex. 30.    Among other things, *Flores* prevents the DHS from detaining children in restricted facilities for long periods and it requires federal detention centers to meet state licensing requirements for childcare facilities.

87.    As Vice President Pence previously conceded, the *Flores* agreement provides only two options for the long term placement of families—(1) parental detention and family separation, or (2) keeping families together, by releasing them into the community.    *See* clip available at https://www.c-span.org/video/?c4736625/pence-options-law).

88.    On June 21, 2018, Attorney General Sessions filed an *ex parte* application seeking relief from the *Flores* Settlement Agreement to allow the federal government to detain families indefinitely at non-licensed facilities.  *Flores, et al. v. Sessions, et al.*, Case No. CV 85-4544-DMG (C.D. Cal.), Dkt. 435-1 at 1, 13, attached hereto as Ex. 31.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

24

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

89.     In his application, Attorney General Sessions admits that mass internment of families by the federal government is currently illegal:  "this Court's construction of the Flores Settlement Agreement eliminates the practical availability of family detention across the nation . ."  Ex. 31 at 2.  "Under current law and legal rulings, including this Court's, it is not possible for the U.S. government to detain families together during the pendency of their immigration proceedings. It cannot be done."  *Id*. at 3.

90.     Nevertheless, Attorney General Sessions argues that indefinitely detaining families is necessary for deterrence.  Specifically, he asserts that, without family detention, there is "a powerful incentive for aliens to enter this country with children."  *Id*. at 1.  Attorney General Session claims that, "[u]ndeniably the limitation on the option of detaining families together and marked increase of families illegally crossing the border are linked."  *Id*. at 2.  "'[D]etaining these individuals dispels such expectations, and deters others from unlawfully coming to the United States.'"  *Id*. at 13 (internal citations omitted).

91.     Attorney General Sessions also requests an exemption from state licensing requirements, "because of ongoing and unresolved disputes over the ability of States to license these types of facilities."  Ex. 31 at 17-18.

92.     The district court and the Ninth Circuit in *Flores* rejected almost identical arguments advanced by the federal government in 2015.  *See Flores v. Lynch*, 212 F. Supp. 3d 907, 913 (C.D. Cal. 2015), *aff'd in part, rev'd in part and remanded,* 828 F.3d 898 (9th Cir. 2016); *Flores v. Lynch*, 828 F.3d 898, 910 (9th Cir. 2016).  At that time, the government requested that the trial court modify the *Flores* agreement to allow DHS to hold female-headed families with their children indefinitely in family detention centers in Texas and New Mexico.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

25

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

Rather than grant that request, the district court confirmed that *Flores* requires that "Defendants must house children who are not released in a non-secure facility that is licensed by an appropriate state agency to care for dependent children."  Case No. CV 85-4544-DMG (C.D. Cal.), Dkt. 177 at 12.  The court stated: "The fact that the [Texas and New Mexico] family residential centers cannot be licensed by an appropriate state agency simply means that, under the Agreement, [children] … cannot be housed in these facilities except as permitted by the Agreement." *Id*. at 12-13.

93.     The district court also found that the alleged "influx" of immigrants crossing the U.S.-Mexico border did not constitute changed circumstances warranting the requested modification and rejected the government's stated rationale that the "family detention policy [would] deter[] others who would have come." Case No. CV 85-4544-DMG (C.D. Cal.), Dkt. 177 at 23.  The Ninth Circuit affirmed, stating: "The Settlement expressly anticipated an influx . . . and, even if the parties did not anticipate an influx of this size, we cannot fathom how a 'suitably tailored' response to the change in circumstances would be to exempt an entire category of migrants from the Settlement, as opposed to, say, relaxing certain requirements applicable to all migrants." *Flores v. Lynch*, 828 F.3d 898, 910 (9th Cir. 2016).

**E.     Defendants' Recent Statements Call Into Question the Administration's Commitment to the Rule of Law**

94.     Neither the Order nor the *Flores* application offer any assurance that the Administration will not once again return to a family separation policy when its efforts to inter families together fail.

95.     To the contrary, on June 25, 2018, Attorney General Sessions told an audience in Reno, NV that DOJ would continue carrying out President Trump's "zero-tolerance" directive

because to do otherwise "would encourage more adults to bring more children illegally on a dangerous journey." The same day, CBP Commissioner Kevin McAleenan stated that his agency would stop referring parents with children for prosecution but that this is a "temporary" halt. *See* Shannon Pettypiece and Toluse Olorunnipa, *Border Patrol Halts Prosecution of Families Crossing Illegally* (June 25, 2018) *available at* https://www.bloomberg.com/news/articles/2018-06-25/border-patrol-halts-prosecution-of-families-crossing-illegally.

96.     Further, the Trump Administration's statements from June 20, 2018-June 26, 2018 raise the specter of further unconstitutional and unlawful acts.

97.     For example, in response to the public outcry against family separation, the Administration appears to be preparing to intern thousands of families in military facilities. As Commissioner McAleenan explained, he is unable to refer parents for prosecution without separating them from their children due to lack of resources, but that he and his agency are working on a plan to resume criminal referrals. *See* Shannon Pettypiece and Toluse Olorunnipa, *Border Patrol Halts Prosecution of Families Crossing Illegally* (June 25, 2018) *available at* https://www.bloomberg.com/news/articles/2018-06-25/border-patrol-halts-prosecution-of-families-crossing-illegally.

98.     On June 21, 2018, at DHS's request, the Pentagon agreed to host up to 20,000 unaccompanied migrant children on military bases. *See* Dan Lamothe, Seung Min Kim and Nick Miroff, *Pentagon will make room for up to 20,000 migrant children on military bases,* the Washington Post (June 21, 2018) *available at* https://www.washingtonpost.com/news/checkpoint/wp/2018/06/21/pentagon-asked-to-make-

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

27

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

room-for-20000-migrant-children-on-military-bases/?utm_term=.decab089f684,                 attached hereto as Ex. 32.

99.     Defense Secretary Jim Mattis confirmed on June 24, 2018, that the military is preparing to construct camps for migrants on at least two military bases.  *See* Phil Stewart, *Pentagon eyes temporary camps for immigrants at two bases*, Reuters (June 24, 2018) available at       https://www.reuters.com/article/us-usa-immigration-military/pentagon-eyes-temporary-camps-for-immigrants-at-two-bases-idUSKBN1JL015, attached hereto as Ex. 33.  Moreover, a planning document from the United States Navy details "temporary and austere" tent cities that would be able to house 25,000 migrants on abandoned airfields. *See* Philip Elliott, *Exclusive: Navy Document Shows Plan to Erect 'Austere" Detention Camps, Time* (June 22, 2018) http://time.com/5319334/navy-detainment-centers-zerol-tolerance-immigration-family-separation-policy/, attached hereto as Ex. 34.

100.     Emerging reports as of June 25, 2018, suggest that immigration officials are using the children taken from their parents as leverage to coerce parents to withdraw their asylum claims.  The family reunification Fact Sheet released by the Department of Homeland Security on June 23, 2018, provides for family reunification only for adults "who are subject to removal" so that they may be "reunited with their children for the purposes of removal." *See* Fact Sheet: Zero Tolerance Prosecution and Family Reunification (June 23, 2018) *available at* https://content.govdelivery.com/accounts/USDHS/bulletins/1f98ad8, attached hereto as Ex. 35. In other words, parents who hope to be quickly reunited with their children must abandon their own asylum claims and agree to withdraw their children's claims to remain in the United States. *See* Dara Lind, *Trump will reunite separated families – but only if they agree to deportation*,

Vox (June 25, 2018) *available at* https://www.vox.com/2018/6/25/17484042/children-parents-separate-reunite-plan-trump, attached hereto as Ex. 36.

101.    Parents have felt compelled to act accordingly.  On June 24, 2018, a DHS official stated that parents separated from their children "were quickly given the option to sign paperwork leading to their deportation. Many chose to do so."  The June 24, 2018 tweet is *available at* https://twitter.com/jacobsoboroff/status/1010862394103328771, and attached hereto as Ex. 37.  This is consistent with other accounts of parents signing voluntary deportation paperwork out of "desperation" because officials had suggested that it would lead to faster reunification with their children. *See, e.g.*, Jay Root and Shannon Najmabadi, *Kids in exchange for deportation: Detained migrants say they were told they could get kids back on way out of U.S.*, Texas Tribune (June 24, 2018) *available at* https://www.texastribune.org/2018/06/24/kids-exchange-deportation-migrants-claim-they-were-promised-they-could/?utm_campaign=trib-social-buttons&utm_source=twitter&utm_medium=social, attached hereto as Ex. 38.

102.    Likewise, on June 24, 2018, a senior administrative official speaking on the condition of anonymity confirmed that defendants do not plan to reunite families until after a parent has lost his or her deportation case, effectively punishing parents who may otherwise pursue an asylum claim or other relief request and creating tremendous pressure to abandon such claims so that parents may be reunited with kids.  *See* Maria Saccherri, Michael Miller and Robert Moore, *Sen. Warren visits detention center, says no children being returned to parents there*, The Washington Post (June 24, 2018) *available at* https://www.washingtonpost.com/local/immigration/desperate-to-get-children-back-migrants-

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

29

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

are-willing-to-give-up-asylum-claims-lawyers-say/2018/06/24/c7fab87c-77e2-11e8-80be-6d32e182a3bc_story.html, attached hereto as Ex. 39.

103.     In recent days, President Trump has proposed deporting immigrants without hearing or legal process as his favored alternative.  On June 21, 2018 President Trump stated: "We shouldn't be hiring judges by the thousands, as our ridiculous immigration laws demand, we should be changing our laws, building the Wall, hire Border Agents and Ice and not let people come into our country based on the legal phrase they are told to say as their password."  *See* https://mobile.twitter.com/realDonaldTrump/status/1009770941604298753.

104.     On June 24, 2018, President Trump again proposed that immigrants who cross into the United States should be sent back immediately without due process or an appearance before a judge:  "We cannot allow all of these people to invade our Country.  When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came.  Our system is a mockery to good immigration policy and Law and Order. Most children come without parents..."  *See* Katie Rogers and Sheryl Gay Stolberg*, Trump Calls for Depriving Immigrants Who Illegally Cross Border of Due Process Rights*, The New York Times (June   24,   2018)   *available   at*   https://www.nytimes.com/2018/06/24/us/politics/trump-immigration-judges-due-process.html, attached hereto as Ex. 40.

105.     On June 25, 2018, President Trump continued:  "Hiring manythousands [sic] of judges, and going through a long and complicated legal process, is not the way to go – will always be disfunctional [sic]. People must simply be stopped at the Border and told they cannot come into the U.S. illegally.  Children brought back to their country….." The June 25, 2018

tweet is available at https://twitter.com/realDonaldTrump/status/1011228265003077632, and attached hereto as Ex. 41.

106.    On June 25, 2018, White House press secretary Sarah Huckabee Sanders confirmed that CPB's halt of prosecution referrals "is a temporary solution. This isn't going to last. . . This will only last a short amount of time, because we're going to run out of space, we're going to run out of resources to keep people together."  Secretary Sanders reiterated:  "We're not changing the policy . . . We're simply out of resources. And at some point, Congress has to do what they were elected to do, and that is secure our border, that is stop the crime coming into our country."  Secretary Sanders dodged questions regarding President Trump's recent suggestion that immigrants be afforded no due hearing or due process prior to deportation. *See* Press Briefing by Press Secretary Sarah Sanders (June 25, 2018)*, available at* https://www.whitehouse.gov/briefings-statements/press-briefing-press-secretary-sarah-sanders-062518/.

**F.    Defendants' Policy Causes Devastating Harm To Children and Parents**

107.    Separating families when a child's safety is not at risk causes immediate, acute trauma as well as foreseeable long term damage and harm to both the parents and the children. The negative effects and consequences of the Policy are likely to be long-lasting and in some cases debilitating.

108.    Unless required to protect a child's safety, forced separation from their parents is likely to cause immediate and extreme psychological harm to young children, and the resulting cognitive and emotional damage can be permanent.  Parental separation is a traumatic loss for the child; as a result they are likely to experience post-traumatic symptoms such as nightmares,

and other manifestations of anxiety and depression, all of which are likely to increase in severity the longer the separation lasts and lead to the potential development of problematic coping strategies in both the near and long term. This trauma may be exacerbated for children who are fleeing persecution or violence in their home countries.

109.    Observations by those who have seen children recently separated pursuant to Defendants' Policy suggest that conditions created by Defendants will further exacerbate the separation trauma.  By way of example, after touring a shelter along the Texas border to Mexico, Dr. Colleen Kraft, President of the American Academy of Pediatrics, described a "screaming" girl, "no older than 2" who could not be comforted because shelter workers had been told they are not allowed to touch the children, not even to hold a crying child and convey some semblance of compassion. *See Immigrant children: What a doctor saw in a Texas shelter*, The Washington Post   (June   17,   2018)   *available   at*   https://www.washingtonpost.com/news/post-nation/wp/2018/06/16/america-is-better-than-this-what-a-doctor-saw-in-a-texas-shelter-for-migrant-children/?utm_term=.e1e5566675e9, attached hereto as Ex. 42.

110.    These reports are also consistent with the observations of State employees who recently interviewed separated children living in Seattle.  Every child displayed significant distress when relaying their experience and broke down when describing their separation.  Some reported ongoing nightmares, others were so traumatized they could not continue the brief interviews.

111.    Similarly, parents who arrive together with their children at the U.S. border and then are separated from their children by the U.S. government are likely to experience immediate and acute psychological injury as a result.  Under the Policy, many parents are being separated

from their children suddenly without the chance to prepare the child or even say goodbye, without knowing where they or their children will be taken, without any guarantee of reunification, and often without contact with their children or with long gaps in that contact. When parents and children are allowed to speak, it is only briefly – ten minutes or so – by telephone.

112.    These otherwise fit parents are likely to experience deterioration of their mental and physical health in the aftermath of the forcible separation from their children with symptoms including anxiety, depression, PTSD, and other trauma-related disorders. In some cases, parental trauma from separation from their children will become unbearable because their available coping mechanisms may be overwhelmed by the sudden loss of the important role of parent and protector of the child.  Indeed, at least one parent, distraught after officials pried his 3-year-old son from his arms, is reported to have committed suicide following the separation. *See* Nick Miroff, *A family separated at the border, and this distraught father took his own life*, (June 9, 2018) *available at* https://www.washingtonpost.com/world/national-security/a-family-was-separated-at-the-border-and-this-distraught-father-took-his-own-life/2018/06/08/24e40b70-6b5d-11e8-9e38-24e693b38637_story.html?utm_term=.96a4606e47c7, attached hereto as Ex. 43.

113.    These general observations were confirmed by interviewers who recently spoke with mothers detained in a federal facility in King County, Washington.  The mothers were visibly upset, with some expressing panic and desperation, because they lacked information about their children's safety and did not know whether or when they would see their children again.

**G.      The Policy Is Expressly Intended to Use Traumatized Children and Families to Deter Migration of Latina/o Immigrants and for Political Leverage**

114.     Defendants have changed public positions on the Policy numerous times over the last few weeks, but what has remained consistent throughout is Defendants' unambiguous adoption of a policy at the Southwestern border that uses trauma as deterrence, and their insistence that Congress overhaul immigration laws to codify President Trump's immigration agenda, including building a wall at the U.S.-Mexico border. *See* JM Rieger, *The Trump Administration Changed its Story on Family Separation no Fewer than 14 Times Before Ending the Policy* (June 20, 2018) *available at* https://www.washingtonpost.com/news/the-fix/wp/2018/06/20/the-trump-administration-changed-its-story-on-family-separation-no-fewer-than-14-times-before-ending-the-policy/?utm_term=.6719a188344f, Ex. 44 (collecting contradictory statements). Confirmation of these two goals is reflected in statements from a year ago and continued even after issuance of the Executive Order.

115.     As early as March 7, 2017, then-Secretary of DHS John Kelly confirmed that the Policy was intended to "to deter movement" along the Southwestern border. *See* Ex. 3.   Later that year, a source who attended a DHS meeting to discuss ways to "deter immigrants from coming to the U.S. illegally" reported that the Policy was still being considered, but kept getting "bogged down" because of how "difficult and controversial it was." *See* Ex. 4.

116.     On December 5, 2017, Kirstjen Nielsen replaced John Kelly as DHS Secretary.

117.     On February 8, 2018, 75 members of Congress wrote a letter to DHS Secretary Nielsen expressing "deep[] concern that the Department of Homeland Security (DHS) is separating families, including parents and their minor children . . . along the U.S.-Mexico border."   DHS' "reported justification of this practice as a deterrent to family migration suggests

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

34

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

a lack of understanding about the violence many families are fleeing in their home countries" and "[m]ore pointedly, the pretext of deterrence is not a legally sufficient basis for separating families." The letter is attached hereto as Ex. 45.

118.     The letter details two complaints filed in December 2017 that confirmed DHS was "intentionally separating families for purposes of deterrence and punishment." In particular, the second complaint documented "instances of infants and toddlers as young as one and two years old separated from their parents and rendered 'unaccompanied'"—among these was "a father separated from his one-year-old son, Mateo, despite presenting appropriate documents to establish their relationship." *Id*.

119.     Attorney General Sessions has confirmed that the Policy is intended to deter other families from entering the United States. For example, on April 6, 2018, he issued a warning to immigrants crossing the Southwestern border that "illegally entering this country will not be rewarded, but instead will be met with the full prosecutorial powers of the Department of Justice" and children "will be separated from [their parents]." *See* Ex. 12.

120.     In May 2018, DHS announced the results of its pilot at the El Paso border sector from July to November 2017. Its report—later found to be inaccurate—further confirms that deterrence is the primary purpose of the Policy. When asked about the Policy, DHS reported that "[t]he number of illegal crossings between ports of entry of family units dropped by 64 percent. This decrease was attributed to the prosecution of adults amenable to prosecution for illegal entry while risking the lives of their children. Of note, the numbers began rising again after the initiative was paused." *See* Ex. 6. Notably, public reporting suggests that, based on DHS' own statistics, these numbers are wrong and that there was, in fact, a 64% *increase* in apprehensions.

*Id.*; *see also* US Border Patrol Southwest Border Apprehensions by Section FY2017, U.S. Customs and Border Protection *available at* https://www.cbp.gov/newsroom/stats/usbp-sw-border-apprehensions-fy2017#field-content-tab-group-tab-9, attached hereto as Ex. 46 and US Border Patrol Southwest Border Apprehensions by Section FY2018, U.S. Customs and Border Protection *available at* https://www.cbp.gov/newsroom/stats/usbp-sw-border-apprehensions#field-content-tab-group-tab-1, attached hereto as Ex. 47.

121.   On May 11, 2018, White House Chief of Staff John Kelly was interviewed by National Public Radio. When asked whether he was in favor of the Policy, he acknowledged that "the vast majority of the people that move illegally into United States are not bad people. They're not criminals.  They're not MS-13. . . . They're not bad people. They're coming here for a reason.  And I sympathize with the reason. . . . But a big name of the game is deterrence." *See* White House Chief of Staff John Kelly's Interview with NPR (May 11, 2018) *available at* https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr, transcript attached hereto as Ex. 48. He noted that the Policy "would be a tough deterrent" but that "this is a technique that no one hopes will be used extensively or for very long." *Id.*

122.   On June 5, 2018, Attorney General Sessions was asked whether it was "absolutely necessary" to "separate parents from children when they are detained or apprehended at the border."  He responded, "yes" and "[i]f people don't want to be separated from their children, they should not bring them with them.  We've got to get this message out."  *See* Hugh Hewitt, US Attorney General Jeff Sessions on Children Separated From Parents at Border, F-1 Visas For PRC Students, and Masterpiece Cakeshop Decision (June 5, 2018) *available at*

http://www.hughhewitt.com/attorney-general-jeff-sessions-on-the-immigration-policies-concerning-children-apprehended-at-he-border-and-f-1-visas/, transcript attached hereto as Ex. 49.

123.    On June 14, 2018, Attorney General Sessions quoted a Bible verse ostensibly to justify the Policy to leaders of the faith community and added: "Having children does not give you immunity from arrest and prosecution." *See* Adam Edelman, *Sessions Cites Bible in Defense of Breaking up Families, Blames Migrant Parents* (June 14, 2018) *available at* https://www.nbcnews.com/politics/immigration/sessions-cites-bible-defense-breaking-families-blames-migrant-parents-n883296, attached hereto as Ex. 50.

124.    Public statements suggest that the Trump Administration intends to use the Policy as a negotiating tool to force congressional acquiescence to its proposed immigration legislation.  For example, President Trump tweeted on May 26, 2018 that Democrats should "end the horrible law that separates children from there [sic] parents once they cross the Border." The May 26, 2018 tweet is available at https://twitter.com/realDonaldTrump/status/1000375761604370434, and attached hereto as Ex. 51.

125.    On May 29, 2018 Senior Advisor to the President Stephen Miller confirmed that families are intentionally being traumatized for political gain: "If we were to have those [Republican sponsored] fixes in federal law, the migrant crisis emanating from Central America would largely be solved in a very short period of time," and "[f]amilies would then therefore be able to be kept together and could be sent home expeditiously and safely." *See* Ted Hesson, *White House's Miller Blames Democrats for border crisis,* Politico (May 29, 2018) *available* at

https://www.politico.com/story/2018/05/29/stephen-miller-democrats-border-574537, attached hereto as Ex. 52.

126.   On June 16, 2018, President Trump confirmed that he is using the Policy to push lawmakers to enact immigration legislation more in line with his own agenda: "Democrats can fix their forced family breakup at the Border by working with Republicans on new legislation." *See* Kate Sullivan, *Trump suggests separation of families at border is a negotiating tool* (June 16, 2018) *available at* https://www.cnn.com/2018/06/16/politics/trump-separation-families-negotiating-tool/index.html, attached hereto as Ex. 53.

127.   On June 18, 2018, President Trump complained that "[w]e have the worst immigration laws in the entire world.  Nobody has such sad, such bad and actually, in many cases, such horrible and tough – you see about child separation, you see what's going on there." *See* Ex. 19.  He suggested, "[i]f the Democrats would sit down, instead of obstructing, we could have something done very quickly, good for the children, good for the country, good for the world.  It could take place quickly."  *Id*.  But in the meantime, he stated, "The United States will not be a migrant camp and it will not be a refugee holding facility, it won't be."  *Id*.

128.   On June 18, 2018, in remarks before the National Sheriffs' Association, Attorney General Sessions also suggested that if lawmakers would simply acquiesce to President Trump's demands to fund a wall on the Southwestern border, Defendants would stop separating families: "We do not want to separate parents from their children," "[i]f we build the wall, if we pass legislation to end the lawlessness, we won't face these terrible choices."  *See* Ex. 20.

129.   DHS Secretary Nielsen also linked the Policy with demands the Administration has made on Congress:  "We are enforcing the laws passed by Congress, and we are doing all

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

38

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

that we can in the executive branch to protect our communities.  It is now time that Congress act

to fix our broken immigration system."  *See* Ex. 21.

**H.    Defendants' Family Separation Policy Targets Immigrant Families Based on Their National Origin**

130.    Defendants' Policy is directed only at "Southwest Border crossings" (*see* Ex. 13),

the majority of which consist of immigrants from Latin America.  Indeed, in its reports on recent

"Southwest Border Apprehensions," CBP only tracks family unit apprehensions for immigrants

from El Salvador, Guatemala, Honduras, and Mexico.  *See* U.S. Border Patrol Southwest Border

Apprehensions by Sector FY2018, *available at* https://www.cbp.gov/newsroom/stats/usbp-sw-

border-apprehensions, attached hereto as Ex. 54.  Defendants do not track whether the Policy is

impacting family unit migration from any other countries.

131.    Defendants' stated rationale for adopting the Policy—*i.e.*, to deter migration—is

ineffective and not a legitimate law enforcement tactic.  Rather than deter migration, the number

of families and unaccompanied children apprehended has steadily increased since Defendants

have implemented the Policy.  According to Defendants' own statistics, in March 2018, the

number of families apprehended at the Southwestern border was 37,385; in April 2018, 38,278;

and in May 2018, 40,344.  *See* Ex. 8.  The number of family units arriving at ports of entry

determined to be inadmissible also stayed relatively stable; in March 2018, the number was

5,162, in April, 5,445, and in May 4,718.  *Id*.

132.    Defendants also report that U.S. border agents made more than 50,000 arrests in

each of the months of March, April and May 2018—"an indication that escalating enforcement

tactics by the Trump Administration—including separating immigrant parents from their

children—has not had an immediate deterrent effect."  *See* Nick Miroff, *Border arrests exceed*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
39
ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

50,000 for third month in a row (June 6, 2018), available at https://www.washingtonpost.com/world/national-security/border-arrests-exceed-50000-for-third-month-in-a-row/2018/06/06/db6f15a6-680b-11e8-bea7-c8eb28bc52b1_story.html?utm_term=.72b8f43a7470, attached hereto as Ex. 55.

133.    On May 23, 2018, Steven Wagner, Acting Secretary of the Administration for Children and Families testified before a Senate committee, stating: "In FY 2017, 84 percent of [unaccompanied alien minors] referred to ORR came from Honduras, Guatemala, and El Salvador. To date in FY 2018, 93 percent of referred children come from those countries." A copy of the Wagner Statement is attached as Ex. 56.

134.    On April 6, 2018, President Trump signed a memorandum ordering agencies to "expeditiously end" the practice of "catch and release," a pejorative phrase that refers to the practice of allowing immigrants to be released into the community pending resolution of their immigration cases. *See* Jesse Byrnes, *Trump signs memo ordering end to 'catch and release'* *practices*, The Hill, *available at* http://thehill.com/homenews/administration/382054-trump-signs-memo-ordering-end-to-catch-and-release-practices, attached hereto as Ex. 57. For example, the memo orders DHS to submit a report within 45 days "detailing all measures that their respective departments have pursued or are pursuing to expeditiously end 'catch and release' practices." *Id.*  It also requests "a detailed list of all existing facilities, including military facilities, that could be used, modified, or repurposed to detain aliens for violations of immigration law" and specifically directs Attorney General Sessions and DHS Secretary Nielsen to identify any resources "that may be needed to expeditiously end 'catch and release' practices." *Id.*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

40

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

135.   The Policy—announced shortly thereafter—targets only the immigrants at the Southwestern border, the vast majority of whom are from Latin American countries.  *See* Ex. 12.

136.   In stark contrast to Defendants' Southwestern border actions, DHS' updated Northern Border Strategy, announced on June 12, 2018, aims "to facilitate the flow of lawful cross-border trade and travel, and strengthen cross-border community resilience."  Although the Northern Border Strategy is intended, in part, to "safeguard our northern border against terrorist and criminal threats," the strategy does not demand prosecution and family separation for all unauthorized entrants at the northern border of the United States.  *See* Department of Homeland Security     Northern     Border     Strategy     *available     at* https://www.dhs.gov/sites/default/files/publications/18_0612_PLCY_DHS-Northern-Border-Strategy.pdf, attached hereto as Ex. 58.

137.   The Policy is intended to target immigrants by their country of origin and is consistent with the demonstrated anti-Latina/o bias repeatedly shown by President Trump.

138.   Members of the Trump Administration repeatedly disparaged Latin American countries during the presidential campaign and during the Trump presidency.  When Mr. Trump announced his campaign at Trump Tower in June 2015, he announced: "When Mexico sends its people, they're not sending their best. . . . They're bringing drugs.  They're bringing crime.  They're rapists."  *See* Z. Byron Wolf, *Trump basically called Mexicans rapists again*, *available at* *https://www.cnn.com/2018/04/06/politics/trump-mexico-rapists/index.html*, attached hereto as Ex. 59.  In that same speech, he first proposed the idea of building a wall along the Southwestern border and "mak[ing] Mexico pay for that wall."

139.    During the first Republican presidential debate, then-candidate Trump again stated his distaste for immigrants from Mexico:  "The Mexican government is much smarter, much sharper, much more cunning.  And they send the bad ones over because they don't want to pay for them.  They don't want to take care of them."  *See* Andrew O'Reilly, *At GOP debate, Trump says 'stupid' U.S. leaders are being duped by Mexico*, Fox News (Aug. 6, 2015) *available at*   http://www.foxnews.com/politics/2015/08/06/at-republican-debate-trump-says-mexico-is-sending-criminals-because-us.html, attached hereto as Ex. 60.

140.    Soon after, on August 25, 2015, then-candidate Trump refused to answer questions about immigration posed by Jorge Ramos, a Mexican-American and the top news anchor at Univision, a Spanish-language news network.  After sending his bodyguard to physically remove Mr. Ramos, then-candidate Trump derisively told Mr. Ramos to "Go back to Univision."  *See* Phillip Rucker, *First, Trump booted Univision anchor Jorge Ramos out of his news conference.  Then things got    interesting*,    The    Washington    Post,    (Aug.    25,    2015)    *available    at* https://www.washingtonpost.com/news/post-politics/wp/2015/08/25/first-trump-booted-univision-anchor-jorge-ramos-out-of-his-news-conference-then-things-got-interesting/?utm_term=.33965c195aca, attached hereto as Ex. 61.

141.    In May 2016, then-candidate Trump referred to anti-Trump protestors who carried the Mexican flag as "criminals" and "thugs."  Donald Trump, "The protestors in New Mexico were thugs who were flying the Mexican Flag."  The May 25, 2016 tweet is attached hereto as Ex. 62.  Donald Trump, "Many of the thugs that attacked peaceful Trump supporters in San Jose were illegals." The June 4, 2016 tweet is attached hereto as Ex. 63.

142.     In June 2016, then-candidate Trump impugned the integrity of a federal judge presiding over a lawsuit against one of his businesses.  Trump commented that Judge Gonzalo Curiel's rulings against him "[H]as to do with perhaps that I'm very, very strong on the border. . . . Now, he is Hispanic, I believe.  He is a very hostile judge to me."  *See* Jose A. DelReal and Katie Zezima, *Trump's personal, racially tinged attacks on federal judge alarm legal experts*, The    Washington    Post    (June    1,    2016)    *available    at* https://www.washingtonpost.com/politics/2016/06/01/437ccae6-280b-11e6-a3c4-0724e8e24f3f_story.html?utm_term=.c82ec7177a13, attached hereto as Ex. 64.

143.     U.S. House Speaker Paul Ryan publicly rebuked his own party's presumptive presidential nominee, stating:  "Claiming a person can't do the job because of their race is sort of like the textbook definition of a racist comment.  I think that should be absolutely disavowed.  It's absolutely unacceptable."  *See* Tom Kertscher, *Donald Trump's racial comments about Hispanic judge in Trump University case*, Politifact (June 8, 2016) available at http://www.politifact.com/wisconsin/article/2016/jun/08/donald-trumps-racial-comments-about-judge-trump-un/, attached hereto as Ex. 65.

144.     In an interview with CBS News on June 5, 2016, then-candidate Trump reiterated his views, noting that "[Judge Curiel]'s a member of a club or society very strongly, pro-Mexican, which is all fine.  But I say he's got bias."  *See* CBS News, Transcript of Face the Nation (June 5, 2016) *available at* https://www.cbsnews.com/news/face-the-nation-transcripts-june-5-2016-trump/, attached hereto as Ex. 66.  Judge Curiel is a member of the San Diego Chapter of the La Raza Lawyers Association.  *See* Michelle Ye Hee Lee, *Trump Supporters' False Claim That Trump U Judge Is a Member of a Pro-immigrant Group*, The Washington Post (June 7, 2016)

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

43

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

*available      at      https://www.washingtonpost.com/news/fact-checker/wp/2016/06/07/trump-supporters-false-claim-that-trump-u-judge-is-a-member-of-a-pro-immigrant-group/?utm_term=.07b5b0148791*, attached hereto as Ex. 67.

145.   On August 21, 2015, two men urinated on a sleeping Latino man and then beat him with a metal pole.  They later told police that "Donald Trump was right; all these illegals need to be deported."  When asked about the incident, then-candidate Trump failed to condemn the men, instead describing them as "passionate."  *See* Adrian Walker, *'Passionate' Trump fans behind homeless      man's      beating?*      (Aug.      21,      2015)      *available      at* https://www.bostonglobe.com/metro/2015/08/20/after-two-brothers-allegedly-beat-homeless-man-one-them-admiringly-quote-donald-trump-deporting-illegals/I4NXR3Dr7litLi2NB4f9TN/story.html, attached hereto as Ex. 68.  Specifically, Trump stated, "[i]t would be a shame . . . I will say that people who are following me are very passionate.  They love this country and they want this country to be great again.  They are passionate."  *Id.*

146.   In October 2016, during a presidential debate, then-candidate Trump responded to a question about immigration by stating:  "We have some bad hombres here and we're going to get them out."  *See* Katie Zezima, *Trump on immigration: There are 'bad hombres' in the United      States*,      The      Washington      Post      (Aug.      30,      2017)      *available      at* https://www.washingtonpost.com/news/post-politics/wp/2016/10/19/trump-on-immigration-there-are-bad-hombres-in-the-united-states/?utm_term=.e24f12fed08a, attached hereto as Ex. 69.

147.   On January 27, 2017, newly-inaugurated President Trump and Mexico's President Peña Nieto discussed President Trump's proposal for a border wall over the phone.

44

During that transcribed conversation, President Trump again referred to "hombres" stating: "You have some pretty tough hombres in Mexico that you may need help with, and we are willing to help you with that big-league.  But they have to be knocked out and you have not done a good job of knocking them out."  *See* Greg Miller *et. al.*, *Full Transcripts of Trump's Calls with Mexico and Australia*, The Washington Post (Aug. 3, 2017) *available at* https://www.washingtonpost.com/world/national-security/you-cannot-say-that-to-the-press-trump-urged-mexican-president-to-end-his-public-defiance-on-border-wall-transcript-reveals/2017/08/03/0c2c0a4e-7610-11e7-8f39-eeb7d3a2d304_story.html?utm_term=.85f36aa7a876, attached hereto as Ex. 70.

148.    In August 2017, President Trump pardoned Joe Arpaio, the former Arizona sheriff who oversaw operations that consistently targeted and harassed Latino residents in Maricopa County.  After a thorough investigation, the U.S. Department of Justice issued a report in 2011 finding that Mr. Arpaio's office had committed numerous civil rights violations by, *inter alia*, conducting immigration sweeps that routinely violated the Fourth Amendment; detaining Latino residents based on fabricated charges; placing Spanish-speaking inmates in solitary confinement as punishment for not speaking English; refusing to accept requests for basic services written in Spanish; pressuring Latino inmates to sign deportation forms; and referring to Latino inmates as "wetback," "Mexican bitches," and "stupid Mexicans."  *See* Letter/Report, attached hereto as Ex. 71.  The report found that Mr. Arpaio's own actions "promoted a culture of bias in his organization and clearly communicated to his officers that biased policing would not only be tolerated, but encouraged."  *Id.*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

45

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

149.   A federal judge ruled twice that Mr. Arpaio's deputies unlawfully deprived detainees of food and medical care, and tortured inmates by locking them in unbearably hot solitary confinement cells in violation of the Eighth Amendment.  *See* Mark Joseph Stern, *White Nationalist Rule is Already Here* (Aug. 15, 2017), *available at* http://www.slate.com/news-and-politics/2018/06/district-court-judge-rules-that-trump-administration-child-separations-would-be-unconstitutional.html, attached hereto as Ex. 72.  The vast majority of individuals jailed by Mr. Arpaio's office were Latinos detained on suspicion of being undocumented.  *Id*.  In issuing the pardon, President Trump stated that Mr. Arpaio "has done a lot in the fight against illegal immigration.  He's a great American patriot and I hate to see what has happened to him."  *Id*.

150.   In February 2018, President Trump referred to nations such as El Salvador as "shithole countries" in a meeting with lawmakers, and suggested that the U.S. preferred to receive immigrants from countries like Norway.  *See* David Boddiger, *Trump falsely links Central American Immigrants to Drug Trafficking, Again* (Feb. 3, 2018) *available at* https://splinternews.com/trump-falsely-links-central-american-immigrants-to-drug-1822692216, attached hereto as Ex. 73.

151.   That same month, President Trump said of undocumented immigrants from Mexico and Central America, "You know they're bad.  They're pouring in from El Salvador, Honduras, Mexico, all over."  *See* Ex. 73.  He added, "These countries are not our friends."  *Id*.

152.   In April 2018, President Trump expressed repeated frustration with immigration numbers at the Southwestern border, and made a number of racially charged comments around the time he issued the memorandum directing DHS Secretary Nielsen and Attorney General

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

46

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

Sessions to end catch-and-release practices.  For example, President Trump again insinuated that Mexican immigrants are rapists.  *See* Ex. 59.

153.    President Trump also commented multiple times about a "caravan" of Central American immigrants aiming to reach the Southwestern border, many of whom planned on seeking asylum.  He stated that "Mexico has the absolute power to not let these large 'Caravans' of people enter our country."  *See* Edgard Garrido, *Migrant 'caravan' that angers Trump nears U.S.-Mexico border*, Reuters (April 23, 2018), *available at* https://www.reuters.com/article/us-usa-immigration-caravan/migrant-caravan-that-angers-trump-nears-u-s-mexico-border-idUSKBN1HU2ZB, attached hereto as Ex. 74.  The "caravans" are an apparent reference to a contingent of Latin American immigrants traveling through Mexico.  *Id*.  President Trump stated: "If it reaches our border, our laws are so weak and so pathetic . . . it's like we have no border."  *See* Klein, Starr, Shoichet, *Trump: 'We're going to be guarding our border with the military' until wall complete* (April 3, 2018) *available at* https://www.cnn.com/2018/04/03/politics/trump-border-wall-military/index.html, attached hereto as Ex. 75.  He added, "[t]he caravan makes me very sad that this could happen to the United States." *Id*.

154.    After expressing frustration regarding the "caravan," President Trump announced that he planned to dispatch U.S. troops to guard the U.S.-Mexico border because "we have very bad laws for our border" so "we're going to do some things militarily, until we can have a wall and proper security—we're going to be guarding our border with the military." *See* Ex. 75.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

47

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

155.    On June 19, 2018, President Trump tweeted that without strong border policies "illegal immigrants" would "pour into and infest our Country." *See* https://twitter.com/realDonaldTrump/status/1009071403918864385.

156.    On June 20, 2018, shortly after signing the Executive Order, at a rally in Duluth, Minnesota amid chants of "Build the Wall," President Trump repeated: "They're not sending their finest. We're sending them the hell back. That's what we're doing." *See* Katie Rogers and Jonathan Martin, *'We're Sending them the Hell Back,' Trump Says of Securing the County's Borders,* The New York Times (June 20, 2018) *available at* https://www.nytimes.com/2018/06/20/us/politics/trump-minnesota-rally.html, attached hereto as Ex. 76.

I.    **The Policy Has Been Widely Denounced by the United Nations, Professional Organizations, Public Figures, and Religious Leaders**

157.    The United Nations High Commissioner for Human Rights has called for an end to the Policy, saying, "The thought that any state would seek to deter parents by inflicting such abuse on children is unconscionable. I call on the United States to immediately end the practice of forcible separation of these children." *See* Stephanie Nebehay, *U.N. rights boss calls for an end to Trump's policy of family separation,* (June 18, 2018) *available at* https://www.reuters.com/article/us-un-rights/un-rights-boss-calls-for-end-to-trumps-policy-of-family-separation-idUSKBN1JE0NA, attached hereto as Ex. 77. A spokesperson for the U.N. also said that the Policy "amounts to arbitrary and unlawful interference in family life, and is a serious violation of the rights of the child." *See* Nick Cumming-Bruce, *Taking Migrant Children From Parents Is Illegal, U.N. Tells U.S.,* available at

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

48

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

https://www.nytimes.com/2018/06/05/world/americas/us-un-migrant-children-families.html,

attached hereto as Ex. 78.

158.    Numerous professional and religious organizations have also denounced the Policy.  On June 12, 2018, the American Bar Association (ABA) expressed "strong opposition" to Defendants' "separation of children from their parents when arriving at the southern border," calling the practice "unfair, inhumane, and, in the end, ineffective."  *See* ABA letter attached hereto as Ex. 79 (noting "that the primary purpose of the 'zero tolerance' Policy is to serve as a deterrent for migrant parents" at the Southwestern border, and "that family separation is not a collateral consequence of regular law enforcement" but "an explicitly intentional goal.").

159.    The Policy has also been widely condemned by the medical community. For example, the American Association of Pediatrics (AAP) recently denounced Defendants' Policy, writing:  "Separating children from their parents contradicts everything we stand for as pediatricians – protecting and promoting children's health. In fact, highly stressful experiences, like family separation, can cause irreparable harm, disrupting a child's brain architecture and affecting his or her health. This type of prolonged exposure to serious stress - known as toxic stress - can carry lifelong consequences for children."  *See* AAP Statement Opposing Separation of Mothers and Children at the Border (March 4, 2017), *available at* https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/immigrantmotherschildrenseparation.aspx, attached hereto as Ex. 80; *See also* AAP Statement Opposing Separation of Children and Parents at the Border (May 8, 2018), *available at* https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/StatementOpposingSeparationofChildrenandParents.aspx, attached hereto as Ex. 81; The American Academy of Family Physicians also released a statement in opposition, urging

the federal government to "withdraw its policy" and "instead, give priority to supporting families and protecting the health and well-being of the children within those families." *See* American Academy of Family Physicians Statement Regarding the United States Department of Homeland Security's Policy to Separate Children from Adult Caregivers available at https://www.aafp.org/dam/AAFP/documents/advocacy/prevention/equality/ST-DHSPolicyChild-AdultSeparation-061618.pdf, attached hereto as Ex. 82. Further, the American Medical Association "strongly urge[d]" the Defendants to withdraw the Policy, writing, "It is well known that childhood trauma and adverse childhood experiences created by inhumane treatment often create negative health impacts that can last an individual's entire lifespan."  See AMA Urges Administration to Withdraw "Zero Tolerance" Policy (June 20, 2018) *available at* https://www.ama-assn.org/ama-urges-administration-withdraw-zero-tolerance-policy, attached hereto as Ex. 83.

160.    On June 13, 2018, Daniel Cardinal DiNardo of the United States Conference of Catholic Bishops (USCCB) "join[ed] Bishop Joe Vásquez, Chairman of USCCB's Committee on Migration, in condemning the continued use of family separation at the U.S./Mexico border: "Families are the foundational element of our society" and separating parent from child "is not the answer" to "protecting our borders."  *See* A Statement from Daniel Cardinal DiNardo, United States Conference of Catholic Bishops, (June 13, 2018) *available at* http://www.usccb.org/news/2018/18-098.cfm, attached hereto as Ex. 84.

161.    Likewise, the Southern Baptist Convention recently passed a resolution affirming that immigrants be treated "with the same respect and dignity as those native born," and emphasizing "maintaining the priority of family unity."  *See* Sasha Ingber, *Faith Leaders Oppose*

*Trump's Immigration Policy of Separating Children From Parents*, *available at* https://www.npr.org/2018/06/16/620651574/faith-leaders-oppose-trumps-immigration-policy-of-separating-children-from-paren, attached hereto as Ex. 85.

162.   Prominent figures from both political parties have denounced the Policy. For example, on June 17, 2018, former First Lady Laura Bush wrote: "Our government should not be in the business of warehousing children in converted box stores or making plans to place them in tent cities in the desert outside of El Paso. These images are eerily reminiscent of the Japanese American internment camps of World War II, now considered to have been one of the most shameful episodes in U.S. history." *See* Laura Bush: *Separating Children from Their Parents at the Border Breaks my Heart*, The Washington Post, *available at* https://www.washingtonpost.com/opinions/laura-bush-separating-children-from-their-parents-at-the-border-breaks-my-heart/2018/06/17/f2df517a-7287-11e8-9780-b1dd6a09b549_story.html?utm_term=.84b533c697a8, attached hereto as Ex. 86.  Likewise, Jeb Bush, former Florida Governor, recently stated:  "Children shouldn't be used as a negotiating tool."  The June 18, 2018 tweet is attached hereto as Ex. 87.

163.   At least one federal court has found that Defendants' practice of separating immigrant families "arbitrarily tears at the sacred bond between parent and child" and "is brutal, offensive, and fails to comport with traditional notions of fair play and decency." *Ms. L. v. U.S Immigration & Customs Enf't*, No. 18-cv-0428 DMS, 2018 WL 2725736, at *12 (S.D. Cal. June 6, 2018).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

51

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

### J.    Defendants' Policy Harms the States' Sovereign Interests

164.    Defendants' Policy and subsequent actions harm the States' sovereign interests by interfering with their licensing authority and rendering the States unable to honor their own policies favoring family unity.

165.    Even for residential facilities that are federally funded, States have sovereign responsibility for the licensing, inspection, and monitoring of out-of-home care providers (i.e., providers who care for children away from their parents). The States conduct periodic licensing monitoring visits to these facilities, meeting with the staff and children in their care, to ensure that these facilities meet minimum safety standards, including background check approvals, facility safety standards, and ensuring the facilities provide necessary and appropriate care to the children.

166.    For example, in Washington State, any agency that cares for children on a 24-hour basis away from their parents must be licensed.  *See, e.g.* RCW 74.15.020, 74.15.090. Under RCW 74.15.030(7) and .080, the state's department of social and health services has the authority and duty to access and inspect the facility's records for the purpose of determining whether or not there is compliance with state licensing requirements. *See also* ch. 388-145 WAC (the licensing requirements for group homes and youth shelters). These licensing requirements apply to all private facilities, even those operated by a private agency contracting with the federal government.

167.    In the Commonwealth of Massachusetts, no "agency or institution of the federal government" may operate a "[foster care] placement agency, group care facility, or temporary shelter facility" for children unless licensed by the Department of Early Education and Care

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

52

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

(EEC). Mass. Gen. Laws Ch. 15D, § 1A, 6.  EEC "may, at any reasonable time, visit and inspect any facility" subject to such licensure. *Id,* § 9.

168.    Likewise, New York State has licensing and oversight responsibilities over the facilities where immigrant children who are separated from their parents are placed. Specifically, the Bureau of Child Welfare and Community Services ("CWCS") of the New York State Office of Children and Family Services ("OCFS") has regulatory, licensing, inspection and supervisory authority over residential programs that care for foster children. N.Y. Soc. Serv. Law §§ 460-b, 460-c, 462-a. OCFS issues operating certificates to non-profit agencies in New York State that provide residential care in a congregate setting to UACs, including the children who have been separated from their parents at the border. OCFS, as the licensing state agency of child residential programs in New York, retains the authority to conduct building, equipment, fire and safety inspections of these facilities. Also, OCFS has the statutory authority to establish regulatory standards for the certification or approval of foster homes, and the authority of an agency to certify or approve foster homes. N.Y. Soc. Serv. Law §§ 378, 460-a, N.Y. Not-for-Profit Corp. Law § 404(b). Provider agencies in New York that contract with ORR place UACs in foster homes that the agency has approved or certified pursuant to this authority from the state.

169.    In the State of North Carolina, "[n]oTo s person shall operate, establish or provide foster care for children or receive and place children in residential care facilities, family foster homes, or adoptive homes without first applying for a licensure to the Department" of Health and Human Services]. N.C. Gen. Stat. § 131D-10.3.  In addition to other powers and duties, the North Carolina Department of Health and Human Services also has the authority to "[i]nspect

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

53

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

facilities and obtain records, documents, and other information necessary to determine compliance with" North Carolina law and regulations. *Id.* § 131D-10.6(6).

170.     Likewise, Delaware licenses, registers, and monitors all residential and nonresidential childcare facilities including . . .  child placement and adoption agencies . . ." 29 *Del. C.* § 9003 (7).  Delaware's monitoring scheme includes the right of entrance, inspection, and access to the papers of childcare facilities operating within Delaware and entities that operate within Delaware and place children in other states. 31 *Del. C.* §§ 343, 344.   In certain circumstances, a violation of Delaware's childcare licensing requirements may constitute a criminal act. 31 *Del. C.* § 345.

171.     Other States have similar licensing authority and statutory regimes. These provisions are intended to protect children from substandard housing and care, and are essential to the wellbeing of minors placed in facilities located in the States.

172.     The United States' *Ex Parte* Application for relief from the *Flores* Settlement is a frontal attack on that sovereign interest.  That request seeks rescission of *Flores's* protections and a "determin[ation] that the Agreement's state licensure requirement does not apply to ICE family residential facilities." The United States has thus sought to extinguish state licensing powers over federally contracted out-of-home care providers, leaving those facilities wholly unregulated at the local level.  The government's attempt to modify the *Flores* settlement terms by removing States' licensing authority and jurisdiction interferes with the States' sovereign powers.

173.     Moreover, each of the States is required to respect family integrity absent a finding that a parent is unfit or unavailable to care for a child. Here, the federal government has

intentionally separated parents from children and is leaving it to the States' court systems to establish alternative guardianships for them, or relying on state-licensed foster care facilities to care for the children, rendering the States unable to enforce the legal mandates and public policies that require keeping families together unless the best interests of the child dictate otherwise.

174. For example, the **State of Washington** has a longstanding public policy affirming the importance of family integrity and the primacy of the parent-child relationship. Wash. Rev. Code § 13.34.020 "declares that the family unit is a fundamental resource of American life which should be nurtured" and mandates "that the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized." Wash. Rev. Code § 26.09.002 likewise "recognizes the fundamental importance of the parent-child relationship to the welfare of the child" and requires "that the relationship between the child and each parent [] be fostered unless inconsistent with the child's best interests." Similarly, Washington's child abuse and neglect law, contained in chapter 26.44 RCW, enshrines the state's policy that "[t]he bond between a child and his or her parent . . . is of paramount importance[.]" RCW 26.44.010. Under Washington law, the state is justified to intervene in that relationship only when a child is deprived of the right to conditions of minimal nurture, health, and safety.

175. Washington also has recognized that children in government custody have substantive due process rights under the U.S. Constitution. *See Braam v State of Washington*, 150 Wn.2d 689, 81 P.3d 851 (2003) (foster children possess substantive due process rights). While these rights are not coextensive with parental rights in every context, Washington recognizes a child's constitutional rights "to be free from unreasonable risk of harm, including a

risk flowing from the lack of basic services, and a right to reasonable safety." *Id.* The intentional exposure of a child to an unreasonable risk of harm, including physical or mental injury, violates these rights.

176.    Washington has also declared that practices that discriminate against any of its inhabitants because of race, creed, color, or national origin are matters of public concern that threaten the rights and proper privileges of the State and harm the public welfare, health, and peace of the people. *See* Wash. Rev. Code § 49.60.010.

177.    **The Commonwealth of Massachusetts** has long committed itself to the promotion and safeguarding of the family unit.  Massachusetts law, for example, notes that "the family is the best source of child rearing," 110 C.M.R. 1.02, and holds that "the policy of this commonwealth [is] to direct its efforts, first, to the strengthening and encouragement of family life for the care and protection of children."  Mass. Gen. Laws c. 119, § 1.  Normally, therefore, "the interest of the child is best served by a stable, continuous environment with his or her own family." *Adoption of Frederick*, 405 Mass. 1, 4 (1989).  As a result, the Commonwealth allows "state intervention into a family unit [to] be used only when it is clearly needed to protect a child." 110 C.M.R. 1.02.

178.    The Commonwealth of Massachusetts has also long protected the civil rights and liberties of its residents, outlawing practices that harm or discriminate individuals based on race, color, religious creed, or national origin. *See, e.g.,* Mass. Gen. Laws c. 151B, § 4; c. 151C, § 2; c. 76, § 5; and c. 272, § 98.

179.    **The State of Oregon** has statutorily codified a number of deeply-rooted public concerns that are grossly undermined by defendants' unlawful actions, thus harming Oregon's

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

56

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

sovereign interests.  Oregon recognizes the intrinsic value of family relationships and prioritizes protecting them.  For example, Or. Rev. Stat. § 419B.007 states the policy of Oregon is to "preserve family life" by "stabilizing the family."  In addition, Oregon has declared there is a "strong preference" that children live "with their own families." Or. Rev. Stat. § 419B.090(5). Similarly, custody determinations are based on the best interest of the child, including "[t]he emotional ties between the child and other family members" as well as "[t]he desirability of continuing an existing relationship."  *Id*.  Oregon thus places great value on the parent-child relationship, on "interaction, companionship, interplay and mutuality, that fulfilled the child's psychological needs for a parent" in addition to a child's physical needs. Or. Rev. Stat. § 109.119 (10)(a).

180.    Oregon further recognizes that children are individuals who have legal rights. Among those rights are "freedom from…emotional abuse or exploitation."  Or. Rev. Stat. § 419B.090(1).  To that end, Oregon has enacted laws and policies to protect children's rights.  For example, "[i]t is the policy of the State of Oregon to safeguard and promote each child's right to safety, stability and well-being and to safeguard and promote each child's relationships with parents, siblings, grandparents, other relatives and adults with whom a child develops healthy emotional attachments."  Or. Rev. Stat. § 419B.090(3).

181.    Moreover, Oregon acknowledges the importance of due process rights afforded to parents facing "interference" with their right to "direct the upbringing of their children" because the policy of Oregon is to "guard the liberty interest of parents protected by the Fourteenth Amendment to the United States Constitution and to protect the rights and interests of children."  Or. Rev. Stat. § 419B.090(4).  Oregon requires appointment of legal counsel for

parents whenever due process so requires, and courts must consider "[t]he duration of and degree of invasiveness of the interference with the parent-child relationship" that could result from legal proceedings as well as the "effects" the proceedings may have on later proceedings or events that may interfere with the parent-child relationship.  Or. Rev. Stat. § 419B.205(1).  Pursuant to Or. Rev. Stat. § 419B.165, a child taken into custody must be released to a parent unless a court order prevents it or there is probable cause to believe the child may be endangered by immediate release.

182.    When parents and children are separated, Oregon prioritizes a child's existing relationships in considering placement alternatives.  For example, "there shall be a preference given to placement of the child or ward with relatives and persons who have a caregiver relationship with the child." Or. Rev. Stat. § 419B.192(1).  Oregon law also recognizes the value of sibling relationships and requires state social agencies to make "diligent efforts" to keep siblings together when they have been separated from their parents.  Or. Rev. Stat. § 419B.192(2).

183.    Children separated from families in Oregon are entitled to participate in age and developmentally appropriate activities.  Specifically, this includes activities that are reflective of and promote "development of cognitive, emotional, physical and behavioral capacities that are typical for an age or age group."   Or. Rev. Stat. § 419B.194(a)(A). Moreover, Oregon requires appropriate activities for a specific child separated from family "based on the developmental stages attained by the child." Or. Rev. Stat. § 419B.194(a)(B).  In making these determinations, the "reasonable and prudent parent standard" applies.  Or. Rev. Stat. § 419B.194(b).  The standard is characterized by "careful and sensible parental decisions that

maintain the health, safety and best interests of a child or ward while encouraging the emotional and developmental growth of the child or ward…" *Id.*

184.     Oregon has also codified anti-discrimination policies that protect all Oregon residents from disparate treatment based on race, color, religion, sex, sexual orientation, national origin, marital status or age.  Or. Rev. Stat. § 659A.403(1).  Further, it is unlawful for any person to deny another full and equal accommodations, advantages, facilities, and privileges of any place of public accommodation.  Or. Rev. Stat. § 659A.403(3).

185.     The **State of California** similarly has a long history of preserving the integrity of the family unit and the parent-child relationship.   For example, California Welfare and Institutions Code section 11205 declares "the family unit is of fundamental importance to society in nurturing its members," and states "[e]ach family has the right and responsibility to provide sufficient support and protection of its children." California's policy to "preserve and strengthen a child's family ties whenever possible" and to remove a child from the custody of his or her parents "only when necessary for his or her welfare or for the safety and protection of the public" is delineated in California Welfare and Institution Code section 201, subdivision (a), and section 16000, subdivision (a).

186.     California's interests in protecting the physical, emotional and psychological health of minors and in preserving and fostering the parent-child relationship "are extremely important interests that rise to the level of 'compelling interests' for purposes of constitutional analysis." *American Academy of Pediatrics v. Lungren*, 16 Cal. 4th 307, 348 (1997).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

59

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

187.     It is California policy that social services programs must prevent or reduce inappropriate institutional care by providing community-based care, home-based care, or other forms of less intensive care. Cal. Welf. & Inst. Code § 13003(4).

188.     In California, per statute, any out-of-home placement of children must be in the "least restrictive family setting," and should promote "normal childhood experiences that [are] suited to meet the child's or youth's individual needs." Cal. Welf. & Inst. Code § 16000(a).

189.     California also has robust constitutional and statutory protections against discrimination. For example, the California Constitution protects against discrimination on the basis of race, creed, color or national or ethnic origin. Cal. Const. art. I, § 8. California law also protects against discrimination on the basis of ancestry, citizenship, primary language, and immigration status. Cal. Civ. Code § 51. California is also committed to developing strategic polices and plans regarding health issues affecting immigrants and refugees. Cal. Health & Saf. Code § 131019.5.

190.     **The State of New Mexico**'s laws embody a public policy dedicated to the preservation of the family unit. NMSA 1978, Sec. 32A-1-3 (2009). To "the maximum extent possible, children in New Mexico shall be reared as members of a family unit." *Id. See also* NMSA 1978, Section 40-15-3 (2005) ("It is the policy of the state that its laws and programs shall: support intact, functional families and promote each family's ability and responsibility to raise its children; strengthen families in crisis and at risk of losing their children, so that children can remain safely in their own homes when their homes are safe environments and in their communities…help halt the breakup of the nuclear family[.]"). Further, New Mexico's Family Preservation Act clearly indicates the purpose of the Act is to "confirm the state's policy of

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

60

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

support for the family" as a "institution" and that the Act is "intended to serve as a benchmark against which other legislation may be measured to assess whether it furthers the goals of preserving and enhancing families in New Mexico." NMSA 1978, Section 40-15-2 (2005). New Mexico case law affirms there is a clearly established right to familial integrity embodied in the Fourteenth Amendment. *Oldfield v. Benavidez*, 1994-NMSC-006, ¶ 14, 116 N.M. 785.

191.    The New Mexico Children's Code also ensures that New Mexican parents have substantial due process protections prior to losing the right to care of and custody of their own children. *See* NMSA 1978, Section 32A-4-28. The sole fact that a parent is incarcerated is not a basis for terminating parental rights. *Id.* A parent's fundamental liberty interest in the care, custody, and management of their children is well established. *See State ex rel. Children, Youth & Families Dep't v. Mafin M.*, 2003–NMSC–015, ¶ 18, 133 N.M. 827, 70 P.3d 1266; *State ex rel. Children, Youth & Families Dep't v. Joe R.*, 1997–NMSC–038, ¶ 29, 123 N.M. 711, 945 P.2d 76. "[T]he parent-child relationship is one of basic importance in our society ... sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *State ex rel. Children, Youth & Families Dep't v. Anne McD.*, 2000–NMCA–020, ¶ 22, 128 N.M. 618, 995 P.2d 1060 (alteration in original) (internal quotation marks and citation omitted). Thus, we have recognized that process is due when a proceeding affects or interferes with the parent-child relationship. *State ex rel. Children, Youth & Families Dep't v. Stella P.*, 1999–NMCA–100, ¶ 14, 127 N.M. 699, 986 P.2d 495; *State ex rel. Children, Youth & Families Dep't v. Rosa R.*, 1999–NMCA–141, ¶ 13, 128 N.M. 304, 992 P.2d 317 (recognizing that constitutionally adequate procedures must be in place before the State can investigate or terminate the parent-child relationship).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

61

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

192.   New Mexico custody determinations are also driven by the best interests of the child. *See Schuermann v. Schuermann*, 1980-NMSC-027, ¶ 6, 94 N.M. 81 ("In any proceeding involving custody, the courts' primary concern and consideration must be for the child's best interests.") (citing NMSA 1978, Section 40-4-9(A) (1977)). "In any case in which a judgment or decree will be entered awarding the custody of a minor, the district court shall, if the minor is under the age of fourteen, determine custody in accordance with the best interests of the child." *Id.*

193.   The laws of the State of New Mexico dictate that the best interests of a child, if not properly within the custody of their parents, then lies in the custody of other family members. This policy is not only rooted in the best interests of children generally, but is designed to protect both family unity as well as unique cultural heritage. Under the State's Kinship Guardianship Act, family members have a protected interest in raising a child when neither parent is available. NMSA 1978, Section 40-10B-2 (2001).  Where the United States' policy of family separation does not provide a meaningful opportunity for children who are separated from their parents to unite with other members of their family, it is direct contravention of the laws of this state and the policy principles that underlying those laws. Further, because "a kinship guardian possesses the same legal rights and responsibilities of a biological parent," members of separated children's families should be afforded the opportunity to seek custody of their relatives.  *State ex rel. Children, Youth & Families Dep't v. Djamila B.*, 2015-NMSC-003. To reiterate, any policy or practice of the federal government that would serve to deny or otherwise disrupt any family member's ability to take custody of their child relative is an affront to the laws of a sovereign state and the views of the people therein.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

62

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

194.    New Mexico's Children's Code is structured to promote child safety, recognize cultural diversity, and to ensure that civil and criminal justice systems are coordinated.  NMSA 1978, Section 32A-1-3 (2009). All children are to be provided services sensitive to their cultural needs.  *Id.*;  *see also* NMSA 1978, Section 32A-18-1 (2009) (requiring cross-cultural training for all caregivers and service-providers under the children's code). Families seeking asylum do not face allegations of abuse, neglect, or a crime that allows children to be removed from the custody of their parents under New Mexico law. In New Mexico, the mental and physical wellbeing of children is paramount. NMSA 1978, Section 32A-1-3(A)(2009). Children removed from the home in New Mexico because of a parent's criminal behavior are afforded due process and representation of counsel in every proceeding other than probation.  *State v. Doe*, 1977-NMCA-234, 91 N.M. 232, 572 P.2d 960,cert. denied 91 N.M. 249, 572 P.2d 1257 (1978). *See also* NMSA 1978, § 32A–1–7.  *State ex rel. Children, Youth & Families Dept. v. Lilli L.*, 1996-NMCA-014, ¶ 14, 121 N.M. 376."[F]ailure to appoint either counsel or a guardian ad litem to protect the interests of a minor may constitute a denial of due process, thereby invalidating such proceedings."

195.    The **State of New Jersey** has a longstanding public policy confirming the importance of family integrity and the primacy of the parent-child relationship. New Jersey law declares that "the preservation and strengthening of family life is a matter of public concern as being in the interest of the general welfare." N.J. Stat. Ann. § 30:4C-1(a).  It also includes a mandate "to make reasonable efforts … to preserve the family in order to prevent the need for removing the child" from his or her parents, and to return the child safely to his or her parents if possible.  N.J. Stat. Ann. § 30:4C-11.1.  In determining whether removal of a child is required,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

63

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

"the health and safety of the child shall be of paramount concern to the court."  N.J. Stat. Ann. § 30:4C-11.2.  Moreover, any proceeding which may result in even a temporary loss of custody of a child implicates a parent's state constitutional right to appointed counsel.  *In re Guardianship of Dotson*, 72 N.J. 112, 123 (1976).

196.    New Jersey has also long protected the civil rights and civil liberties of its residents, including by prohibiting discrimination on the basis of race, creed, color, or national origin.  *See, e.g.*, N.J. Stat. Ann. § 10:5-12.

197.    The **State of Rhode Island** has a longstanding public policy affirming the importance of family integrity and the primacy of the parent-child relationship.  For example, R.I. Gen. Law § 42-72-2 (1979) declares that "the state has a basic obligation to promote, safeguard and protect the social well-being and development of the children of the state through a comprehensive program providing for" such items as "the strengthening of the family unit" and "making the home safe for children by enhancing the parental capacity for good child care and services to children and their families to prevent the unnecessary removal of children from their homes".  *See* R.I. Gen. Laws § 42-72-2 (1979).

198.    Rhode Island has declared that practices that discriminate against any of its persons within the state on the basis of race, color, religion, sex, disability, age, or country of ancestral origin are matters of public concern that threaten the rights and proper privileges of the State and harm the public welfare, health, and peace of the people.  *See*. R.I. Gen. Laws § 42-112-1 (1990).

199.    The **State of Vermont** has a fundamental, sovereign interest in the welfare of children and families.  Vermont has the authority and obligation to intervene where children are

"without proper parental care or subsistence, education, medical, or other care necessary for [their] well-being." 33 V.S.A. § 5102(3)(B).  That duty includes bearing "such expenses for the proper care, maintenance, and education of a child, including the expenses of medical, surgical, or psychiatric examination or treatment" as deemed necessary in connection with juvenile care proceedings.  33 V.S.A. § 5116(a).  Vermont authorities owe a corollary duty "to preserve the family and to separate a child from his or her parents only when necessary to protect the child from serious harm or in the interests of public safety."  33 V.S.A. § 5101(a)(3).

200.    Where children require foster care, Vermont strives to ensure their placement in a healthy, loving environment through strict licensing requirements. *See* 33 V.S.A. § 4905; Vt. Admin. Code § 12-3-501. The Vermont Department of Children and Families closely regulates not only the child's physical environment but also the individuals who may be entrusted to care for the child. *See* Vt. Admin. Code §§ 12-3-501:20; 12-3-501:40.

201.    Vermont has long protected its residents from discrimination on the basis of race, color, and national origin — irrespective of their citizenship status.  *See, e.g.,* 9 V.S.A. §§ 4502-4503 (public accommodations and housing); 21 V.S.A § 495 (employment); and 13 V.S.A. § 1455 (bias-motivated crimes).   Vermont continues to reaffirm this commitment through legislation.  *See, e.g.,* Vermont Act 5 (S. 79) (March 28, 2017) ("In Vermont, we celebrate the rich cultural heritage and diversity of our residents. . . .  All Vermont residents should be free from discrimination on the basis of their sex, sexual orientation, gender identity, marital status, race, color, religion, national origin, immigration status, age, or disability.").

202.    The **State of Minnesota**'s public policy also affirms the importance of family integrity.  For example, Minnesota Statutes section 252.32 declares that it is the State's policy

"that all children are entitled to live in families that offer safe, nurturing, permanent relationships, and that public services be directed toward preventing the unnecessary separation of children from their families."  Minn. Stat. § 252.32, subd. 1.  In addition, Minnesota Statutes section 260C.001 recognizes the importance of "preserv[ing] and strengthen[ing] the child's family ties whenever possible and in the child's best interests . . . ."  Minn. Stat. § 260C.001, subd. 1(b)(3).

203.    Minnesota has also declared that the State's public policy is that persons be free from discrimination in employment, housing and real property, public accommodations, public services, and education on the basis of, among other things, race, color, creed, or national origin. Minn. Stat. § 363A.02, subd. 1(a).  "Such discrimination threatens the rights and privileges of the inhabitants of this state and menaces the institutions and foundations of democracy." *Id.* subd. 1(b).

204.    The **State of Iowa** has a longstanding policy that favors the protection of the family unit.  The State of Iowa only separates parents and children in the most exceptional of circumstances because when we do so we "inflict[] a unique deprivation of a constitutionally protected liberty interest[.]"*In re M.S.*, 889 N.W.2d 675, 677-78 (Iowa Ct. App. 2016).  "An innocent man can be set free.  The landowner can be justly compensated.  The childless parent has no recourse." *Id.*  To that end, Iowa's child welfare system strives to ensure that every child receives the care, guidance, and control she needs in her own home, with her own parents, whenever possible.  Iowa Code § 232.1.  "[T]he custody, care, and nurture of the child reside first in the parents" and it is presumed to be in a child's best interest to remain in parental custody. *In re M.S.*, 889 N.W.2d 675, 677-78 (Iowa Ct. App. 2016); *In re N.M.*, 528 N.W.2d 94, 96 (Iowa 1995).  Under Iowa law, a family cannot be broken up simply upon proof that a parent has

"engaged in immoral or illegal conduct[.]" *In re M.S.*, 889 N.W.2d 675, 677-78 (Iowa Ct. App. 2016). "Indeed, due process would be violated if the State 'attempt[ed] to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness'" as a parent. *Id.*

205.    The State of Iowa prohibits discrimination based on race, creed, color, national origin, or religion. *See* Iowa Code chapter 216.

206.    The **State of Illinois** has a longstanding policy recognizing the importance of maintaining the family relationship.

207.    The Illinois Juvenile Court Act of 1987, for example, declares that the State should "secure for each minor subject hereto such care and guidance, preferably in his or her own home, as will serve the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community; [and] preserve and strengthen the minor's family ties whenever possible, removing him or her from the custody of his or her parents only when his or her safety or welfare or the protection of the public cannot be adequately safeguarded without removal." 705 ILCS 405/1-2.

208.    The Illinois Abused and Neglected Child Reporting Act likewise instructs the Department of Children and Family Services to "protect the health, safety, and best interests of the child in all situations in which the child is vulnerable to child abuse or neglect, offer protective services in order to prevent any further harm to the child and to other children in the same environment or family, stabilize the home environment, and preserve family life whenever possible." 325 ILCS 5/2(a).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

67

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

209. In addition, the State of Illinois has a longstanding policy affirming the importance of assisting the state's immigrant population.

210. The Illinois Attorney General Act declares that "[i]t is imperative that State government is aware of the needs of the State's immigrant community and sensitive to the barriers that may prevent them from seeking and obtaining services." 15 ILCS 205/6.6(a). The Act further directs the Office of the Illinois Attorney General to "assist immigrants by increasing accessibility to the Office and providing outreach services to the community, which will serve to educate immigrants as to their rights and responsibilities as residents of the State." *Id.*

211. **New York State** has a strong interest in family unity. It is the long-established policy and practice of the State to prioritize keeping a child with his or her parent or parents. OCFS operates under the principal that families staying together is the most desired outcome for children. Children are some of the most vulnerable residents in New York State and they best develop their unique potential in a caring and healthy family environment with their birth parents or other relatives. The State's first obligation is to help the family with services to prevent its break-up, or to quickly reunite the family if the child has already been separated from his parents. That is because the child's need for a normal family life will usually best be met with his or her birth parent, and parents are entitled to bring up their own children unless the best interests of the child would thereby be endangered. N.Y. Soc. Serv. Law § 384-b(1); N.Y. Exec. Law § 990.

212. New York State has a strong interest in promulgating and operating under non-discriminatory policies. In fact, the legislature has declared that non-discrimination is a guiding principal of policy in New York State. New York's legislature has found that "the state has the responsibility to act to assure that every individual within this state is afforded an equal

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

68

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

opportunity to enjoy a full and productive life and that the failure to provide such equal opportunity, whether because of discrimination, prejudice, intolerance or inadequate education, training, housing or health care not only threatens the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants." N.Y. Exec. Law § 290. Thus, it is unlawful to discriminate against any person in New York State on the basis of age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, domestic violence victim status, gender identity, transgender status, and gender dysphoria. N.Y. Exec. Law § 296; 9 N.Y. Comp. Codes R. & Regs. Tit. 9 § 466.13(c)(2)-(3).

213.    This principal of non-discrimination is also applied at the agency level. For example, OCFS promulgates regulatory standards that expressly prohibit discrimination or harassment of adults or children involved in child welfare programs and services based on race, creed, color, national origin, age, sex, religion, sexual orientation, gender identity or expression, marital status or disability. N.Y. Comp. Codes R. & Regs. Tit. 10 §§ 421.6, 423.4, 441.24

214.    The **State of Maryland** has longstanding policies affirming the importance of family integrity and of protecting the wellbeing of children to the greatest extent possible. Maryland's Legislature has declared that "it is the policy of this State to promote family stability, [and] to preserve family unity[.]" Md. Code Ann., Fam. Law § 4-401(1). Maryland's statute governing custody proceedings for children in need of assistance is intended to "conserve and strengthen the child's family ties and to separate a child from the child's parents only when necessary for the child's welfare," and to "provide for the care,

protection, safety, and mental and physical development of" children.  Md. Code Ann., Cts. & Jud. Proc. § 3-802(a)(3), (1).  And under state law, various social programs must be administered to "preserve family unity" or "preserv[e] family integrity."  Md. Code Ann., Health-Gen. § 7-702(b); Code of Md. Regs. 07.02.01.01; Code of Md. Regs. 11.02.13.01.

215.    Maryland also has a public policy prohibiting discrimination against any of its inhabitants because of their race, age, color, creed, or national origin, and has enacted anti-discrimination laws in a wide array of contexts, ranging from public accommodations, *see* Md. Code Ann., State Gov't §§ 20-304, to employment, *id.* § 20-602, to residential housing, *id.* § 20-702.  Maryland law also prohibits any person from retaliating against any person because he or she has exercised or enjoyed the rights granted or protected by Maryland's anti-discrimination laws, *id.* § 20-708(2).

216.    It is the policy of the State of Maryland, "in the exercise of its police power for the protection of the public safety, public health, and general welfare, for the maintenance of business and good government, and for the promotion of the State's trade, commerce, and manufacturers," to "assure all people equal opportunity in receiving employment" regardless of race, color, religion, age, ancestry, or national origin.  Md. Code Ann., State Gov't § 20-602.

217.    The **Commonwealth of Pennsylvania** has a longstanding public policy recognizing the significance of family integrity and the parent-child relationship.  For example, Pennsylvania law declares that "[t]he family is the basic institution in society in which our children's sense of self-esteem and positive self-image are developed and nurtured" and that "[t]hese feelings and values are essential to a healthy, productive and independent life during adulthood."  62 P.S. § 2172(a)(1). Similarly, Pennsylvania's Domestic Relations Act states that

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

70

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

"[t]he family is the basic unit in society and the protection and preservation of the family is of paramount public concern." 23 Pa.C.S. § 3102(a).

218.    Pennsylvania law further recognizes that children who are separated from their parents are deprived "of the unique bond which exists in the parent-child relationship, leaving emotional scars on such children which may never fully heal" because "children are better off emotionally when their needs can be met by their biological parents." 62 P.S. § 2172(a). This reality is recognized throughout Pennsylvania law. For instance, the Commonwealth's Juvenile Act seeks to "preserve the unity of the family whenever possible" and to separate "the child from parents only when necessary for his welfare, safety or health or in the interests of public safety." 42 Pa.C.S. § 6301(b).

219.    To separate a child from her family is among the most intrusive acts that the government can initiate.  North Carolina has long committed itself to separating families only as a last resort, and only after exhausting other options, and taking all appropriate measures to ensure the safety of children.  In North Carolina, protection of the family unit is guaranteed not only by the U.S. Constitution but also by North Carolina law.  *Adams v. Tessner*, 354 N.C. 57, 60 (N.C. 2001).  As a result, taking a child away from its parent requires "a showing that the parent is unfit to have custody."  *Id.* at 62.

220.    Parents of children in North Carolina have due process rights that require "reasonable efforts [to be] made to prevent or eliminate the need for removal of the child" from her parents, but only to allow removal when "necessary to protect the safety and health of the child."  *In re Dula*, 143 N.C. App. 16, 17 (N.C. Ct. App. 2001).  A parent's "right to retain custody of their child and to determine the care and supervision suitable for their child is a

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

71

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

fundamental liberty interest which warrants due process protection." *In re Montgomery*, 311 N.C. 101, 106 (N.C. 1984).

221.    The people of North Carolina, in their Declaration of Rights, have stated that "[n]o person . . . shall be subjected to discrimination by the State because of race, color, religion, or national origin."   N.C. Const. Art. I, § 19.   The State of North Carolina reiterates this commitment in numerous statutes that make it unlawful to discriminate on the basis of, *inter alia*, race, color, religion, or national origin. *See, e.g.*, N.C. Gen. Stat. §§ 75B-2, 41A-4, 95-151, 126-16, 143-422.2.

222.    In the **State of Delaware**, "parents have the primary responsibility for meeting the needs of their children and the State has an obligation to help them discharge this responsibility  . . ." 29 *Del. C.* § 9001.   Delaware law explicitly declares that "the State has a basic obligation to promote family stability and preserve the family as a unit...." *Id.*   Delaware law also recognizes that preservation of the family as a unit is "fundamental to the maintenance of a stable, democratic society." 10 *Del. C.* § 902(a).   To that end, the state has directed its courts, when possible consistent with the safety of family members, to ensure that homes "remain unbroken." *Id.*   The express statutory child welfare policy of the State is to "serve to advance the interests and secure the safety of the child, while preserving the family unit whenever the safety of the child is not jeopardized." 16 *Del. C.* § 901.

223.    The State of Delaware has comprehensively prohibited discrimination based on race and national origin in its laws, including the areas of public accommodations (6 *Del. C.* § 4501, housing (6 *Del. C.* § 4601), and employment (19 *Del. C.* § 711).   While children forcibly separated from their parents pursuant to the Trump Administration's policy are not presently

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

72

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

located within any facility within the State of Delaware, a business entity that has facilitated such placements has a business location within the State of Delaware.  Upon information and belief, this entity has assisted in placing children forcibly separated from their parents in other co-plaintiff States.   Should separated children ultimately be placed within Delaware, its education and child welfare systems may be saddled with unanticipated fiscal and operational burdens due to the need to provide care for children who have been psychologically traumatized by involuntary separation from their parents.  In order to ensure a complete injunction, to eliminate the chilling effect on the exercise of the fundamental rights of documented and undocumented immigrants presently residing in the State of Delaware, to protect the sovereignty of the State of Delaware by protecting its obligation to assist parents in meeting the needs of children, and to maintain the appropriate licensure and supervision of childcare facilities within the State, Delaware joins this action.

224.    The **District of Columbia** is uniquely situated among the Plaintiff States, as it has no sovereign interest to claim as against the Federal Government.  *See* Const. art. I, § 8, cl. 17; *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 76 (1982); *District of Columbia ex rel. Am. Combustion, Inc. v. Transamerica Ins. Co.*, 797 F.2d 1041, 1046 (D.C. Cir. 1986) (Congress acts "as sovereign of the District of Columbia").  Rather, the District asserts its quasi-sovereign interests and its authority to enforce its laws and uphold the public interest under its Attorney General Act, which was intended to incorporate the common law authority of states' attorneys general.  D.C. Code. § 1-301.81.  *See also Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 608 n.15 (1982) (recognizing that Puerto Rico "has a claim to represent its quasi-sovereign interests in federal court at least as strong as that of any State").

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

73

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

**K.      Defendants' Policy Harms the States' Proprietary Interests**

225.      The Policy also harms the States' proprietary interests.  ORR places thousands of unaccompanied minors with sponsors (adults who can care for the child during the pendency of immigration proceedings) in the States every year.  In FY 2016, ORR placed 52,147 individual children in such placements nationwide.  In FY 2017, there were 42,497 placements, and so far there have been almost 20,000 in FY 2018 (October-April). *See* Unaccompanied Alien Children Released to Sponsors by State (June 30, 2017) *available at* https://www.acf.hhs.gov/orr/resource/unaccompanied-alien-children-released-to-sponsors-by-state, attached hereto as Ex 88.  These ORR data are inclusive of children who were separated as a result of the Policy.

226.      The States are receiving and will continue to receive an increasing number of separated immigrant parents and children if Defendants are allowed to continue implementing their Policy.  The federal government's separation of these families and transfer of separated persons into the States places increased burdens on state resources, particularly because of the acute trauma that children and parents have experienced due to Defendants' unlawful policy.  Children who have been separated from their parents and are awaiting immigration proceedings (for example the adjudication of an asylum application or adjustment of status) are entitled to access a variety of state-funded programs.  Providing the necessary services to address the legal, educational, physical, and psychological needs of parents and children who have been separated will burden the state systems.  The following are non-exclusive examples of state systems that are impacted.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

74

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

227. **Courts**. Many of the sponsors of these children will need to obtain guardianship through the States' juvenile and family courts. This is not discretionary: ORR's agreement with sponsors requires "best efforts" to establish such guardianships, and sponsors in many states would be unable to access medical and educational records and make important decisions for the children in their care without such court-ordered guardianships. *See* Sponsor Care Agreement *available* *at* https://www.acf.hhs.gov/sites/default/files/orr/frp_4_sponsor_care_agreement_05_14_18.pdf, and attached hereto as Ex. 89.

228. Children who have been separated from their parents will also access the State courts to obtain orders necessary for their immigration proceedings. For example, some such children are eligible for Special Immigrant Juvenile Status (SIJS), pursuant to federal law. *See* Immigration and Nationality Act (INA) §203(b)(4); INA §101(a)(27)(j); Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), P.L. 110-457 §235. In these proceedings, the federal immigration system relies on the expertise of state courts in making determinations regarding a child's welfare, requiring SIJS-eligible children to seek SIJS predicate findings from a state's juvenile court.

229. **Education.** Public elementary and secondary schools have a constitutional obligation to educate students irrespective of immigration status. *See Plyler v. Doe*, 457 U.S. 202 (1982), and various statutory obligations to provide particularized services to high needs students, such as through the Individuals with Disabilities Education Act (IDEA). Children separated from their parents and placed with sponsors will attend the States' public schools and receive a variety of educational services, including special education, ESL programs, mental

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

75

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

health services, and other programs delivered within the school district. Such programs are funded in large part through local levy funds and state dollars. Indeed, state funding for general education delivered in public schools is calculated in part on a per-student basis.

230. The trauma of forcible separation from a parent renders public schooling more difficult and expensive for the States to provide. Research shows that the experience of trauma may severely undercut a child's ability to learn and function in the classroom. *See* Helping Traumatized Children Learn*, available at* https://traumasensitiveschools.org/wp-content/uploads/2013/06/Helping-Traumatized-Children-Learn.pdf, attached hereto as Ex. 90. Children may require additional mental health services through school guidance counselors and social workers; they may have behavioral problems and trauma-related learning disabilities that would need to be addressed; and they lack the critically important educational advocacy and partnership that parents can provide. Students without parents to care for them are also more likely to arrive at school with housing and food insecurity and require additional attention and resources to address hunger, exhaustion, and increased levels of stress and anxiety.

231. **Healthcare.** Such children are also often eligible for State-funded healthcare programs, including mental health care treatment. Health care costs will be exacerbated for the states because of the Policy, as children who suffer prolonged and unexpected separation from their parents experience particular health effects, including higher levels of anxiety, more susceptibility to physical and emotional illness, and decreased capacity to manage their emotions. These health effects may result in higher levels of care and increase costs to the state. *See* Burke and Mendoa, *At Least 3 tender age shelters set up for child migrants*, the AP (June

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

76

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

20, 2018) *available at* https://apnews.com/dc0c9a5134d14862ba7c7ad9a811160e, attached hereto as Ex. 91.

232. **Other programs**. Many States also have programs that provide services specifically directed at helping immigrants and refugees, as well as programs designed to address the consequences of trauma. Some have limited available group care facilities that they stand to lose to ORR placements because of the increase in separated families.

233. The plaintiff States are already experiencing some of these proprietary harms.

234. **Washington**. For example, ORR places hundreds of unaccompanied minors with sponsors in the state of Washington every year. For FY 2017, the last year for which complete data are available, ORR placed almost 500 children with Washington resident sponsors. As of April 30, 2018, ORR's available data show that Washington has already received 278 unaccompanied children during this fiscal year. *See* https://www.acf.hhs.gov/orr/resource/unaccompanied-alien-children-released-to-sponsors-by-state. *See* Ex. 88.

235. Washington has almost 300 public school districts and serves well over a million children. Per pupil expenditures for 2016-17, for example, were more than $11,800 per child. Of this total, slightly more than 90% of school funding came from state and local resources. *See* Statewide Average Financial Tables and Charts *available at* http://k12.wa.us/safs/PUB/FIN/1617/1617Section1Full.pdf, attached hereto as Ex. 92. For the 2017-19 biennium, state spending for basic education will total over $22 billion, with over $16 billion allocated to basic general education services.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

77

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

236.     Washington State children residing in households with an income less than 312 percent of the federal poverty level are eligible for the Apple Health program, regardless of citizenship and/or documented status.  Qualifying children receive access to the full scope of health care coverage including medical, dental, behavioral health, vison, hearing and pharmaceutical benefits.  Of the $7.3 billion that Washington state spent in state fiscal year 2017 to support the entire Apple Health program, the cost to cover minor children was $1.6 billion. In state fiscal year 2017, the cost to cover undocumented immigrant children was $31 million.  The average cost per undocumented child in state fiscal year 2017 was $1,552 per year.

237.     Washington's Office of Refugee and Immigrant Assistance (ORIA) is part of the State of Washington, Department of Social and Health Services (DSHS). ORIA coordinates and facilitates the provision of services for people who are refugees and immigrants to enable them to achieve economic stability and integrate into Washington communities. To do this, ORIA braids federal funding from the ORR with other federal and state dollars, for a total annual budget of $27,925,874. This funding provides services to more than 10,000 refugees and immigrants each year through contracts with more than 60 different organizations across the state to offer 11 distinct programs and services. National immigration policies affect the state's access to federal funding. For example, around August of 2014, the nation experienced an influx of unaccompanied immigrant children being apprehended by immigration officials, and ORR reduced Washington's federal funding to provide refugee social services to cover an increase in costs at the national level.

238.     **Massachusetts.**  Since 2014, ORR has placed 3,803 unaccompanied children with sponsors in Massachusetts. *See* Ex. 88.  These numbers are particularly high in part because

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

78

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

of Massachusetts' large population of residents from which UACs most often come (Honduras, Guatemala, and El Salvador, in particular). *See* Office of Refugee Resettlement Facts & Data, *available at* https://www.acf.hhs.gov/orr/about/ucs/facts-and-data, attached hereto as Ex. 93. For example, Massachusetts has the eighth largest Salvadoran population in the country. *See* Profiles of Boston's Latinos *available at* http://www.bostonplans.org/getattachment/e0019487-138b-4c73-8fe5-fbbd849a7fba, attached hereto as Ex. 94. These residents are more likely than the general population to become sponsors of UACs because sponsors are often family members.

239.    A non-profit foster care agency in Massachusetts, which is licensed by the Massachusetts Department of Early Education and Care, also provides long term foster care services to UACs in Massachusetts foster homes. *See* Office of Refugee Resettlement Division of Children Services Legal Resource Guide – Legal Service Provider List for UAC in ORR Case, *available                                                                                        at* https://www.acf.hhs.gov/sites/default/files/orr/legal_service_provider_list_for_uac_in_orr_care_english_092016.pdf, attached hereto as Ex. 95.

240.    In Massachusetts, all children regardless of immigration status are entitled to a free public education. On average, per pupil expenditures amount to more than $16,000. *See* Massachusetts Department of Elementary and Secondary Education School Finance Statistical Comparisons FY13-FY17 Per Pupil Expenditures All Funds, *available at* http://www.doe.mass.edu/finance/statistics/ppx13-17.html, attached hereto as Ex. 96. Of this total, over 95 percent comes from state and local funding resources, with 39 percent from the state alone. *See* https://www.census.gov/data/tables/2016/econ/school-finances/secondary-education-finance.html.   In Massachusetts' Gateway Cities, where a higher population of

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

79

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

immigrants live, state funding amounts to an even higher percent of total per pupil spending. *See* http://www.doe.mass.edu/finance/chapter70/chapter-17.html.  For Fiscal Year 2017, state spending on education programs totaled more than $7 billion. *See* http://massbudget.org/browser/index.php.

241.    All undocumented children in Massachusetts are eligible for state-funded health insurance through the Children's Medical Security Plan, MassHealth Limited, or the Health Safety Net. Immigrant children with SIJS and other statuses may be eligible for more robust state-funded health insurance. *See* Understanding the Affordable Care Act: Non-Citizens' Eligibility for Mass Health & Other Subsidized Health Benefits (March 2018) *available at* https://www.masslegalservices.org/system/files/library/Understanding%20eligibility%20of%20non-citizens_0.pdf, attached hereto as Ex. 97.

242.    Children separated from their parents pursuant to the Policy will require determinations from the Massachusetts Probate and Family Court or Juvenile Court for purposes of SIJS, *see Recinos v. Escobar,* 473 Mass. 734 (2016), and determinations about guardianship in the best interests of children. Mass. Gen. Laws c. 190B, § 5-206.

243.    Undocumented children and other immigrant children who are not eligible for mental health services through state-funded health insurance programs may qualify for mental health services through the state's Department of Mental Health ("DMH"). Under its statutory mandate, DMH provides or arranges for the provision of services to residents who meet certain clinical criteria. Mass. Gen. Laws c. 19 § 1. For Massachusetts youth to meet DMH's clinical criteria, they must have a "serious emotional disturbance…that has lasted or is expected to last at least one year [and] has resulted in functional impairment that substantially interferes with or

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

80

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

limits the child's [or] adolescent's role or functioning in family, school or community activities….". 104 CMR 20.04(2)(b). Many if not all children separated from their parents under the Policy may suffer from such disturbances.

244.   **Oregon.** Defendants' Policy also harms Oregon's proprietary interests, because it forces Oregon to expend resources and incur costs that would otherwise not be required.  For example, unaccompanied minors detained in Oregon have often suffered severe trauma in their home countries.  Children separated from their parents under this Policy have suffered additional trauma from Defendants' actions.  Counsel for these minors can and do file petitions with the juvenile court departments of the Oregon Circuit Courts on their behalf to obtain Special Immigrant Juvenile status.  This allows the court to transfer custody to the Oregon Department of Human Services, where they can be placed in foster care and receive other necessary services, such as healthcare, education, and other support. This process employs the financial and other resources of the state of Oregon.

245.   Children in Oregon, including those separated from parents, are entitled to a public education.  The cost of that education as of 2016-17 was $11,715 per student, with 92% from state and local resources.

246.   Children in Oregon, including those separated from parents, may be eligible for health care funded in part by the state of Oregon.  Children separated from parents who may become wards of the state due to forced separation would become eligible for state-funded healthcare at a cost of approximately $664 per-member per-month.  Federal reimbursement is not available for healthcare recipients in this population due to their immigration status.  Some children may not become wards of the state and would not have access to any state-funded

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

81

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

healthcare.  The average cost of hospitalization for a child in Oregon is $9,370.  Oregon bears the entire cost of providing healthcare and/or emergency-related care to children separated from their families.

247.    **California.**  ORR places more unaccompanied minors with resident sponsors in California than any other State in the country.  For FY 2017, ORR placed 6,268 children with California resident sponsors.  As of April 30, 2018, California has already received 2,807 unaccompanied children during this fiscal year.  *See* Ex. 88.

248.    In California, any child, including children who have been separated from their parents, is entitled to a free public education.  Per pupil expenditures in 2017-18 exceeded $14,000 per child from all fund sources. Of this total, over 91% came from state and local resources.   California has also dedicated educational funds to meeting the needs of unaccompanied immigrant children.

249.    In California, undocumented children receive healthcare coverage paid for entirely by the State.  *See* Cal. Welf. & Inst. Code § 14007.8.  These children are also eligible for and benefit from other state funded public health programs.

250.    Children separated from their parents because of the Policy may require determinations by California courts in order to obtain a guardianship or a predicate order enabling the child to apply for Special Immigrant Juvenile Status.  *See* Cal. Prob. Code § 1514; Cal. Civ. Proc. Code § 155.

251.    The federal government has already placed a number of children separated from their parents pursuant to the Policy at nonprofit facilities in California, including facilities that also serve children in the State child welfare system.  In California, both state and county

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

82

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

personnel license and approve homes and facilities for the placement of vulnerable children. Community Care Licensing (CCL) is the division within the California Department of Social Services that has regulatory oversight of the residential facilities for children in California, and is responsible for the health, safety, and welfare of children in out-of-home care facilities, including those facilities who have contacts with ORR to house unaccompanied immigrant children in California. In its role, CCL has three main functions: prevention, compliance, and enforcement.

252.    California's Refugee Programs Bureau is part of the Immigration and Refugee Programs Branch of the California Department of Social Services (CDSS).   This Bureau provides assistance to newly arrived refugees to support long term social and economic integration.   In FY 2017, at least 12,058 refugees arrived in the state of California, and received assistance from the State in the form of nutrition aid, cash assistance, employment services, immigration legal services, medical services, and educational support.   The Bureau administers the Unaccompanied Refugee Minors (URM) Program, the Refugee School Impact Grant (RSIG), and the California Newcomer Education and Well-Being (CalNEW), three programs exclusively for minors.   The URM provides foster care, case management, mental health, and medical services to certain unaccompanied minors.   Through RSIG and CalNEW, the RPB funds programs in schools to provide supplementary educational and social adjustment support services including academic, English-language acquisition, and mental and well-being supports. The CalNEW is funded exclusively by the State.   Combined, these programs help ensure that immigrants coming to California are prepared to be full participants in California society and culture, and that they are able to thrive in their new surroundings.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

83

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

253.   California's Immigration Services Unit is also a part of the Immigration and Refugee Programs Branch of the CDSS.  The California Legislature has authorized this program to provide assistance to "persons residing in, or formerly residing in, California," including "[s]ervices to obtain . . . immigration remedies." Cal. Welf. & Inst. Code § 13303(b)(1)(B).  The program awards funding to California-based legal services organizations to assist in the representation of undocumented immigrants in their immigration proceedings, including targeted funding for unaccompanied undocumented minors present in California after release from the care and custody of ORR pursuant to Cal. Welf. & Inst. Code § 13300.  The State has invested $12,000,000 in services for unaccompanied minors since State FY 2014-2015.  Legal services providers have provided representation to 2,147 minors.

254.   **New Jersey.**  ORR released a total of 2,268 Unaccompanied Children (UAC) to sponsors in New Jersey in FY 2017 (October 2016 – September 2017), and an additional 1,053 between October 2017 and April 2018.  *See* https://www.acf.hhs.gov/orr/resource/unaccompanied-alien-children-released-to-sponsors-by-state.  This is more than any other state except Virginia, Texas, New York, Maryland, Florida and California.

255.   **Rhode Island.**  In Rhode Island, all children regardless of immigration status are entitled to free public education. Rhode Island has over 300 public schools that serve over 142,000 children. Per-pupil expenditures for 2013-14 were more than $15,000 per child. The majority of these funds come from state and local funding resources. As forcible separation from a parent renders public schooling more difficult and expensive for Rhode Island, Rhode Island

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

84

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

will experience harm.   *See* InfoWorks! Rhode Island Education Data Reporting, Rhode Island Public Schools, available at http://infoworks.ride.ri.gov/state/ri.

256.   **Vermont.**  In Vermont, all children, regardless of immigration status, are entitled to a free public education.  On average, Vermont spends over $18,000 per pupil each year. *See* Vermont Agency of Education, *Per Pupil Spending: FY 2017 Report* (2018), available at http://education.vermont.gov/documents/data-per-pupil-spending-fy2017, attached hereto as Ex. 98.

257.   Many immigrant children are also eligible to receive free or low-cost health care through Vermont's children's health insurance program, known as Dr. Dynasaur. *See generally* Vt. Health Benefits Eligibility and Enrollment Rules §§ 2.03(b), 7.02(b), 7.03(a)(3), 17.02, 17.03, available at http://humanservices.vermont.gov/on-line-rules/hbee/hbee-all-parts-1-8-adopted-with-toc.pdf. The program includes mental health services, which may face increased demand in cases of family separation.

258.   Since 2014, ORR has placed four unaccompanied minors in Vermont.  *See* Ex. 88.  However, the Policy has seen increasingly large numbers of children scattered across the nation, often in conditions of secrecy.  *See* Exs. 23 & 25.

259.   Vermont's responsibility to protect the welfare of all children living in the State includes those children who are separated from their parents and moved to Vermont pursuant to the Policy. That responsibility includes, when appropriate, commencing juvenile judicial proceedings and incurring significant costs to ensure that children are receiving safe and adequate care. *See generally* 33 V.S.A. §§ 5102, 5103, and 5116.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

85

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

260.    The Policy's negative impact upon immigrants also threatens Vermont's economic interests.  For example, in 2014, immigrant households paid $57.9 million in state and local taxes.  Of that amount, undocumented immigrants paid an estimated $2.9 million in state and local taxes that year.  Immigrants also greatly contributed to the economy with over $462.5 million in spending power.  *See The Contributions of New Americans in Vermont,* New American Economy (2016), available at  https://research.newamericaneconomy.org/report/the-contributions-of-new-americans-in-vermont/, attached hereto as Ex. 99.  *Undocumented Immigrants' State & Local Tax Contributions, Institute of Tax and Public Policy* (2017), available at https://itep.org/undocumented-immigrants-state-local-tax-contributions-2/, attached hereto as Ex. 100.

261.    **Minnesota.** For FY 2017, the last year for which complete data are available, ORR placed over 300 children with Minnesota resident sponsors.  As of April 30, 2018, ORR's available data show that Minnesota has already received 164 unaccompanied children during this fiscal year.  *See* Ex. 88.

262.    In Minnesota, any child, including children who have been separated from their parents, is eligible to a free public education.  On average, per pupil expenditures for the current fiscal year is $12,251 per child.  Of this total, approximately 96% comes from state and local resources.  If, as may be expected, an immigrant child requires services through the English Learners program, the state funds an additional $700 or $950 per child.  Children in Minnesota may also require special education, mental health services, and other programs delivered within the school district. Unaccompanied children, including those who are separated from their parents, may also receive child care assistance in certain settings.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

86

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

263.   In addition, unaccompanied children residing in Minnesota, including those who are separated from their parents, are also eligible to receive health care through Minnesota's Emergency Medical Assistance program and support through the Women, Infants, and Children program.  They may also receive services through the state's child protection system.

264.   Unaccompanied children in Minnesota, including those who are separated from their parents, may also be involved in state court proceedings related to the unaccompanied child's immigration status or the child's sponsor's legal authority.

265.   **Iowa.**  Likewise, since 2014, ORR has placed 980 unaccompanied children with sponsors in Iowa.  *See* Ex. 93.

266.   In Iowa, all children regardless of immigration status are entitled to a free public education.   On average, per pupil expenditures amounted to nearly $13,000 in federal FY2015.  *See* Revenues and Expenditures for Public Elementary and Secondary Education: School Year 2014-15 (Fiscal Year 2015) *available at* https://nces.ed.gov/pubs2018/2018301.pdf, attached hereto as Ex. 101.   Of this total, 93% came from state and local funding sources, with 53% coming from the state alone.  *Id.*

267.   **Illinois.**  Illinois's commitment to supporting its immigrant communities is also evidenced by certain state expenditures.

268.   In FY 2018, for example, the Illinois Department of Human Services (DHS) was appropriated approximately $13,779,400 for various refugee and immigration services. These funds came from General Revenue Funds and other state funds. *See* Pub. Act 100-21, at 15, 450 (2017), *available at* http://ilga.gov/legislation/publicacts/100/PDF/100-0021.pdf, attached hereto as Ex. 102.  In FY 2019, DHS, the Illinois Office of the Secretary of State, and the Illinois

Department of Public Health were appropriated approximately $37,477,900 for various refugee and immigration services.  *See* Pub. Act 100-586, at 335, 343–44, 402–03, 433 (2018), *available at* http://ilga.gov/legislation/publicacts/100/PDF/100-0586.pdf, attached hereto as Ex. 103.

269.  Services provided by DHS through the Bureau of Refugee and Immigrant Services include helping newly arrived refugees achieve self-sufficiency in the United States and providing outreach and interpretation services to low-income and limited English-proficient individuals requiring supportive services." See *Refugee & Immigrant Services*, ILL. DEP'T OF HUMAN SERVS., *available at* http://www.dhs.state.il.us/page.aspx?item=30363 (last visited June 22, 2018), and attached hereto as Ex. 104.

270.  Similarly, within the Illinois Department of Children and Family Services (DCFS) exists the Office of the DCFS Guardian. This Guardian serves as the legal parent of every child in the custody of DCFS, "monitor[ing] and mak[ing] critical decisions based on the child's best interests regarding major medical treatment, … and all other decisions requiring parental consent."  *See* ILL. DEP'T OF CHILDREN & FAMILY SERVS., BUDGET BRIEFING FY 2019, at 34 (2018), https://www2.illinois.gov/dcfs/aboutus/newsandreports/Documents/FY19_Budget Briefing.pdf, attached hereto as Ex. 105.  To that end, the DCFS Guardian, with assistance from the DCFS Special Counsel and the Immigration Services Unit, acquires adjustment of legal status for foreign-born youth who are under its guardianship.  *Id.*

271.  Children reunited with a family member residing in Illinois will likely be entitled to access certain state-funded programs.  This is also true for children currently sheltered outside of Illinois who are later reunited with a family member residing in Illinois.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

88

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

272.     For example, every child residing in Illinois, including children who have been separated from their parents, is entitled to a free public education. In school year 2015–16, Illinois per-pupil expenditures exceed $12,900 per child. Of this total, over 92% comes from state and local resources. *See* ILL. STATE BD. OF EDUC., ILLINOIS STATE REPORT CARD 3 (2017), http://webprod.isbe.net/ereportcard/publicsite/getReport.aspx?year=2017&code=2017StateReport_E.pdf, attached hereto as Ex. 106.

273.     Moreover, separated children enrolled in Illinois schools may receive bilingual support services through Transitional Bilingual Education (TBE) Programs and/or Transitional Programs of Instruction (TPI).  These programs help English Learners achieve academically, and provide classroom and other forms of support.  In FY 2018 and FY 2019, Illinois appropriated approximately $65,540,700 and $48,600,000, respectively to support bilingual education programs in Illinois school districts. *See* Pub. Act 100-21, at 636–37 (Ex. 102); Pub. Act 100-586, at 491 (Ex. 104).  Currently, Illinois school districts receive funding on a per-pupil allocation by level of service ranging from $304–758 per pupil. *See* ILL. STATE BD. OF EDUC., FISCAL YEAR 2018 PROPOSED BUDGET 14, 58 (2017), *available at* https://www.isbe.net/Documents/fy2018-budget-book.pdf, attached hereto as Ex. 107.  Children who are reunited with family members located in Illinois who attend Illinois schools are likely to receive such services as English Learners.

274.     As well, each child who qualifies is entitled to receive free breakfast and lunch pursuant to the Illinois Free Lunch and Breakfast Program, 105 ILCS 125/1. Through this program, the Illinois State Board of Education reimburses all public schools, nonprofit private schools, and residential child care institutions that provided breakfast and lunch to children who

meet the income-level guidelines.  In FY 2018 and FY 2019, the Board of Education received $9,000,000 in state funding to provide reimbursements. *See* Pub. Act 100-21, at 435, 634–35 (Ex. 102); *See* Pub. Act. 100-587, at 39, 450 (2018), *available at* http://ilga.gov/legislation/publicacts/100/PDF/100-0587.pdf, attached hereto as Ex. 108. Heartland Alliance is a participant in the Free Lunch and Breakfast Program and receives reimbursement from the State of Illinois for breakfasts and lunches provided to unaccompanied children in Illinois.

275.    Separated children may also be eligible for healthcare programs that are partially or fully funded by the State of Illinois, including Medicaid.  In FY 2014, for example, Illinois spent an average of approximately $2,108 per Medicaid-eligible child. *See* Medicaid Spending Per Enrollee (Full or Partial Benefit), KAISER FAMILY FOUND., https://www.kff.org/medicaid/state-indicator/medicaid-spending-per-enrollee/ (last visited June 22, 2018).

276.    In addition, children who have been separated from their parents may access state courts in Illinois in order to obtain Special Immigrant Juvenile Status (SIJS). In order to petition the U.S. Customs and Immigration Services for a SIJS, a child must first obtain an order from a state court finding that it is not in the child's best interests to return to her home country or to the country she last lived in, and that the child cannot be reunited with a parent because of abuse, abandonment, or neglect. As additional children are brought to Illinois as a result of Defendants' child separation policy, Illinois courts will see an increase in the number of orders being sought.

277.    **New York.** In FY 2017, ORR placed 3,938 children with New York resident sponsors. ORR placed another 1,577 UACs with New York resident sponsors from October 2017

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

90

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

through April 30, 2018. *See* Unaccompanied Alien Children Released to Sponsors by State, available at Ex. 88.

278.    Once a UAC is placed with a sponsor who resides in New York State, the child is entitled to a variety of services funded by the state, including educational services, early intervention services, and access to healthcare, among others. New York State makes these services available to such children in support of the State's interest in ensuring the health, safety, and well-being of all residents.

279.    New York State will incur expenses to educate UACs placed within the state because under state law, children ages six through sixteen who reside in New York must attend school and are entitled to attend school up until age twenty-one. Moreover, the IDEA requires the state to provide special education services to students with learning or emotional disabilities. Under this federal law, children aged three to twenty-one are entitled to special education services when clinically warranted.  20 U.S.C. § 1411.  New York State law also entitles qualified students to English Language Learner (ELL) services. N.Y. Comp. Codes R. & Regs. Tit. 8, § 154.  There are 692 public school districts in New York that serve approximately 2.6 million students. While costs will vary depending on the school district's location and the child's needs, the statewide average to educate a student in New York is approximately $22,000 per year.

280.    New York State also provides a robust early intervention program which UACs utilize when placed in New York State communities. The Part C Early Intervention Program (EIP) was created by Congress in 1986 as part of the IDEA. The IDEA authorizes the discretionary EIP for infants and toddlers with disabilities and requires states to provide a free

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

91

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

appropriate education for all students with disabilities, ages three to twenty-one. 20 U.S.C. §§ 1411, 1419. Each year, New York's EIP serves over 60,000 children ages zero to three who have moderate to severe developmental delays. The EIP includes 1,279 providers that contract with New York State to bill for EI services. Total annual expenditures for New York's EIP total more than $644 million across all payers—45% is covered by Medicaid, 2% by commercial insurance, 26% by state funds, and 27% by county funds. While EIP costs and services vary based on the child's needs and the intensity of services offered, for the 2017 program year the average cost of services delivered ranged from $5,820 to $22,000 per child.

281.   New York State also incurs significant medical expenses for each UAC placed in state.   UACs who are placed with sponsors in the community are eligible to enroll in the Children's Health Insurance Program (CHIP) operated by New York's Office of Health Insurance Programs. The yearly cost of CHIP per child is $2,607.36 and is financed exclusively by New York State.

282.   An influx of UACs also carries with it increased costs for the New York State child welfare system. After a UAC is placed with a sponsor in the community, that placement may be disrupted for a number of reasons. If the child becomes at risk of entering foster care— for example, because of allegations of abuse or neglect by the person now legally responsible for the child—the child welfare system will provide preventive services to attempt to keep the child safely in the new home; such services are funded, in part, by New York State. If those services are unsuccessful and the child must be removed from the new home, New York State will also partly fund the child's placement and needed services while in the foster system.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

92

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

283.  **Maryland**.  For FY 2017, the last year for which complete data are available, ORR placed almost 3,000 children with Maryland resident sponsors—the fifth most of any state. As of April 30, 2018, ORR's available data show that Maryland has already received 901 unaccompanied children during this fiscal year. *See* Ex. 88.  Maryland is one of the states that is receiving children separated from their parents under the Trump Administration's "zero tolerance" policy.  *See* Theresa Vargas, "*I will kiss their boo-boos" Foster Families provide small comforts* (June 22, 2018), attached hereto as Ex. 109; *I really miss my mom*: *What becomes of a 5-year-old in Maryland and the other separated children now?*, The Washington Post (June 21, 2018) available at https://www.washingtonpost.com/local/i-really-miss-my-mom-what-becomes-of-a-5-year-old-in-maryland-and-other-the-separated-children-now/2018/06/21/28afbd54-759d-11e8-9780-b1dd6a09b549_story.html?utm_term=.383bb9cc8a01, attached hereto as Ex. 110; "Bethany Continues to Work to Reunify Families Separated at the Border," *available at* https://www.bethany.org/campaigns/refugee, attached hereto as Ex. 111.

284.  The Office of Licensing and Monitoring within Maryland's Department of Human Services licenses several organizations that operate shelters at which unaccompanied children—including children separated from their parents under the federal government's policy—are being placed.  At least one such organization receiving children in Maryland is under contract with ORR to provide services for unaccompanied immigrant minors, including children separated from their parents under the policy.

285.  As the separated children are placed in foster homes, many will enter the Maryland's public school system.  Maryland's 24 public school districts served nearly 900,000

students during the 2016-17 school year.  Per pupil expenditures for 2016-17 were over $13,000 per child.  Of this total, approximately 95% of school funding came from state and local resources.  For the 2016-17 school year, state and local spending for basic education totaled over $12 billion, with nearly $5 billion allocated to general instructional expenditures. *See* Selected Financial Data Maryland Public Schools 2016-2017 *available at* http://marylandpublicschools.org/about/Documents/DBS/SFD/2016-2017/SFD20162017Part3.pdf., attached hereto as Ex. 112.

286.  **Virginia**.  More than one hundred traumatized, unaccompanied alien children have been transported and are being housed at federal detention centers in Virginia.  More than a dozen of those children were separated from their parents at the southern border. *See* Nick Anderson and Marissa J. Lang, *Sen. Tim Kaine tours Virginia shelter housing about 15 separated migrant children,* the Washington Post (June 22, 2018) *available at* https://www.washingtonpost.com/local/immigration/sen-tim-kaine-tours-virginia-shelter-housing-about-15-separated-migrant-children/2018/06/22/7bc1e8f2-763b-11e8-b4b7-308400242c2e_story.html?utm_term=.5be4b43f307c, attached hereto as Ex. 113.

287.  ORR reports that they have placed hundreds of unaccompanied alien children with sponsors in the Commonwealth of Virginia every year.  For FY 2017, the last year for which complete data are available, ORR placed 2,888 children with Virginia resident sponsors.  As of April 30, 2018, ORR's available data show that Virginia has already received 931 unaccompanied alien children during this fiscal year. *See* Ex. 88.

288.  Under federal law, states and local educational agencies are obligated to provide all children – regardless of immigration status – with equal access to public education at the

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

94

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

elementary and secondary level.  This includes unaccompanied alien children who may be involved in immigration proceedings.  Once these children are released to a sponsor, they have a right to enroll in Virginia schools regardless of their immigration status.  In Virginia, some of these unaccompanied alien children under 18 will be classified as homeless under applicable state and federal law. See Va. Code Ann. § 22.1-3. Virginia school divisions are required to immediately enroll homeless students. The Virginia Department of Education provides the state share, and the enrolling local school division is responsible for paying the local share of the cost for educating students enrolled in public schools at a total per pupil statewide average expenditure in excess of $10,000.

289.    Unaccompanied alien children may seek a variety of health services in Virginia. For example, they need childhood immunizations and may seek testing and treatment when they present with symptoms of a communicable disease. In Virginia, school divisions are required to help any child classified as homeless obtain necessary physical examinations and immunizations. Va. Code § 22.1-271.2. Moreover, if an unaccompanied alien child needed to be hospitalized for emergency care, including psychiatric care, then Virginia would provide and bear the cost of that care in part by absorption of costs by state-owned hospitals.

290.    ORR places hundreds of unaccompanied minors with sponsors in the State of North Carolina every year.  For FY 2017, ORR placed approximately 1,290 children with North Carolina-resident sponsors.  As of April 30, 2018, ORR's available data show that North Carolina has already received 565 unaccompanied children during this fiscal year. *See* Ex. 88.

291.    **North Carolina**.  The State of North Carolina has 11 State Refugee and Health Coordinators that are coordinated and organized through the State's Department of Health and

Human Services Refugee Services program. North Carolina's Refugee Services program integrates federal funding from ORR with other federal and state funding. The program services thousands of refugees across the State of North Carolina.

292. **District of Columbia.** ORR places hundreds of unaccompanied minors with sponsors in the District of Columbia every year. For FY 2017, the last year for which complete data are available, ORR placed almost 300 children with District of Columbia resident sponsors. As of April 30, 2018, ORR's available data show that the District of Columbia has already received more than 80 unaccompanied children during this fiscal year. *See* Ex. 88.

293. In the District of Columbia, any child, including children who have been separated from their parents, is entitled to a free public education. The District spends almost $10,000 per child in D.C Public Schools. The overwhelming share of the money spent on public education in the District comes from local taxes, fees, and resources. *See, e.g.*, https://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/DCOCFO_FY17_Budget_vol_3.pdf.

294. The District of Columbia offers comprehensive health insurance coverage to eligible children who have been separated from their parents through the Immigrant Children's Program, which provides coverage equal to that offered by Medicaid, including: doctor visits, immunizations, mental health services, dental, vision, and prescription drugs. *See* Department of Health Care Finance – DHCF Immigrant Children's Program *available at* https://dhcf.dc.gov/service/immigrant-childrens-program, attached hereto as Ex. 114.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

96

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

**L.    Defendants' Policy Harms the States' Quasi-Sovereign Interests**

295.    States have a quasi-sovereign interest in protecting the health, safety, and well-being of their residents, including protecting their residents from harms to their physical, psychological, emotional, or economic health. The States' interests in preventing and remedying injuries to the public's health, safety, and well-being extends to all of their residents who will be harmed by the Policy. The Policy has caused and will continue to cause severe and immediate harm to the States' residents, including parents who are detained, released, or otherwise reside in the States after being forcibly separated from their children; children who are placed in facilities, shelters, homes or otherwise reside in the States after being separated from their parents; extended families and sponsors in the States; and the States' immigrant communities.

296.    The States also have an interest in ensuring that their residents are not excluded from the rights and privileges provided by the U.S. Constitution, international laws, federal laws, and state laws. These rights include due process and equal protection rights afforded to alien parents and their minor children, and rights and protections under federal asylum and refugee laws, international human rights laws, and state laws.

297.    The Policy causes measurable harm to existing immigrant communities in the States.  A 2018 study published in the *Journal of Adolescent Health* finds that recent changes in U.S. immigration policy that appear to target Latino immigrants have triggered serious psychological distress for many resident Latino parents, including those living in the United States legally.  A substantial proportion of U.S. Latino parents reported adverse emotional and behavioral consequences from recent immigration actions and news. For example, 66% said that they very often or always worry about family members getting separated.  Nearly 40% of parents

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
97
ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

said they frequently avoided getting medical care, help from police, or support from social service agencies because of reports about immigration actions.  Parents who frequently experienced worries or changes in behavior due to immigration news and policies had at least a 250% increase in the odds of experiencing high psychological distress, including clinical anxiety and depression. The association between U.S. immigration actions and psychological distress in this study held true after controlling for education, residency status, gender and other factors.

298.    Many of the States have resident Latino and Hispanic populations that are affected by the Policy and attendant distress.  For example, as of 2010, 10.2 percent of the total population of Washington State was of Hispanic origin, with some counties over 45%.  Indeed, roughly one in seven Washington residents is an immigrant, while one in eight residents is a native-born U.S. citizen with at least one immigrant parent.  The other States also have resident Latino and Hispanic communities who are impacted by the Policy, as well.

299.    Indeed, the States are already acting to try to protect the health, safety, and well-being of persons separated and harmed by the Policy.  As a result of the Policy, thousands of immigrant parents and children are being separated and moved to a range of facilities or homes in the States or being released to live in the States. Transfer of these separated immigrant parents and children into the States will continue into the future as long as Defendants' Policy remains in place.  *See* Exs. 55, 8, 21. In May 2018 alone, DHS took nearly 51,912 immigrants into custody, nearly three times the number detained in May 2017. Ex. 55. The number of families apprehended at the Southwestern border increased by 435% in May 2018 in comparison to May 2017. Ex. 8.  The States have an interest in protecting those immigrants who are resident, or will soon settle, in their jurisdictions.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

98

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

300.     Traumatized immigrant parents and children are already present in the States'

shelters and in federal detention centers in the States.  On June 7, 2018, ICE spokeswoman

Danielle Bennett confirmed that because of "implementation of the U.S. Department of Justice's

zero-tolerance Policy . . . ICE has entered into inter-agency agreements with [the Bureau of

Prisons (BOP)] to acquire access to more than 1,600 additional beds at [five] BOP facilities."

These include 220 beds at the Federal Detention Center SeaTac in Seattle, Washington; 130 beds

in Sheridan, Oregon; and 1,000 beds at the Federal Correctional Institution Victorville Medium

Security Prison in Victorville, California.  *See* Robert Moore, Immigration Officials Taking Over

1,600 Beds in Federal Prison System, Texas Monthly (June 8, 2018) available at

https://www.texasmonthly.com/news/immigration-officials-taking-1600-beds-federal-prison-

system/, attached hereto as Ex. 115.

301.     Defendants' Policy causes severe and lasting psychological and emotional harm

to immigrant parents in Washington who have been separated from their children.  For example,

of the approximately 200 immigrants detained in Seattle as of June 19, 2018, 174 were women,

and dozens of those women were mothers who had been forcibly separated from their children,

whose ages range from one-year-old to teenagers.  *See* Jayapal Goes Inside Federal Detention

Center to Meet with Asylum Seeking Women: "the mothers could not stop crying" (June 9,

2018), *available at* https://jayapal.house.gov/media/press-releases/jayapal-goes-inside-federal-

detention-center-meet-asylum-seeking-women-0, attached hereto as Ex. 116.   Many were

asylum seekers from Latin American countries.  *Id*.  Most had been in detention for more than

two weeks and many for over a month.  *Id*.  A majority of the mothers have not spoken with their

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

99

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

children in weeks, and Defendants had not provided the mothers with any information regarding the whereabouts or well-being of their children. *Id.*

302.   These women described the horrific and inhumane conditions at the Border Patrol facilities where they were previously detained, including fenced cages; lack of blankets and mats notwithstanding frigid temperatures; and lack of access to food and water. *Id.* Some suffered verbal abuse from border agents who called them "filthy" and "stinky." *Id.* And they endured further intentionally inflicted trauma when agents told them their "families would not exist anymore" and that they would "never see their children again." *Id.*

303.   The specific stories of two immigrant mothers who are being detained in Seattle confirm this horrifying experience. These two mothers crossed the border in Texas, immediately turned themselves in, and were taken to a holding facility. The mothers were each separated from their daughters upon arrival and held in a facility they describe as similar to a dog kennel. The following week, the mothers appeared in federal court, were charged with illegal entry, found guilty, and served time in Texas. After approximately three weeks, the mothers were flown to SeaTac, where they remain in prison without their daughters.

304.   A growing number of children separated from their parents pursuant to Defendants' Policy have been placed in facilities in Washington. These children have suffered severe psychological and emotional trauma.

305.   Similarly, a Brazilian woman who recently arrived in Massachusetts presented herself for asylum at the U.S.-Mexico border and was detained and then separated from her 8-year-old son. Immigration authorities determined that she has a credible fear of persecution if she is returned to Brazil, so she has since been released pending adjudication of her asylum

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

100

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

claim.  As of June 22, 2018, she had not, however, been reunited with her son, who remains in a facility in Chicago, where he hasn't been able to see his mother for almost a month. *See* Akilah Johnson, *A Brazilian Mother Seeking Asylum Was Freed from Detention. Her son was not.* The Boston Globe (June 22, 2018) *available at* https://www.bostonglobe.com/news/nation/2018/06/22/brazilian-mother-seeking-asylum-was-freed-from-detention-her-son-was-not/kIYT1F4fHTsHxdkfmHh73I/story.html, attached hereto as Ex. 117.

306.    In Massachusetts, two Guatemalan children were recently released to their father, a Massachusetts resident, after being separated from their mother, with whom they crossed the border to seek asylum.  She is still in detention in Texas.  The children were held in facilities in Texas and then Michigan for five weeks until they were released to their father.  The young girl, who is 9 years old, has been particularly affected by the experience and still cries for her mother. *See* Mark Sullivan, *Guatemalan in Westboro Sees the Effects of Separation Policy Firsthand,* The Worcester Telegram & Gazette (June 20, 2018) *available at* http://www.telegram.com/news/20180620/guatemalan-in-westboro-sees-effects-of-separation-policy-firsthand, attached hereto as Ex. 118.

307.    Defendants' abhorrent and indefensible family-separation Policy has already had an impact on Oregon in a variety of ways, and will continue to do so.  There are at least 123 immigrant men detained at the federal prison in Sheridan, Oregon.  At least six of these are fathers, from Mexico, Guatemala and Honduras, who have been separated from their children pursuant to the Policy.  Oregon's federal lawmakers have been able to visit these detainees, and report that they have been denied access to lawyers and health care and are confined to cells for

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

101

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

up to 22 hours a day.  Oregon immigration lawyers also report that they have been repeatedly denied access to detainees.  The Mexican Consulate reports that one of the detained men had his newborn infant, only 15 days old, taken from him.  Another detainee was separated from his 18-month-old toddler.  Another reports his wife is detained in San Antonio, Texas, and he does not know the whereabouts of their 4-year-old child.

308.    There are a number of children in Oregon who have been separated from their parents by the defendants' implementation of its Policy, including two children who saw their mother being taken away in chains.  At least three others have been separated from their parents at the border pursuant to the Policy.

309.    Defendants' unlawful Policy also cruelly affects the wellbeing of Oregon residents, including its immigrant and Hispanic and Latinx populations.  For example, a substantial number of Oregon residents are survivors of the Japanese-American internment camps of World War II, or family members of such survivors.  Many of those survivors and/or family members have experienced significant emotional and psychological distress as a result of the government's family-separation Policy.

310.    Similarly, some Oregonians are survivors of Nazi concentration camps. Many of those survivors are also experiencing profound psychological and emotional distress as a result of the federal government's family-separation Policy.  For all these Oregon survivors and their families, the Policy echoes the ethnic-based targeting that they experienced in the twentieth century, and causes them to relive the trauma of one of the darkest times in history.  Many survivors are also profoundly afraid for the safety of minority communities targeted by the current Administration.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

102

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

311.    Defendants' Policy similarly harms immigrant parents and children in California who have been separated by federal immigration officials. For example, at least 50-60 children are being served in group homes and family homes approved by foster family agencies in California as a result of Defendants' Policy.

312.    Additionally, parents, including asylum-seekers, who have been separated from their children are being housed at facilities throughout Southern California. There is a particularly large number of immigration detainees being held at the Victorville facility, but unlike the SeaTac facility, attorneys have been denied access to determine how many of those individuals are parents.

313.    Several asylum-seeker parents who arrived at a port of entry with a migrant caravan in April 2018 were separated from their children. While their children have been placed by ORR in facilities across the nation, the parents are being detained in other immigration detention facilities in California.   Parents are not provided with information about their children's whereabouts or how to locate them.  As a result, parents have been unable to locate or communicate with their children, are not receiving regular in-person visitation or phone contact with their children, and have not been told if or when their families will be reunified.

314.    Likewise, New Mexico has a right to ensure that no one within its border is excluded from the rights and privileges provided by the U.S. Constitution, international, federal or state law. State resources are used without statutory authority if used in furtherance of unconstitutional federal policies contravening the purposes of New Mexico's constitution and laws. There is well documented evidence to suggest that these interests are currently being infringed upon with the boundaries of the State of New Mexico.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

103

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

315.    The federal Office of Refugee Resettlement reported that 15 Unaccompanied Children (UAC) taken into custody in New Mexico were released to U.S. sponsors between October 2017 and April 2018, but those children were not released to caregivers licensed by the State of New Mexico.  One Brazilian grandmother held at the Santa Teresa border crossing in New Mexico was separated from her 16-year-old ward almost a year ago.  The child, who has severe epilepsy, neurological problems and is autistic, was placed in Connecticut.  *See* Angela Kocherga, *Zero-tolerance policy impacts New Mexico,* Albuquerque Journal June 20, 2018, page 4 (citing Maria Vandelice de Pastos' attorney Eduardo Beckett), *available at* https://www.abqjournal.com/1186875/zerotolerance-policy-impacts-new-mexico.html, attached hereto as Ex. 119.

316.    Approximately fifty mothers, some with valid claims for asylum have had their children separated from them at border crossings and are being held in a private jail in Otero County, New Mexico. One of the Mothers details health issues her child faces and that she is completely unaware of where he is or whether his health needs are being addressed. *See* Jonathan Blitzer, "Mothers in a New Mexico Prison Do Not Know How to Find Their Children," New Yorker Magazine (June 21, 2018) *available at* https://www.newyorker.com/news/dispatch/mothers-in-a-new-mexico-prison-do-not-know-how-to-find-their-children, attached hereto as Ex. 120.

317.    New Mexico also has an interest in ensuring that New Mexico citizens continue to be afforded their rights to cross the U.S.-Mexico border unmolested.  Because many New Mexico families visit their relatives in Mexico and because these families traditionally visit with

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

104

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

their own children in tow, such New Mexico citizens face the potential of separation in derogation of their rights to travel and to maintain their familial ties.

318.    Because there is direct evidence of harm to these families, occurring within the borders of New Mexico, the state has a distinct interest in ensuring that no violations of law occur. This notion is grounded in general principles of federalism, and are distinctly the obligations of the state in ensuring that its constitution and laws are upheld. This interstitial framework is well grounded in law and is the underpinning of our system of government.

319.    Fathers who were forcibly separated from their children at the border are currently being detained at the Elizabeth Detention Center in Elizabeth, New Jersey. *See* Brenda Flanagan, *At Detention Center Rally, Family Reunification Left in Question*, NJTV News June 22, 2018, clip *available at* https://www.njtvonline.org/news/video/at-detention-center-rally-family-reunification-left-in-question/.

320.    In addition, children who were forcibly separated from their parents at the border have been placed at the Center for Family Services in Camden, New Jersey, which contracts with ORR to provide shelter to children who crossed the border. *See* Kelly Heyboer and Erin Banco, *20 Immigrant Children Have Arrived in N.J. in the Last 30 Days. Here's What We Know*, NJ Advance Media for NJ.com, Updated June 22, 2018 at 12:24PM, https://www.nj.com/news/index.ssf/2018/06/are_immigrant_kids_being_held_in_nj_heres_how_trum.html, attached hereto as Ex. 121.

321.    Defendants' Policy causes severe and potentially permanent emotional and psychological trauma to children in Rhode Island who have been separated from their parents pursuant to Defendants' Policy. Unaccompanied Alien Children are released to sponsors in

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
105
ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
206-464-7744

Rhode Island by the Office of Refugee Resettlement of the United States Department of Health and Human Services each year. For example in FY 2017, 234 total Unaccompanied Minor Child were released in Rhode Island and thus far in FY 2018 that total already stands at 129. These children have suffered severe psychological and emotional trauma. *See*. Unaccompanied Alien Children Released to Sponsors by State (June 30, 2017) Ex. 88.

322.    In Vermont, reports are emerging that federal authorities' animus toward Latino migrants is taking a psychological and medical toll on migrant workers essential to Vermont's dairy industry and economy.  *See* J. Dillon, *For Undocumented Workers On Vermont Farms, 2017 Was A Year Filled With Anxiety*, Vermont Public Radio (January 5, 2018),  (public health screening of migrant workers found 80% exhibiting elevated levels of stress), available at http://digital.vpr.net/post/undocumented-workers-vermont-farms-2017-was-year-filled-anxiety#stream/0, attached hereto as Ex. 122.  The Policy will likely increase the strain on an already vulnerable population.

323.    Children who have been forcibly separated from their parents at the border have already arrived in Minnesota and other children who have been separated from their parents are likely to come to Minnesota in the future.

324.    For example, an 8 year-old girl experienced the most "traumatic moment of her life" when she was forcibly separated from her father at the U.S.-Mexico border.  *See* Chris Serres and Mary Lynn Smith, the Star Tribune (June 23, 2018) *available at* http://www.startribune.com/migrant-children-separated-from-parents-start-to-arrive-in-minnesota/486365431/, attached hereto as Ex. 123.  The father "begged the officer to be able to stay with his child.  He was crying. She was crying." *Id.*  After they were separated, her father

was deported to Guatemala.  The girl remains in Minnesota, but wants to be reunited with her family.

325.    As one lawyer who represents unaccompanied minors in Minnesota explained, "[s]o many of these children, they just want their parents.  They really, really, really want to be reunited with their families." *Id.*

326.    Illinois has also received children affected by the Policy.  As of June 22, 2018, approximately 66 minor children, who have been separated from their parents or guardians and are awaiting immigration proceedings, are currently under the care of Heartland Alliance. Currently, Heartland is housing these separated children in the cities of Chicago and Des Plaines.

327.    Heartland is endeavoring to reunite the 66 separated children with family members in the United States. Certain of these children will likely remain in Illinois, given the fact that 1,568 unaccompanied minors were released to sponsors located in Illinois between October 2014 and April 2018.  *See* Ex. 88.

328.    New York State relies on the same agencies that the federal ORR relies on for provision of foster care services. ORR currently contracts with eleven provider agencies in New York State to care for UACs, including those children whom Defendants have separated from their parents: Abbott House; Catholic Family Center; Catholic Guardian Services; Cayuga Home for Children; Children's Home of Kingston; Children's Village; Jewish Child Care Association of New York; Rising Ground (formerly Leake and Watts Services); Lincoln Hall; Lutheran Social Services of New York; and MercyFirst. These agencies either run residential congregate care programs that house the children or place the children with family or sponsors in the community, or do both. These agencies also provide residential care and placement services for

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

107

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

children who enter New York's child welfare system because they are abandoned, abused, neglected, delinquent or dependent children.  OCFS has confirmed that at least 321 children who have been separated from their parents at the Southwestern border are currently in the care of one of these eleven agencies and thus residing in New York State. Since the State was unable to obtain this information from HHS or ORR, OCFS undertook efforts to create a census of separated children in New York State. Specifically, OCFS's Acting Commissioner issued a directive to the agencies to confirm the total number of UACs in their care. Upon receipt of that information, OCFS staff verbally verified with each voluntary agency how many of those children were in fact separated from their families at the border. To accomplish this, OCFS staff took a hiatus from their regular duties and, in a single day, physically went to each of the 11 agencies to review records and interview children in order to obtain a current head count. ORR has still not confirmed this number or shared data regarding how many children have already come through these voluntary agencies, or how many it plans to send to these voluntary agencies in the future.

329.    Staff at one voluntary agency have informed local government officials that the ages of most children newly placed at their agency, many of whom were separated from family at the border, are between four and twelve.  The youngest child so far was a nine-month-old baby, in addition to multiple not-yet-verbal toddlers.

330.    The children whom Defendants have separated from their parents and sent to New York are suffering extreme trauma. For example, a South American boy who was separated from his father at the Mexican border was rushed to the hospital because he was about to jump out of the second-story window of the group home where he was sent in early June after being forcibly

separated from his family. The distraught child verbalized that he wanted to jump because he missed his parents. Twelve other young immigrant children who were separated from their parents at the border have been treated for physical and mental illnesses at New York City hospitals. One child was suicidal and others were treated for depression and anxiety. *See* Jillian Jorgensen*, City hospitals have treated 12 immigrant children who were taken from parents, including a suicidal child*, N.Y. Daily News (June 21, 2018) *available at* http://www.nydailynews.com/news/politics/ny-pol-immigrant-children-treated-20180621-story.html, attached hereto as Ex. 124.

331.    New York State has a quasi-sovereign interest in the health, safety and well-being of all children within its borders, and Defendant's separation policy directly undermines that interest by causing severe trauma to these children.  New York State goes to great lengths to provide significant due process protections for both parents and children when families are separated as a result of government action. When a child is placed in foster care in New York, state statutes and regulations afford both the parent and the child a range of rights, including the right of visitation. Indeed, the child's *family* service plan must include a plan for regular visitation between the parents and child. N.Y. Soc. Serv. Law § 409-e; N.Y. Comp. Codes R. & Regs. Tit. 18 § 428.3. *See also* N.Y. Fam. Ct. Act § 1030(a) (providing that a parent has a right of regular and reasonable visitation with a child in foster care unless otherwise prohibited by court order). This right of regular visitation is afforded even when one or both parents is incarcerated in a prison or jail. In that situation, the child welfare agency must make suitable arrangements with the correctional facility for a parent to visit with the child, unless the visiting would be harmful to the child. 11 OCFS ADM 07.  Moreover, parents who are incarcerated are

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
109
ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

entitled to participate in the planning for their child in foster care by participating in family court proceedings and periodic family service plan reviews. *See* N.Y. Comp. Codes R. & Regs. Tit. 18 § 428.9. To protect these vital rights, state law provides that the parent of a child in foster care has a right to assigned counsel by the court where such parent is financially unable to obtain one. N.Y. Family Court Act § 26. Such rules are premised on the importance of the parent-child bond, and the parent's critical, indispensable role in assuring that the needs of his or her child are met. Here, by contrast, the parents and children whom Defendants have separated at the border are afforded no visitation procedure and have no process to recognize or protect their rights. Due to Defendant's illegal policy, the separated children who are currently residing in New York are being treated differently than other children in foster care in the State, to their great detriment and in direct contravention of the state's interest in ensuring the health, safety, and well-being of all its residents.

332.    Upon information and belief, family members of separated children currently reside in New York State. An HHS spokesman stated that "[t]here's an effort to place [children who were separated at the border] as closely as possible to where they're going to be eventually reunified with a sponsor or a family member" and that if a child was placed in New York it usually means that there is a family member residing in the state who is a possible placement option for the child. *See* Tal Kopan, *Why some children have been sent to states far away from the US border*, CNN (June 22, 2018) *available at* https://www.cnn.com/politics/live-news/immigration-border-children-separation/h_714fd2e091af7813fb8df5fc587c7b8b, attached hereto as Ex. 125. New York has a quasi-sovereign interest in ensuring that children

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

110

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

residing in New York State, who have been separated from their parents, are placed with family members also residing in the State if the children cannot be quickly reunified with their parents.

333. **Maryland** has an interest in the health, safety, and wellbeing of all its residents, including any parents or children being placed in Maryland under the Policy. Immigration agents are reported to have sent dozens of children to Maryland during the implementation of the Trump Administration's family separation policy. The children often have no family connection to the state; they are sent here because the system has capacity. Some of the children have been placed with foster families coordinated by care organizations, while others are placed in residential group child care.

334. Immigration officials are sending separated children to Maryland without the most basic information about the children or their parents, or how to connect them with one another. And many of the children have come with little or no information and are too young—as young as 18 months—to communicate with caregivers or social workers trying to track down relatives who could take them in. Thus, the sheltering organizations that are housing the children do not know how to identify, let alone locate, the children's parents, who risk deportation before they can find or be reunited with their children.

335. Care organizations report that children who have been separated from their parents suffer greater trauma than other unaccompanied minors whom the organizations care for. For some of these children, their suffering is immediately apparent, as has been shown in publicly available videos and other recordings. For others, their suffering emerges over time, as they become more comfortable with the staff of the care organizations. And when those organizations can track down a parent and arrange for a call with his or her child, the children

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

111

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

are reportedly so upset afterwards that they need counseling.  *See* Andrea K. McDaniels, *Border separations could have traumatic impact on children, doctors say*, The Balt. Sun (June 22, 2018) at A9, *available at* http://www.baltimoresun.com/health/bs-hs-border-separation-trauma-20180621-story.html, attached hereto as Ex. 126; Ian Duncan, ", The Balt. Sun, June 21, 2018, at A1, available at http://www.baltimoresun.com/news/maryland/bs-md-border-separations-20180620-story.html, attached hereto as Ex. 127.

336.    Parents who have been separated from their children are also being sent to Maryland and detained in local facilities that contract with ICE to hold detainees, mostly pending criminal process.  Anne Arundel, Frederick, Howard, and Worcester counties have all agreed to hold immigration detainees, and the Anne Arundel Detention Center is reportedly holding at least two parents who have been separated from their children under the Trump Administration's policy.  *See* Ex. 127.  In addition, Maryland is the location of a Federal Correctional Institution and the Chesapeake Detention Facility where, by contract, the federal government houses federal pre-trial detainees, which might be affected by ICE's policy of housing separated parents in federal detention facilities.  Parents held in Maryland have little contact with their children and no information about where they are being held.  One was reportedly separated from his five-year-old daughter by force and has not had any contact with, or information about, her in the two months since.  *See* Patricia Sullivan, *Md., Va. congressmen hear stories of family separation*, the Washington Post (June 21, 2018) at B4, *available at* https://www.washingtonpost.com/local/immigration/md-va-congressmen-hear-stories-of-family-separation/2018/06/20/af3fe0ae-74aa-11e8-b4b7-308400242c2e_story.html?noredirect=on&utm_term=.fa6d5bb19919, attached hereto as Ex. 128.

337.    In other respects, as well, ORR is using facilities in Maryland to facilitate the Administration's family separation policy without providing the transparency that would allow Maryland to ensure the safety and security of its residents, including the parents and children who have been separated from one another under the policy.  ORR has provided no information about the care and circumstances of immigrant children detained within Maryland's borders—where they are being held; what condition they are in; where their parents are; whether they have adequate food, clothing and shelter; whether they have access to medical care and legal representation; or when and how they will be reunited with their families.

338.    Children separated from their families as a result of Defendants' actions have been sent to organizations in **Pennsylvania**. For instance, 50 child immigrants separated from their families are being housed at the Holy Family Institute in Emsworth, Pennsylvania, a Catholic social services organization that is under contract with Defendant ORR.  *See* Paula Reed Ward and Ashley Murray, *Child migrants separated from families housed at Holy Family Institute in Emsworth,* Pittsburg Post-Gazette (June 17, 2018) *available at* http://www.post-gazette.com/news/faith-religion/2018/06/17/Child-migrants-separated-from-families-being-housed-at-Holy-Family-Institute/stories/201806160074, attached hereto as Ex. 129. The children, who range in age from 4 to 17, are from Honduras, Guatemala, El Salvador, and other countries. Other child immigrants separated from their parents as a result of Defendants' actions have been placed with a shelter in Pennsylvania's Lehigh Valley.  *See* Laura Benshoff, *As Trump ends family separation policy, children removed from their parents are already in Pa.*, (June 21, 2018), *available at* https://whyy.org/segments/as-trump-ends-family-separation-policy-children-removed-from-their-parents-are-already-in-pa/, attached hereto as Ex. 130.

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

339.    The **District of Columbia** places an emphasis on preserving families and reunifying families even when children become involved with the state due to child abuse or neglect.  *See* D.C. Code § 4-1303.03(a)(11) and (a)(13).  The District of Columbia follows the United States Supreme Court's holdings that there is "a presumption that fit parents act in the best interests of their children," *Troxel v. Granville*, 530 U.S. 57, 68, (2000), and recognition that the state may not "inject itself into the private realm of the family" absent a finding of unfitness. Id. at 68–69. The Court has frequently emphasized the importance of the family, and has held that individuals have a fundamental right to parent their own children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). This important relationship may not be terminated without a predicate determination, by clear and convincing evidence that the individual is unfit to parent.  *Santosky v. Kramer*, 455 U.S. 745 760, 768–71 (1982).

340.    The District of Columbia also prohibits discrimination based upon the race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, genetic information, disability, matriculation, or political affiliation, source of income, status as a victim of an intrafamily offense, and place of residence or business of any individual.  D.C. Code § 2-1401.01.

341.    Defendants' Policy causes severe and potentially permanent emotional and psychological trauma to children who have been separated from their parents, some of whom are placed with sponsors in the District of Columbia. The number of children placed with sponsors in the District will increase as the sponsors are identified and vetted, and approved to receive these children.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
114
ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

# V.    CAUSES OF ACTION

## Count I: Violation of Fifth Amendment – Substantive Due Process

342.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

343.    State residents who are parents have a fundamental liberty interest in the care, custody, and control of their children. This includes current state residents and those who may arrive in the States following separation pursuant to Defendants' Policy.

344.    State residents who are minors have a reciprocal liberty interest in their parents' care. This includes current state residents and those who may arrive in the States following separation pursuant to Defendants' Policy.

345.    State residents who are minors have a right to be free of unreasonable risk of harm, including trauma from separation and detention, as well as the risk of harm from housing them in unlicensed facilities.

346.    Defendants' Policy offends the Due Process Clause by separating parents from their children without any showing that the parent is unfit or is otherwise endangering the child.

347.    Defendants' violation causes ongoing harm to the States and their residents.

## Count II: Violation of Fifth Amendment – Procedural Due Process

348.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

349.    The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving individuals of their liberty interests without due process of law.

350.   Defendants' Policy deprives the States' residents of a fundamental liberty interest with no hearing whatsoever. This includes current state residents and those who will arrive in the States following separation pursuant to Defendants' Policy.

351.   Defendants have violated the procedural due process guarantees of the Fifth Amendment.

352.   Defendants' violation causes ongoing harm to the States and their residents.

**Count III: Violation of Fifth Amendment – Equal Protection**

353.   All of the foregoing allegations are repeated and realleged as though fully set forth herein.

354.   The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws.

355.   The Policy burdens a fundamental right and targets individuals for discriminatory treatment based on their nationality or ethnicity, without lawful justification, and is therefore not narrowly tailored to achieve a compelling governmental interest. The Policy is also unconstitutional because it disparately impacts immigrants from Latin America arriving at the Southwestern border and is motivated by animus and a desire to harm this particular group.

356.   Alternatively, the discriminatory terms and application of the Policy are arbitrary and do not bear a rational relationship to a legitimate federal interest.

357.   Through their actions above, Defendants have violated the equal protection guarantee of the Fifth Amendment.

358.   Defendants' violation causes ongoing harm to the States and their residents.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

116

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

**Count IV: Violation of the Administrative Procedure Act**

359.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

360.     The Administrative Procedure Act, 5 U.S.C. § 706(2), prohibits federal agency action that is arbitrary, unconstitutional, and contrary to statute.

361.     Defendants' Policy constitutes final agency action for purposes of the Administrative Procedure Act.

362.     Defendants have offered no legitimate basis for their Policy.

363.     Defendants' Policy is arbitrary and capricious because it conflicts with various laws requiring Defendants and the States to consider the best interests and well-being of children arriving to the United States.

364.     The Policy is not authorized or required by the TVPRA, which only applies to unaccompanied minors. The minors subject to Defendants' Policy are not "unaccompanied," as they are accompanied by a parent or guardian.  Indeed, in a White House Press Release, dated October 8, 2017, Defendants released a "detailed outline of President Trump's immigration principles and policies" which states Defendants' agreement that "alien minors [] are not UACs [if they are] accompanied by a parent or legal guardian." *See* Immigration Principles & Policies, *available at* http://www.aila.org/infonet/wh-immigration-principles-and-policies,  attached hereto as Ex. 131.

365.     Further, as alleged herein, the separation Policy contravenes the spirit and purpose of the TVPRA, which seeks to protect children.  In general, the TVPRA requires,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

117

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

whenever possible, family reunification or other appropriate placement for unaccompanied alien children. *See* 8 U.S.C. § 1232(c)(2)(A).

366.    In implementing the Policy, federal agencies have taken or will take unconstitutional and unlawful action, as alleged herein, in violation of the Administrative Procedure Act.

367.    In implementing the Policy, federal agencies have applied or will apply provisions arbitrarily, in violation of the Administrative Procedure Act.

368.    Defendants' violation causes ongoing harm to the State and its residents.

**Count V: Violation of Asylum Laws**

369.    Under United States law, noncitizens with a well-founded fear of persecution shall have the opportunity to obtain asylum in the United States. 8 U.S.C. § 1158 ("[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum in accordance with this section."). Federal law also prohibits the return of a noncitizen to a country where he may face torture or persecution. *See* 8 U.S.C. § 1231(b); United Nations Convention Against Torture (CAT), implemented in the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231).

370.    In enacting these statutes, Congress created a right to petition our government for asylum that at the very least requires that asylum seekers be able to present themselves at ports of entry to request asylum. Defendants are preventing asylum-seekers from presenting themselves at ports of entry that are allegedly "full," thus preventing asylum claims from being heard, in violation of 8 U.S.C. § 1158.

371.    Another effect of turning asylum-seekers away prior to their reaching a port of entry is that the immigrants are then forced to cross the border outside a port of entry, in a claimed violation of 8 U.S.C. § 1325, in order to present their asylum claim. But under the Policy, all such border-crossing violations are referred to the Department of Justice and prosecuted. By criminalizing the pursuit of asylum, this Policy runs counter to established immigration and refugee laws that allow a person to present themselves to immigration officials to request asylum wherever they are able.

## VI.    PRAYER FOR RELIEF

Plaintiffs request that the Court enter a judgment against Defendants and award the following relief:

a.    Enjoin Defendants from refusing to accept applications for asylum at a valid port of entry, and from criminally charging asylum applicants with illegal entry or re-entry if they present themselves at a valid port of entry;

b.    Declare Defendants' family separation Policy unauthorized by or contrary to the Constitution and laws of the United States;

c.    Enjoin Defendants from enforcing the family separation Policy, including at all United States borders and ports of entry, pending further orders from this Court;

d.    Order Defendants to expeditiously reunite all children with parents from whom they have been separated pursuant to the Policy, unless a court of competent jurisdiction has found the parents to be unfit;

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

119

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

e.      Enjoin Defendants from conditioning family reunification on an agreement not to petition for asylum or other relief available under the INA, or on an agreement to withdraw a petition or other request for that relief;

f.      Enjoin Defendants from removing separated parents from the United States without their children, unless the parent affirmatively, knowingly, and voluntarily waives the right to reunification before removal after consultation with an attorney;

g.      Enjoin Defendants from placing children in unlicensed facilities;

h.      Order Defendants to provide specific information to parents who are lawfully separated from their children about the nature and purpose of the separation, the process by which they can be reunified, and the whereabouts of their children at all times, absent a finding by a court of competent jurisdiction that such information would be dangerous to a child's welfare;

i.      Award such additional relief as the interests of justice may require.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

120

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

Respectfully submitted this 26th day of June, 2018.

ROBERT W. FERGUSON, WSBA #26004
Washington State Attorney General
NOAH G. PURCELL, WSBA #43492
Solicitor General
COLLEEN M. MELODY, WSBA #42275
Civil Rights Division Chief
LAURA K. CLINTON, WSBA #29846
MEGAN D. LIN, WSBA #53716
Assistant Attorneys General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Tel: (206) 464-5342
NoahP@atg.wa.gov
ColleenM1@atg.wa.gov
LauraC5@atg.wa.gov
MeganL@atg.wa.gov
Attorneys for Plaintiff State of Washington


MAURA HEALEY
Attorney General for Massachusetts

/s/ Abigail B. Taylor
ABIGAIL B. TAYLOR
Director, Child & Youth Protection Unit
GENEVIEVE C. NADEAU
Chief, Civil Rights Division
ANGELA R. BROOKS
Assistant Attorney General
Public Protection & Advocacy Bureau
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
Tel: (617) 727-2200
Abigail.Taylor@state.ma.us
Genevieve.Nadeau@state.ma.us
Angela.Brooks@state.ma.us
Attorneys for Plaintiff Commonwealth of Massachusetts

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

121

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
206-464-7744

XAVIER BECERRA
Attorney General of California
Michael L. Newman
Susan E. Slager
Supervising Deputy Attorneys General
Vilma Palma-Solana
Deputy Attorney General

*/s/ Sarah E. Belton*
SARAH E. BELTON
Deputy Attorney General
Office of the Attorney General
1515 Clay Street, Suite 2000
Oakland, CA  94612-1492
Telephone:  (510) 879-0009
Sarah.Belton@doj.ca.gov
Attorneys for Plaintiff State of California


BRIAN E. FROSH
Attorney General of Maryland

*/s/ Julia Doyle Bernhardt*
JULIA DOYLE BERNHARDT
ADAM D. SNYDER
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
Tel:  (410) 576.7291
jbernhardt@oag.state.md.us
asnyder@oag.state.md.us
Attorneys for Plaintiff State of Maryland

1

ELLEN F. ROSENBLUM
Attorney General

2

*/s/ Scott J. Kaplan*

3

SCOTT J. KAPLAN, WSBA #49377
Senior Assistant Attorney General

4

Oregon Department of Justice
100 SW Market Street

5

Portland, OR 97201
(971) 673-1880

6

Email: scott.kaplan@doj.state.or.us
Attorneys for Plaintiff State of Oregon

7

8

9

HECTOR BALDERAS
Attorney General of New Mexico

10

*/s/ Tania Maestas*

11

TANIA MAESTAS,
Chief Deputy, Civil Affairs

12

400 Galisteo St.
Santa Fe, NM 87501

13

Tel: (505) 490-4060
tmaestas@nmag.gov

14

Attorneys for Plaintiff State of New Mexico

15

16

JOSH SHAPIRO
Attorney General of Pennsylvania

17

*/s/ Jonathan Scott Goldman*

18

JONATHAN SCOTT GOLDMAN
Executive Deputy Attorney General

19

MICHAEL J. FISCHER
Chief Deputy Attorney General

20

Office of Attorney General
1600 Arch Street

21

Suite 300
Philadelphia, PA 19103

22

Tel: (215) 560-2171
jgoldman@attorneygeneral.gov

23

mfischer@attorneygeneral.gov
Attorneys for Plaintiff Commonwealth of Pennsylvania

24

25

26

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

123

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
206-464-7744

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

GURBIR S. GREWAL
Attorney General of New Jersey

*/s/ Rachel Wainer Apter*
RACHEL WAINER APTER
Assistant Attorney General
Office of the Attorney General
Richard J. Hughes Justice Complex
25 Market Street, 8th Floor, West Wing
Trenton, New Jersey 08625-0080
Tel: (609) 376-2702
Fax: (609) 777-4015
Rachel.Apter@njoag.gov
Attorneys for Plaintiff State of New Jersey

THOMAS J. MILLER
Attorney General of Iowa

*/s/ Nathan Blake*
NATHAN BLAKE
Deputy Attorney General
Iowa Department of Justice
1305 E. Walnut St.
Des Moines, IA  50314
(515) 281-4325
nathan.blake@ag.iowa.gov
Attorneys for Plaintiff State of Iowa

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

124

LISA MADIGAN
Attorney General of Illinois

*/s/ Jeanne Witherspoon*
JEANNE WITHERSPOON
Chief, Special Litigation Bureau
ANNA P. CRANE
MATTHEW J. MARTIN
KRENICE M. ROSEMAN
JEFFREY J. VANDAM
Assistant Attorneys General
Office of the Illinois Attorney General
100 West Randolph Street, 12th Floor
Chicago, IL 60601
Tel: (312) 814-3000
acrane@atg.state.il.us
mmartin@atg.state.il.us
kroseman@atg.state.il.us
jvandam@atg.state.il.us
Attorneys for the Plaintiff State of Illinois

LORI SWANSON
Attorney General
State of Minnesota

*/s/ Alethea M. Huyser*
ALETHEA M. HUYSER
Assistant Solicitor General
445 Minnesota Street, Ste 1100
St. Paul, Minnesota 55101-2128
Telephone: (651) 757-1243
Email: alethea.huyser@ag.state.mn.us
Attorneys for Plaintiff State of Minnesota

PETER F. KILMARTIN
Attorney General of the State of Rhode Island

*/s/ Adam D. Roach*
ADAM D. ROACH
Special Assistant Attorney General
RI Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
aroach@riag.ri.gov
Attorneys for Plaintiff State of Rhode Island

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

125

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

1

2    MARK R. HERRING
     Attorney General of Virginia

3    /s/ Toby J. Heytens
     _____
4    TOBY J. HEYTENS
     Solicitor General
5    MATTHEW R. MCGUIRE
     Deputy Solicitor General
     Office of the Attorney General
6    202 N. Ninth Street
     Richmond, VA  23223
7    Tel:  (804) 786-7773
     theytens@oag.state.va.us
8    mmcguire@oag.state.va.us
     Attorneys for Plaintiff Commonwealth of Virginia

9

10   BARBARA D. UNDERWOOD
     Attorney General of New York
11

12   /s/ Lourdes M. Rosado
     _____
13   LOURDES M. ROSADO, Bureau Chief
     JESSICA ATTIE, Special Counsel
14   LILIA TOSON, Assistant Attorney General
     Civil Rights Bureau
15   Office of the New York State Attorney General
     28 Liberty Street
16   New York, NY 10005
     (212) 416-8252
17   lourdes.rosado@ag.ny.gov
     jessica.attie@ag.ny.gov
18   lilia.toson@ag.ny.gov
     Attorneys for Plaintiff State of New York
19

20

21

22

23

24

25

26

COMPLAINT FOR DECLARATORY          126          ATTORNEY GENERAL OF WASHINGTON
AND INJUNCTIVE RELIEF                                    800 Fifth Avenue. Suite 2000
                                                        Seattle, WA  98104-3188
                                                            206-464-7744

THOMAS J. DONOVAN, JR.
Attorney General of Vermont

*/s/ Benjamin D. Battles*
BENJAMIN D. BATTLES,
Solicitor General
JULIO A. THOMPSON,
Assistant Attorney General, Civil Rights Unit
Office of the Attorney General
109 State Street
Montpelier, VT 05609
Tel:  (802) 828-5500
Fax:  (802) 828-3187
benjamin.battles@vermont.gov
julio.thompson@vermont.gov
Attorneys for Plaintiff State of Vermont

JOSHUA H. STEIN
Attorney General of North Carolina

*/s/ Sripriya Narasimhan*
SRIPRIYA NARASIMHAN,
Deputy General Counsel
RYAN Y. PARK
Deputy Solicitor General
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC  27603
Tel:  (919) 716.6400
snarasimhan@ncdoj.gov
rpark@ncdoj.gov
Attorneys for Plaintiff State of North Carolina

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
127
ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744

MATTHEW DENN
Attorney General of Delaware

*/s/ Aaron R. Goldstein*
AARON R. GOLDSTEIN, #3735
Chief Deputy Attorney General
ILONA KIRSHON, #3705
Deputy State Solicitor
DAVID LYONS, #2341
State of Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
Tel:  (302) 577-8400
Matthew.denn@state.de.us
Aaron.goldstein@state.de.us
Ilona.kirshon@state.de.us
David.lyons@state.de.us
Attorneys for Plaintiff State of Delaware.

KARL A. RACINE
Attorney General for the District of Columbia

*/s/ Robyn R. Bender*
ROBYN R. BENDER
Deputy Attorney General, Public Advocacy Division
VALERIE M. NANNERY
Assistant Attorney General
Office of the Attorney General
441 4th Street, N.W., Suite 630 South
Washington, DC 20001
Tel:  (202) 442-9596
robyn.bender@dc.gov
valerie.nannery@dc.gov
Attorneys for Plaintiff District of Columbia

*Pro Hac Vice* motions forthcoming for all counsel of record not barred in the Western District of Washington.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

128

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
206-464-7744