Colleen M. Melody, WSBA #42275
Division Chief, Civil Rights Unit
Laura K. Clinton, WSBA #29846
Megan D. Lin, SBN #298267
Assistant Attorneys General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-5342

*Attorneys for Plaintiff State of Washington*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

STATE OF WASHINGTON, et al.,

        Plaintiffs,

v.

THE UNITED STATES OF AMERICA;
DONALD TRUMP, in his official
capacity as President of the United States
of America, et al.,

        Defendants.

Case No.:  3:18-cv-01979-DMS

**STATES' RESPONSE TO
DEFENDANTS' MOTION TO
BIFURCATE PROCEEDINGS OR
ALTERNATIVELY HOLD IN
ABEYANCE**

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................. 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ........................................ 2

III.  ARGUMENT .................................................................................................. 7

    A.  Defendants' Request is Contrary to Federal Rule of Civil Procedure 12, Which Requires Them to Raise All Available Rule 12 Defenses in a Single Motion ....................................................................................................... 7

    B.  Bifurcation is not Appropriate Where Jurisdictional and Merits Issues Overlap, and an Indefinite Stay on the Merits Would Prejudice the States ... 9

       1.  Bifurcation of Rule 12 Issues is Inappropriate Where Merits and Jurisdictional Issues Overlap and the States Have Strong Arguments as to Both .................... 10

       2.  Bifurcation of Rule 12 Issues Will Not Lead to Efficiencies with *Ms. L.* Because the States' Claims Are Different and Do Not Impact Ongoing Reunification Efforts ............................................................................. 19

       3.  An Indefinite Stay on Merits Issues Would Prejudice the States, Whose Interests and Claims Are Different from Those Raised in *Ms. L.* .............. 21

    C.  Defendants Fail to Show That an Indefinite Stay Is Warranted ................... 24

# TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
    458 U.S. 592 (1982) ....................................................................................................... 11, 12

*Braam v. State of Washington*,
    81 P.3d 851 (2003) ................................................................................................................... 15

*Cataulin v. Washington Mut. Bank, FSB*,
    No. 08 CV 2419 JM NLS, 2009 WL 1404757 (S.D. Cal. May 19, 2009) ..................... 7

*Chen v. Cayman Arts, Inc.*,
    No. 10-80236-CIV, 2011 WL 1085646 (S.D. Fla. Mar. 21, 2011) ............................... 7

*City of Sausalito v. O'Neill*,
    386 F.3d 1186 (9th Cir. 2004) ............................................................................................ 13

*CMAX, Inc. v. Hall*,
    300 F.2d 265 (9th Cir. 1962) ............................................................................................. 24

*Com. of Mass. v. Bull NH Info. Sys., Inc.*,
    16 F. Supp. 2d 90 (D. Mass. 1998) .................................................................................. 11

*County of Sacramento v. Lewis*,
    523 U.S. 833 (1998) .............................................................................................................. 14

*Dependable Highway Exp., Inc. v. Navigators Ins. Co.*,
    498 F.3d 1059 (9th Cir. 2007) ........................................................................................... 25

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,
    489 U.S. 189 (1989) .............................................................................................................. 15

*E. Bay Sanctuary Covenant v. Trump*,
    No. 18-cv-06810-JST, 2018 WL 6053140 (N.D. Cal. Nov. 19, 2018), *appeal docketed*,
    No. 18-17274 (9th Cir. Nov. 27, 2018) ........................................................................... 18

*Ellis v. Worldwide Capital Holdings, Inc.*,
    No. EDCV141427JGBKKX, 2015 WL 12697722 (C.D. Cal. Mar. 24, 2015) .............. 8

*English v. Dyke*,
    23 F.3d 1086 (6th Cir. 1994) ............................................................................................... 8

*GCL, LLC v. Schwab*,
    No. 11-04593, 2012 WL 4321972 (E.D. Pa. Sept. 21, 2012) ........................................ 7

*GEM Acquisitionco, LLC v. Sorenson Grp. Holdings, LLC*,
    No. C 09–01484 SI, 2010 WL 1729400 (N.D. Cal. Apr. 27, 2010) .............................. 9

*Grisham v. Philip Morris, Inc.*,
    No. CV 02-7930 SVW RCX, 2009 WL 9102320 (C.D. Cal. Dec. 3, 2009) .................. 9

*Hangarter v. Paul Revere Life Ins. Co.*,
    236 F. Supp. 2d 1069 (N.D. Cal. 2002), *aff'd,* 373 F.3d 998 (9th Cir. 2004) ................ 9

*Hawai'i v. Trump*,
    859 F.3d 741 (9th Cir. 2017) ............................................................... 13

*Hernandez v. City of San Jose*,
    241 F. Supp. 3d 959 (N.D. Cal. 2017) .................................................... 8

*In re Apple Iphone Antitrust Litig.*,
    846 F.3d 313 (9th Cir. 2017) .............................................................. 8

*In re Packaged Seafood Prod. Antitrust Litig.*,
    277 F. Supp. 3d 1167 (S.D. Cal. 2017) ................................................. 8

*J.E.C.M. v. Lloyd*,
    352 F. Supp. 3d 559 (E.D. Va. 2018) .................................................. 15

*Landis v. North American Co.*,
    299 U.S. 248 (1936) ....................................................................... 24

*Leyva v. Certified Grocers of California, Ltd.*,
    593 F.2d 857 (9th Cir. 1979) ........................................................... 25

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...................................................................... 10

*Marks Food Corp. v. Barbara Ann Baking Co.*,
    274 F.2d 934 (9th Cir. 1959) ........................................................... 10

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ................................................................ 10, 15

*McDermott v. Potter*,
    No. C 07–06300 SI, 2010 WL 956808 (N.D. Cal. Mar. 12, 2010) ............... 10

*Mformation Techs., Inc. v. Research in Motion Ltd.*,
    No. C 08-04990 JW, 2012 WL 1142537 (N.D. Cal. Mar. 29, 2012) ........... 19

*Oregon v. Legal Servs. Corp.*,
    552 F.3d 965 (9th Cir. 2009) ........................................................... 10

*Pacesetter Systems, Inc. v. Medtronic, Inc.*,
    678 F.2d 93 (9th Cir. 1982) ............................................................. 20

*People v. Peter & John's Pump House, Inc.*,
    914 F. Supp. 809 (N.D.N.Y. 1996) .................................................... 11

iii

*Pilgrim Badge & Label Corp. v. Barrios*,
  857 F.2d 1 (1st Cir. 1988)...................................................................................8

*Rivera v. NIBCO, Inc.*,
  No. CIV-F-99-6443 AWISMS, 2006 WL 845925 (E.D. Cal. Mar. 31, 2006)...............9

*Saxion v. Titan-C-Mfg., Inc.*,
  86 F.3d 553 (6th Cir. 1996) .................................................................................9

*Spectra–Physics Lasers, Inc. v. Uniphase Corp.*,
  144 F.R.D. 99 (N.D. Cal. 1992)..........................................................................10

*Texas v. United States*,
  787 F.3d 733 (5th Cir. 2015) ..............................................................................13

*Troxel v. Granville*,
  530 U.S. 57 (2000).............................................................................................15

*United States v. Molen*,
  No. 2:10-CV-02591 MCE, 2011 WL 1810449 (E.D. Cal. May 9, 2011) ....................7

*Washington v. Internet Order, LLC*,
  Case No. C14-1451 JLR, 2015 WL 918694 (W.D. Wash. Mar. 2, 2015) ..................24

*Youngberg v. Romeo*,
  457 U.S. 307 (1982)...........................................................................................15

## Other Authorities

5B Charles Alan Wright & Arthur R. Miller,
  *Federal Practice and Procedure* § 1342 (3d ed. 1995)..........................................8

Adolfo Flores,
  *The Trump Administration Has Sent the First Asylum-Seeking Families Back to
  Mexico* (Feb. 14, 2019), https://www.buzzfeednews.com/article/adolfoflores/the-
  trump-administration-has-sent-the-first-asylum-seeking ............................................5

Amnesty International,
  *USA: 'You Don't Have Any Rights Here,'* (Oct. 11, 2018),
  https://www.amnestyusa.org/wp-content/uploads/2018/10/You-Dont-Have-Any-
  Rights-Here.pdf..................................................................................................23

Angela Kocherga,
  *Border Patrol Officials Probe Death of 7-Year Old*, Albuquerque J. (Dec. 14, 2018),
  https://www.abqjournal.com/1257643/7-year-old-migrant-girl-held-at-us-border-dies-
  in-custody.html ..................................................................................................16

Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied
  Children,

83 Fed. Reg. 45486 (Sept. 7, 2018) to be codified at 8 C.F.R. Parts 212 and 236, and 45 C.F.R. Part 410..................................................................................................5

Brian Naylor,
*FACT CHECK: Trump Wrongly States Obama Administration Had Child Separation Policy* (Apr. 9, 2019), https://www.npr.org/2019/04/09/711446917/fact-check-trump-wrongly-states-obama-administration-had-child-separation-policy............................23

Camilo Montoya-Galvez,
*HHS official urges Congress to limit migrant family separation* (Apr. 9, 2019), https://www.cbsnews.com/news/jonathan-white-top-hhs-official-urges-congress-to-limit-migrant-family-separation/.................................................................................7

Catherine E. Shoichet & Leyla Santiago,
*The Tear Gas is Gone. But in This Shelter at the Border, the Situation Is Getting Worse*, CNN (Nov. 29, 2018), https://www.cnn.com/2018/11/29/americas/mexico-border-tijuana-shelter/index.html. ..............................................................................18

C-Span,
House Energy and Commerce Subcommittee (Feb. 7, 2019), https://www.c-span.org/video/?457545-1/gao-hhs-officials-testify-migrant-family-separation-policy ......................................................................................................................................22

C-Span,
Senate Homeland Security Committee (Apr. 9, 2019), https://www.c-span.org/video/?459642-1/border-patrol-ice-officials-testify-southern-border-migration ........................................................................................................................................7

DHS,
*Migrant Protection Protocols* (Jan. 24, 2019), https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols...........................5

Government Accountability Office,
Unaccompanied Children: Agency Efforts to Reunify Children Separated from Parents at the Border (Oct. 9, 2018), https://www.gao.gov/reports/GAO-19-163/. .................22

Manny Fernandez,
'*You Have to Pay With Your Body': The Hidden Nightmare of Sexual Violence on the Border,* N.Y. Times (Mar. 3, 2019), https://www.nytimes.com/2019/03/03/us/border-rapes-migrant-women.html?action=click&module=RelatedCoverage&pgtype=Article&region=Footer ......................................................................................................................................15

Manny Fernandez,
*They Were Stopped at the Texas Border. Their Nightmare Had Only Just Begun,* N.Y. Times (Nov. 12, 2018), https://www.nytimes.com/2018/11/12/us/rape-texas-border-immigrants-esteban-manzanares.html?module=inline ..................................................15

Maria Atencio,
*Border Facilities Still Need Fixing After Second Migrant Child's Death, Say Democrats*, NBC News (Jan. 7, 2019), https://www.nbcnews.com/news/latino/border-facilities-still-need-fixing-after-second-migrant-child-s-n955876 .............................. 16

Matthew Haag,
*Thousands of Immigrant Children Said They Were Sexually Abused in U.S. Detention Centers, Report Says*, N.Y. Times (Feb. 27, 2019), https://www.nytimes.com/2019/02/27/us/immigrant-children-sexual-abuse.html?module=inline .......................................................................................... 16

Memorandum from Kevin K. McAleenan, *et al.,* to Secretary Kirstjen Nielsen, *Increasing Prosecutions of Immigration Violations* (April 23, 2018), https://www.documentcloud.org/documents/4936568-FOIA-9-23-Family-Separation-Memo.html .......................................................................................................................... 4

Michael D. Shear, Zolan Kanno-Youngs and Maggie Haberman,
*Trump Signals Even Fiercer Immigration Agenda, With a Possible Return of Family Separations* (Apr. 8, 2019), https://www.nytimes.com/2019/04/08/us/politics/trump-asylum-seekers-federal-judge.html ............................................................................ 6

Nadwa Mossad & Ryan Baugh,
*Refugees and Asylees: 2016*, DHS Off. of Immig. Statistics (Jan. 2018), https://www.dhs.gov/sites/default/files/publications/Refugees_Asylees_2016_0.pdf .. 11

Nick Miroff, Kevin Sieff & Mary Beth Sheridan,
*Trump administration reaches deal that will force asylum seekers to wait in Mexico as cases are processed, DHS's Nielsen says*, (Dec. 20, 2018), https://www.washingtonpost.com/world/national-security/dhs-secretary-kirstjen-nielsen-to-face-questions-from-lawmakers/2018/12/20/f7d2ffea-0460-11e9-8186-4ec26a485713_story.html?utm_term=.8b571acda5c5 ...................................................... 5

NPR, Homeland Security Secretary Kirstjen Nielsen's Full Interview with NPR (May 10, 2018), https://www.npr.org/2018/05/10/610113364/transcript-homeland-security-secretary-kirstjen-nielsens-full-interview-with-npr .......................................................................... 4

Off. of Refugee Resettlement,
*Unaccompanied Alien Children Released to Sponsors by State*, (Feb. 28, 2019), https://www.acf.hhs.gov/orr/resource/unaccompanied-alien-children-released-to-sponsors-by-state .................................................................................................................. 12

PBS News Hour,
*Trump administration officials face House questions over family separations* (Feb. 26, 2019), https://www.pbs.org/newshour/politics/watch-live-trump-administration-officials-face-house-questions-over-family-separations ................................................ 22

Policy Options to Respond to Border Surge of Illegal Immigration (2017),
    https://assets.documentcloud.org/documents/5688664/Merkleydocs2.pdf....................2

Sarah Kinosian, *Migrants at Mexico Border Face an Uncertain Future on Their Own*,
    The Guardian (Dec. 1, 2018), https://www.theguardian.com/us-
    news/2018/dec/01/migrants-at-mexico-border-face-an-uncertain-future-on-their-own.
    ....................................................................................................................................18

*Separated Children Placed in Office of Refugee Resettlement Care*,
    U.S. Department of Health & Human Services (2019),
    https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf........................................6

Sheri Fink & Caitlin Dickerson,
    *Border Patrol Facilities Put Detainees With Medical Conditions at Risk*, N.Y. Times
    (Mar. 5, 2019), https://www.nytimes.com/2019/03/05/us/border-patrol-deaths-migrant-
    children.html?action=click&module=Top%20Stories&pgtype=Homepage ...............16

UNICEF,
    *Statement on Situation of Migrant Children at Mexico-U.S. Border* (Nov. 28, 2018),
    https://www.unicef.org/press-releases/unicef-statement-situation-migrant-children-
    mexico-us-border ......................................................................................................18

**Rules**

Fed. R. Civ. P. 12 ...........................................................................................passim

Fed. R. Civ. P. 42 .....................................................................................................9

vii

3:18-cv-01979-DMS

# I. INTRODUCTION

Seventeen States and the District of Columbia filed this action to address Defendants' shifting policies of separating families, flaunting asylum law, pursuing prolonged family detention, and evading state welfare laws. These policies continue to inflict grave harm on the States' communities and programs, including parents, children, sponsors, social services agencies, and school systems.

The States filed their complaint on June 26, 2018, and are still waiting for Defendants to respond. *See* ECF No. 1. Because harms to the States and their residents continue to accrue, the States have consistently opposed Defendants' requests to extend their time to answer. Now, in a novel attempt to avoid addressing the States' claims altogether, Defendants request that the Court "bifurcate" issues under Federal Rule of Civil Procedure (Rule) 12.

Defendants cite no precedent for this highly unusual request, because allowing Defendants to selectively litigate jurisdictional issues will prejudice the States and waste judicial resources, given the overlap between issues of standing and the merits of the States' claims. The second part of Defendants' request, to indefinitely postpone all Rule 12(b)(6) issues to be litigated "in tandem" with *Ms. L.*, is equally curious. Defendants already lost a Rule 12(b)(6) motion in *Ms. L.*, and offer no assurance that *Ms. L.* will proceed past the preliminary stage in the near future (or at all). To the contrary, Defendants in *Ms. L.* recently stated that it could take up to two years for them merely to identify the potentially thousands of additional families harmed by family separation. It is clear that what Defendants really seek is to avoid litigating the States' claims, even though those claims – including a challenge to Defendants' refusal to accept asylum applications and proposal to indefinitely detain families – are different from those being litigated by the class of parents in *Ms. L.*

Defendants' alternative request – an indefinite stay of all proceedings – is based on assumptions that have already been fully considered and rejected by a sister District Court.

Defendants' implication that filing an answer and proceeding under an ordinary civil case schedule would drain all resources from the *Ms. L.* litigation and prevent them from complying with this Court's preliminary injunction is unsupported and lacks credibility. Likewise, the allegation that the States' case will somehow imperil the reunification efforts in *Ms. L.* is baseless. The States do not intend, nor have they ever attempted, to interfere with other cases before this Court, and closing the pleadings so that this case can proceed in the regular course hardly raises the specter of "inconsistent adjudications and obligations for the government and the Court tied to the same claims." *Cf.* Mot. at 2. Any legitimate concern about case scheduling can be amply addressed by the parties and the Court as part of discovery planning and an appropriate case management order.

If Defendants believe that a Rule 12 motion limited to jurisdictional issues is appropriate, they should file one. If that motion is denied, this case then should proceed to orderly discovery and toward resolution. Defendants' Motion should be denied.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

As this Court well knows, Defendants' family separation policy continues to affect thousands of migrant families and their communities. *See Ms. L. v. ICE*, No. 18-cv-428 (S.D. Cal.) (*Ms. L.*), ECF Nos. 83 at 11 (finding that the Executive Order does not obviate the need for injunctive relief); 386 (granting motion to expand class definition).

A number of governmental documents, reports, and official testimony confirm that despite their initial denials, Defendants intentionally implemented family separation as part of a broad set of tactics designed to deter family migration. For example, a draft Administration memo dated December 2017 details deliberate plans to use family separation, turning migrants away at the border, and increased family detention as part of a comprehensive strategy to deter would-be asylum seeking families from entering the United States.[1]

---

[1] *See generally* Policy Options to Respond to Border Surge of Illegal Immigration (2017), https://assets.documentcloud.org/documents/5688664/Merkleydocs2.pdf.

Under a section titled "SHORT TERM (next 30 days) OPTIONS," the memo specifically recommends increased prosecution of parents and separation of family units, noting that these policies "would be reported by the media and [] would have substantial deterrent effect."[2] The memo explains that separated children will be treated as "unaccompanied" and placed in the custody of the Department of Health and Human Services (HHS) away from their parents – the process that led to enormous difficulties when the government was ordered to locate and reunify families.[3] The memo also recommends using background checks and placing sponsors into removal proceedings as a way to deter others from coming forward to sponsor separated children, thus leaving them to languish in federal camps and group homes.[4] One comment proposes simply "referring sponsors for criminal prosecution[.]"[5]

The memo also sets forth "LONG TERM (6+ months) OPTIONS," that likewise focus almost exclusively on tactics to deter families from seeking protection under United States asylum laws. For example, the memo recommends negotiations with Mexico to "require aliens from the Northern Triangle to remain in Mexico until their removability and claims for relief have been decided by an immigration judge," acknowledging that this "would implicate refugee treaties and international law."[6] It also recommends "[t]erminat[ing] the *Flores* Settlement Agreement via legislation" to permit the Department of Homeland Security (DHS) to indefinitely detain families in secure facilities, and specifically directs Immigration and Customs Enforcement (ICE) to "explore additional detention capacity" with long-term family detention being a priority.[7]

---

[2] *Id*. at 1.
[3] *Id*.
[4] *Id*. at 2.
[5] *Id*.
[6] *Id*. at 4.
[7] *Id*.

The government has moved forward with each of these initiatives. Defendants implemented systematic family separation as early as 2017. *See Ms. L*., ECF No. 386 at 5-6 & n.1. An official Customs and Border Protection (CBP) memo from April 2018 confirms that family separation was an official policy tool for deterring children and their parents from coming to the United States.[8] The memo to then-DHS Secretary Kirstjen Nielsen offers several options for increasing border prosecutions, and opines that DHS could "permissibly direct the separation of parents or legal guardians and minors held in immigration detention so that the parent or legal guardian can be prosecuted."[9] It ultimately recommends prosecution of all adults crossing the U.S.-Mexico border, "including those presenting with a family unit" because this would "have the greatest impact on current flows."[10] This directly contradicts statements Secretary Nielsen made immediately thereafter: "It's not our intent to separate people one day longer than is necessary to prove that there is in fact a custodial relationship."[11] That same month, Secretary Nielsen told a Senate committee that the government does not separate families "for purposes of deterrence." [12] And in June 2018, she tweeted: "We do not have a policy to separate children from their parents." [13] None of these statements, it appears, were true at the time they were made.

---

[8] Memorandum from Kevin K. McAleenan, *et al.*, to Secretary Kirstjen Nielsen, *Increasing Prosecutions of Immigration Violations* (April 23, 2018), https://www.documentcloud.org/documents/4936568-FOIA-9-23-Family-Separation-Memo.html.
[9] *Id*. at 3.
[10] *Id*. at 5.
[11] NPR, Homeland Security Secretary Kirstjen Nielsen's Full Interview with NPR (May 10, 2018), https://www.npr.org/2018/05/10/610113364/transcript-homeland-security-secretary-kirstjen-nielsens-full-interview-with-npr.
[12] C-Span, Senate Homeland Security and Governmental Affairs Committee (May 15, 2018), https://www.c-span.org/video/?445411-1/homeland-security-secretary-kirstjen-nielsen-testifies-senate-panel#s-full-interview-with-npr.
[13] Twitter, Sec. Kirstjen Nielsen, June 17, 2018, https://twitter.com/SecNielsen/status/1008467414235992069.

Then, on September 7, 2018, DHS and HHS published a notice of proposed rulemaking, which, once finalized, would allow DHS to detain families together until immigration proceedings are completed.[14] Significantly, the proposed regulations would create a federal licensing scheme for family detention centers and abrogate the *Flores* Settlement's requirement that such facilities be state-licensed, thus evading state oversight. On December 20, 2018, DHS announced that it would adopt a policy requiring asylum seekers to return to Mexico while their immigration claims are processed, possibly for months or years.[15] Shortly thereafter, Defendants formally adopted "Migrant Protection Protocols," which requires asylum seekers, including families, to wait outside the country, presumably in Mexico, for the duration of their asylum proceedings.[16]

While cast by the Administration as efforts to prevent gangs or drugs from crossing the border, these policies are in fact a focused effort to deter family migration, even if those families are asylum seekers. Indeed, the 2017 memo tellingly omits any reference to gangs, violence, or drug enforcement with respect to these policies; instead, the singular focus is on harming families.

---

[14] Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Children, 83 Fed. Reg. 45486 (Sept. 7, 2018) to be codified at 8 C.F.R. Parts 212 and 236, and 45 C.F.R. Part 410, https://www.govinfo.gov/content/pkg/FR-2018-09-07/pdf/2018-19052.pdf.

[15] Nick Miroff, Kevin Sieff & Mary Beth Sheridan, *Trump administration reaches deal that will force asylum seekers to wait in Mexico as cases are processed, DHS's Nielsen says*, (Dec. 20, 2018), https://www.washingtonpost.com/world/national-security/dhs-secretary-kirstjen-nielsen-to-face-questions-from-lawmakers/2018/12/20/f7d2ffea-0460-11e9-8186-4ec26a485713_story.html?utm_term=.8b571acda5c5.

[16] *See* DHS, *Migrant Protection Protocols* (Jan. 24, 2019), https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols; Adolfo Flores, *The Trump Administration Has Sent the First Asylum-Seeking Families Back to Mexico* (Feb. 14, 2019), https://www.buzzfeednews.com/article/adolfoflores/the-trump-administration-has-sent-the-first-asylum-seeking. On April 8, 2019, a federal judge enjoined the federal government from implementing this policy. *See Innovation Law Lab, et al., v. Kirstjen Nielsen, et al*., No. 19-cv-00807 (N.D. Cal. Apr. 8, 2019), ECF No. 73.

And the harms continue. A January 2019 report from the Office of the Inspector General of HHS[17] reveals that "potentially 'thousands' more families" were separated than the government previously admitted. *Ms. L.*, ECF No. 386 at 2-5 (report "is a significant development" and its contents are "undisputed"). Specifically, Defendants continued to separate children from their families even *after* this Court's June 26, 2018, injunction. From July to November 2018, the Office of Refugee Resettlement (ORR) received at least 118 newly separated children, and DHS provided ORR with limited information about the reasons for these separations.[18] Many of these children are very young; 82 were under the age of 13, including 27 under the age of 5.[19] The report concluded that the total number of children separated from a parent or guardian by immigration authorities is still unknown.[20]

Recent reporting suggests Defendants intend to revive family separation, but instead of "zero tolerance," they have rebranded it a "binary choice" policy.[21] Under this policy, parents would be presented with an impossible choice: waive humanitarian protections for their children and remain indefinitely detained as a family in jail-like conditions, or "voluntarily" agree to be separated from their children. At the same time, Commander Jonathan White, a top HHS official who actually sees conditions on the ground, urged a Senate Committee on Monday to define and limit the government's authority to separate

---

[17] *Separated Children Placed in Office of Refugee Resettlement Care*, U.S. Department of Health & Human Services at 1 (2019), https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf.

[18] *Id*. at 2, 11.

[19] *Id*. at 11.

[20] *See id*. at 13.

[21] Michael D. Shear, Zolan Kanno-Youngs and Maggie Haberman, *Trump Signals Even Fiercer Immigration Agenda, With a Possible Return of Family Separations* (Apr. 8, 2019), https://www.nytimes.com/2019/04/08/us/politics/trump-asylum-seekers-federal-judge.html.

migrant families, noting that family separation overwhelms government resources and puts children at "very significant risk of severe psychological harm."[22]

## III.  ARGUMENT

### A.   Defendants' Request Is Contrary to Federal Rule of Civil Procedure 12, Which Requires Them to Raise All Available Rule 12 Defenses In a Single Motion

Rule 12 specifically forbids a party from bringing successive motions to dismiss. *See* Fed. R. Civ. P. 12(g)(2) ("Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under [Rule 12(b)] must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."). Successive motions to dismiss are not allowed where the moving party can raise all arguments in a single motion, as is the case here. *See, e.g., GCL, LLC v. Schwab*, No. 11-04593, 2012 WL 4321972, at *3 (E.D. Pa. Sept. 21, 2012) (refusing to address arguments where "all of Defendant's arguments were available to him at the time he filed his initial motion to dismiss"); *United States v. Molen*, No. 2:10-CV-02591 MCE, 2011 WL 1810449, at *2 (E.D. Cal. May 9, 2011); *Cataulin v. Washington Mut. Bank, FSB*, No. 08 CV 2419 JM NLS, 2009 WL 1404757, at *2 (S.D. Cal. May 19, 2009); *Chen v. Cayman Arts, Inc.*, No. 10-80236-CIV, 2011 WL 1085646, at *2 (S.D. Fla. Mar. 21, 2011) (refusing to allow defendants to file a second motion to dismiss because the Rule 12 "drafters did not intend to allow a party to bring unlimited motions to dismiss based on different defenses").

Courts in the Ninth Circuit have read the Rule 12(h)(2) exception narrowly to allow a party to later raise as a defense the failure to state a claim, but only in a post-answer

---

[22] Camilo Montoya-Galvez, *HHS official urges Congress to limit migrant family separation* (Apr. 9, 2019), https://www.cbsnews.com/news/jonathan-white-top-hhs-official-urges-congress-to-limit-migrant-family-separation/; C-Span, Senate Homeland Security Committee (Apr. 9, 2019), https://www.c-span.org/video/?459642-1/border-patrol-ice-officials-testify-southern-border-migration.

motion under Rule 12(c), a pleading under Rule 7(a), or at trial. *In re Apple Iphone Antitrust Litig.*, 846 F.3d 313, 318 (9th Cir. 2017) (citing *English v. Dyke*, 23 F.3d 1086, 1091 (6th Cir. 1994)); *see also Hernandez v. City of San Jose*, 241 F. Supp. 3d 959, 984-85 (N.D. Cal. 2017). In other words, "the 12(h)(2) exception comes into play only in [these] certain circumstances [and] it is not a blanket exception that permits successive motions" to dismiss under Rule 12(b). *Ellis v. Worldwide Capital Holdings, Inc.*, No. EDCV141427JGBKKX, 2015 WL 12697722, at *2-3 (C.D. Cal. Mar. 24, 2015). Likewise, the exception in Rule 12(h)(3) confirms that a court may dismiss an action if it "determines at any time that it lacks subject-matter jurisdiction" – it does not generally allow for multiple Rule 12 motions.

Rules 12(g)(2) and 12(h) plainly serve "to eliminate the presentation of [Rule 12] defenses in a piecemeal fashion." *Ellis*, 2015 WL 12697722, at *2-3 (quotation and citation omitted); *see also* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1342 (3d ed. 1995) ("objective of Rule 12 is to expedite and simplify the pretrial phase of federal litigation"). As such, Rule 12 "contemplates the presentation of an omnibus pre-answer motion in which defendant advances every available Rule 12 defense and objection he may have that is assertable by motion." *Pilgrim Badge & Label Corp. v. Barrios*, 857 F.2d 1, 3 (1st Cir. 1988) (quotation and citation omitted).[23] Here, Defendants nowhere argue that they are *unable* to raise standing and merits issues in a single motion, nor would such a claim be credible nearly ten months after this case was filed.

Just as Defendants' request circumvents the clear terms of Rule 12, it avoids this Court's own procedures. *See* Civil Pretrial & Trial Procedures of Judge Dana M. Sabraw § 6.A. (requiring "[a]ny party desiring to file a Rule 12(b) motion" to "first attempt to

---

[23] Even consideration of a defense or objection otherwise barred by Rule 12(g)(2) that would further the just and speedy resolution of a case is "error." *In re Apple Iphone Antitrust Litig.*, 846 F.3d at 318 (discussing Fed. R. Civ. P. 1); *see also In re Packaged Seafood Prod. Antitrust Litig.*, 277 F. Supp. 3d 1167, 1173–75 (S.D. Cal. 2017).

resolve the matter informally" and detailing subsequent pre-motion process). Defendants have taken none of the pre-motion steps required by this Court and instead seek leave to file multiple Rule 12(b) motions on their own (unspecified) timeline.

It is clear that what Defendants seek is an opportunity to dispose of this case on jurisdictional grounds without being required to answer the Complaint if they lose that motion. This is an abuse of Rule 12 and should not be sanctioned by the Court.

## B. Bifurcation is not Appropriate Where Jurisdictional and Merits Issues Overlap, and an Indefinite Stay on the Merits Would Prejudice the States

Instead of addressing Rule 12, Defendants instead rely on Rule 42, which governs bifurcation of issues for *trial*. *See* Fed. R. Civ. P. 42 (providing, under the title "Trials," that "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues"). None of Defendants' authorities permit bifurcating Rule 12 issues and allowing serial motions to dismiss. *See, e.g., Saxion v. Titan-C-Mfg., Inc.*, 86 F.3d 553, 556 (6th Cir. 1996) (bifurcating liability from damages at trial); *Rivera v. NIBCO, Inc.*, No. CIV-F-99-6443 AWISMS, 2006 WL 845925, at *5 (E.D. Cal. Mar. 31, 2006) (same); *Grisham v. Philip Morris, Inc.*, No. CV 02-7930 SVW RCX, 2009 WL 9102320, at *4 (C.D. Cal. Dec. 3, 2009) (applying "Rule 42(b) to bifurcate trial on statute of limitations issues"). This is not surprising – Rule 12 already allows for early consideration of specific issues on motion, which in and of itself is a species of bifurcation. Rule 42 has no application here.

Even if Rule 42 applied, which it clearly does not, bifurcation would not be warranted. "In the Ninth Circuit, '[b]ifurcation . . . is the exception rather than the rule of normal trial procedure.'" *GEM Acquisitionco, LLC v. Sorenson Grp. Holdings, LLC*, No. C 09–01484 SI, 2010 WL 1729400, at *3 (N.D. Cal. Apr. 27, 2010) (citation omitted); *Hangarter v. Paul Revere Life Ins. Co.*, 236 F. Supp. 2d 1069, 1094 (N.D. Cal. 2002), *aff'd*, 373 F.3d 998 (9th Cir. 2004) ("piecemeal trial of separate issues in a single suit is not to be the usual course"). The party seeking bifurcation "has the burden of proving that bifurcation is justified." *Spectra–Physics Lasers, Inc. v. Uniphase Corp.*, 144 F.R.D. 99,

101 (N.D. Cal. 1992). Courts "consider several factors in determining whether bifurcation is appropriate, including separability of the issues, simplification of discovery and conservation of resources, and prejudice to the parties." *McDermott v. Potter*, No. C 07–06300 SI, 2010 WL 956808, at *1 (N.D. Cal. Mar. 12, 2010) (citations omitted). These factors undercut, rather than support, the bifurcation Defendants seek.

> 1. <u>Bifurcation of Rule 12 Issues is Inappropriate Where Merits and Jurisdictional Issues Overlap and the States Have Strong Arguments as to Both</u>

Bifurcation is particularly inappropriate for the Rule 12 issues here, because the States' robust standing and merits claims overlap substantially. *See Marks Food Corp. v. Barbara Ann Baking Co.*, 274 F.2d 934, 936 (9th Cir. 1959) (bifurcation inappropriate where merits and jurisdictional issues overlap). Accordingly, bifurcation would only cause harm to the States through delayed and piecemeal rulings on 12(b) defenses that rely on interrelated facts and arguments.

To establish standing, the States must show that: (1) they suffered a concrete, particularized, and actual or imminent "injury in fact"; (2) the injury is fairly traceable to the challenged action; and (3) the injury is likely redressable. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Of course, "'[s]tates are not normal litigants for the purposes of invoking federal jurisdiction,' and have interests and capabilities beyond those of an individual by virtue of their sovereignty." *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 970 (9th Cir. 2009) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)). In particular, states deserve "special solicitude" in standing analysis, and may establish standing based on sovereign and quasi-sovereign interests, in addition to traditional proprietary interests. *Massachusetts,* 549 U.S. at 520. Each of these interests is tied inextricably to the existence and unlawfulness of Defendants' actions that form the basis of the States' claims.

For example, Defendants' unlawful policies impair the States' quasi-sovereign interests in protecting their residents from the direct and indirect effects of Defendants' harmful, unconstitutional, and discriminatory practices. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982) (states have interest in preventing

potential injury to "the health and well-being—both physical and economic—of its residents"); *see also Com. of Mass. v. Bull NH Info. Sys., Inc.*, 16 F. Supp. 2d 90, 98-99 (D. Mass. 1998); *People v. Peter & John's Pump House, Inc.*, 914 F. Supp. 809, 812 (N.D.N.Y. 1996). Defendants' actions not only harm separated parents and children, but also impact some of the States' most vulnerable communities.[24] *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 612 ("As a sovereign entity, a State is entitled to assess its needs, and decide which concerns of its citizens warrant its protection and intervention.").

The States welcome migrant families and children into their communities when they are released from federal custody. In fiscal year 2017, almost 15,000 accompanied immigrant children received positive credible fear determinations and were released from federal custody, most of whom settled in one of the Plaintiff States.[25] Indeed, the States welcome *over 73 percent* of the total asylees entering the United States, and the District of Columbia has the second highest number of asylees per capita of any state.[26] In the last fiscal year, 16,746 unaccompanied immigrant children (over half of the total) were released to adult sponsors in the States.[27] The States have direct interests in the well-being of these

---

[24] *See* Decls. of Roche (ECF No. 15-4, Ex. 58) (impact on resident Latino communities); Matos (ECF No. 15-4, Ex. 62) (same); Torrijos (ECF No. 15-4, Ex. 63) (same); Kimoto (ECF No. 15-4, Ex. 45) (impact on survivors of Japanese American internment camps); Banko (ECF No. 15-4, Ex. 46) (impact on Holocaust survivors and survivor descendent communities); Margles (ECF No. 15-4, Ex. 47) (same); *see also* Decls. of Briggs (ECF No. 15-4, Ex. 48) (historical parallels to Native American family separation and slavery); Jones (ECF No. 15-4, Ex. 49) (historic separation of enslaved parents and children); ECF No. 15 at n. 9, 10, 11.

[25] *See* Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Children, *supra* note 15, at 45519.

[26] Nadwa Mossad & Ryan Baugh, *Refugees and Asylees: 2016*, DHS Off. of Immig. Statistics (Jan. 2018), at 8, Figure 7, https://www.dhs.gov/sites/default/files/publications/Refugees_Asylees_2016_0.pdf.

[27] Off. of Refugee Resettlement, *Unaccompanied Alien Children Released to Sponsors by State*, (Feb. 28, 2019), https://www.acf.hhs.gov/orr/resource/unaccompanied-alien-children-released-to-sponsors-by-state.

families and children: the more traumatized they are by Defendants' conduct, the more the States' interests are impaired when those families inevitably assume residency in the States.

The States continue to receive accounts of families who have suffered as a result of Defendants' unlawful policies, arriving traumatized into their communities. Parents describe lasting distress from being forcibly separated from their children with little to no notice.[28] Many were provided incorrect or no information about their children's whereabouts or well-being, and were permitted to speak with their children only after weeks or months. *See* ECF No. 27-2, Exs. EE, FF, GG, HH; Decls. of Katze (Ex. 102), Skinner (Ex. 103), N.O.S. (Ex. 109), Loh (Ex. 121). There are accounts of gratuitous cruelty – after telling one mother she would never again see her 8-year-old daughter, officers taunted, "Happy Mother's Day." ECF No. 15-3, Ex. 6. Parents were told that their children were being given up for adoption. ECF Nos. 27-2, Ex. GG; 15-3, Ex. 7. One mother was kept in a cell with nearly fifty other women and was not allowed "to bathe or brush her teeth" for eight days. ECF No. 15-3, Ex. 7 ¶¶ 7-11. "The officers told [the mothers] that they could not eat because they were asking about their children" and a pregnant woman "fainted from hunger." *Id*. ¶ 7.

Defendants' policies also harm the States' proprietary interests by imposing increased costs on the States who must provide services to traumatized children and parents. *Snapp*, 458 U.S. at 601-02. There is no minimum amount of pecuniary harm required to establish a State's proprietary standing and courts have held that any non-trivial economic impact constitutes a concrete, particularized injury. *See e.g.*, *Hawai'i v. Trump*, 859 F.3d 741 (9th Cir. 2017) (Hawai'i had standing to challenge executive order based on harms to its state university, including lost tuition revenue); *Texas v. United States*, 787

---

[28] *See* ECF Nos. 15-3, Exs. 1, 4-23, 25-27; 27-2 Exs. EE-II; Decls. of Santiago (Ex. 100), Bless (Ex. 101), Katze (Ex. 102), Skinner (Ex. 103), Roach (Ex. 104), J.S.M (Ex. 105), Hyman (Ex. 106), Press (Ex. 107), Rizio (Ex. 108), N.O.S. (Ex. 109), S.S.P. (Ex. 110), L.K.S. (Ex. 111), Kilpatrick (Ex. 112), Marquez (Ex. 113), Palazzolo (Ex. 114) and Ramos (Ex. 115), Y.P.O. (Ex. 119), Sanchez (120).

F.3d 733 (5th Cir. 2015) (Texas had standing to challenge federal immigration directive based on a $130 per-license cost to issue driver licenses);[29] *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1199 (9th Cir. 2004) (potential lost tax revenues is a sufficient economic interest).

Here, the States, their local jurisdictions, and local non-governmental organizations will need to utilize resources diverted from other purposes to provide services to assist these victims of unnecessary trauma caused by Defendants' unlawful policies. ECF Nos. 1 at ¶¶ 225-94; § K; 15 at n.18 (listing supporting declarations). Among other services, the States' public schools will face more challenges in educating students who have experienced profound trauma and needlessly missed months or years of schooling while stuck at the border and separated from parents in federal detention. *See* ECF No. 1 ¶ 229 (states required to provide free public education to children regardless of immigration status, as well as "various statutory obligations to provide particularized services to high needs students"), 230 (research shows "experience of trauma may severely undercut a child's ability to learn and function in the classroom"); *see, e.g.*, ECF No. 47, Ex. OO, Ex.117, Ex. 120, Ex. 118.

The States' public health care systems will have to address the increased health needs of immigrants who have not had access to preventative care, vaccinations, and necessary medical care while they were trapped near ports of entry or in detention facilities. An attorney representing separated children and parents observed that the vast majority of his clients have experienced physical, emotional, and mental health trauma as a result of separation, each of which requires them to seek services from healthcare professionals. Bless Decl. ¶ 10 (Ex. 101). For example, one mother is taking prescribed medication to cope with the guilt and pain associated with separation from her child. *Id*. ¶ 11. Many of

---

[29] For purposes of the standing inquiry, the Court also flatly declined to weigh any "countervailing economic benefits" created by the challenged program that might offset injury. *Texas*, 787 F.3d at 750.

3:18-cv-01979-DMS

the children have exhibited serious, and possibly long-lasting, mental health and behavioral impacts as a result of family separation and detention. *Id.* ¶ 12; *see also* Ramos Decl. ¶ 16 (Ex. 115); Sanchez Decl. ¶ 10 (Ex. 120) (child is "paralyzed with fear" when mother is not nearby); Loh Decl. ¶ 14 (Ex. 121) (four-year-old cries and refuses to speak about her time away from her mother). For these reasons, the attorney has helped families apply for state-sponsored healthcare to treat their physical and mental health needs caused by the separations. Bless Decl. (Ex. 101) ¶ 13. Similarly, a senior staff attorney with Safe Passage Project, a non-profit that provides legal representation to immigrant children in New York, has personally observed behavior issues and dependency in separated children, and believes these children will likely require additional services from public school systems and/or ongoing therapeutic interventions due to the trauma they experienced. Rizio Decl. ¶¶6-9 (Ex. 108); *see also* Press Decl. ¶ 8 (Ex. 107) (majority of separated parents and children have experienced mental health issues and trauma, and separated children will likely need additional services, including extra support to feel comfortable in a school building); Mostofi Decl. ¶ 9 (Ex. 116) (describing emergency medical and psychiatric services required by separated children in New York City); Sanchez Decl. ¶¶ 6-12 (Ex. 120) (separated child required additional support at school and counseling to address trauma from separation from his mother); Y.P.O. Decl. ¶ 8 (Ex. 119); *see generally* Muir Decl. (Ex. 117).

These harms inflicted by Defendants' shifting strategies, efforts to prolong family detention, and attempts to evade state welfare protections, are tied closely to the States' merits claims. The States allege that Defendants' practices violate the substantive due process rights of parents and children, including because Defendants' conduct shocks the conscience. ECF No. 1 ¶¶ 342-47; *Ms. L.*, ECF No. 83 at 17 (finding that Defendants' method of separating immigrant families "'may fairly be said to shock the contemporary conscience'") (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8 (1998)); *see also Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) (plurality op.) ("[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the

fundamental liberty interests recognized by this Court."). The States' claim also raises the substantive due process rights of detained parents and children to humane treatment, reasonably safe conditions, freedom from unreasonable risk of physical or mental-health harm, provision of basic necessities, and care consistent with qualified professional judgment. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989); *Youngberg v. Romeo*, 457 U.S. 307, 316-17, 322-23 (1982); *Braam v. State of Washington*, 81 P.3d 851, 856 (2003). Through their APA claims, the States also allege that Defendants' conduct is arbitrary, capricious, and contrary to the many statutes that require Defendants to consider the best interests and well-being of migrant children. ECF No. 1 ¶¶ 359-68; *Massachusetts*, 549 U.S. at 521, 523 (under the APA, an agency may not simply ignore "serious and well recognized harms" or grant itself a "roving license to ignore . . . statutory text"); *J.E.C.M. v. Lloyd*, 352 F. Supp. 3d 559, 583-84 (E.D. Va. 2018) (Office of Refugee Resettlement policy violates APA as flatly inconsistent with congressionally mandated priorities to care for child while working to safely and promptly release child to a responsible adult).

Public accounts and the evidence in the record chronicle an array of government conduct that is arbitrary and capricious at best, and shocking and alarming at worst. Teenage girls have reported being assaulted in immigration detention facilities by CBP officers.[30] In the last four years, the federal government has received more than 4,500 complaints of sexual abuse of immigrant children at government-funded detention

---

[30] Manny Fernandez, '*You Have to Pay With Your Body': The Hidden Nightmare of Sexual Violence on the Border,* N.Y. Times (Mar. 3, 2019), https://www.nytimes.com/2019/03/03/us/border-rapes-migrant-women.html?action=click&module=RelatedCoverage&pgtype=Article&region=Footer; Manny Fernandez, *They Were Stopped at the Texas Border. Their Nightmare Had Only Just Begun,* N.Y. Times (Nov. 12, 2018), https://www.nytimes.com/2018/11/12/us/rape-texas-border-immigrants-esteban-manzanares.html?module=inline.

facilities, including a spike in such complaints when family separation was implemented.[31] The long term effects of these events on the child victims are currently unknown, but likely to be profound and require significant State and community resources to address. Likewise, reports that medications – including lifesaving prescriptions for asthma, heart disease and infant diarrhea – are routinely confiscated during federal detention only exacerbate medical issues that will require increased State resources to remedy.[32] Some migrants describe being left alone in concrete cells with broken bones, recent surgeries, or extremely sick babies as young as 6-months old.[33] In December 2018, two migrant children – aged 7 and 8 – died after signs of illness were ignored by CBP agents in Texas and New Mexico.[34]

Accounts from separated parents and children in the States confirm these dire conditions. One mother explains how officers confiscated medication for a 10-year-old boy even after the mother begged border agents to let her son have his medication. S.P.P. Decl. ¶¶ 5-7 (Ex. 110). As a result, the boy developed a fever and vomited through the night. *Id.*

---

[31] Matthew Haag, *Thousands of Immigrant Children Said They Were Sexually Abused in U.S. Detention Centers, Report Says*, N.Y. Times (Feb. 27, 2019), https://www.nytimes.com/2019/02/27/us/immigrant-children-sexual-abuse.html?module=inline.

[32] Sheri Fink & Caitlin Dickerson, *Border Patrol Facilities Put Detainees With Medical Conditions at Risk*, N.Y. Times (Mar. 5, 2019), https://www.nytimes.com/2019/03/05/us/border-patrol-deaths-migrant-children.html?action=click&module=Top%20Stories&pgtype=Homepage.

[33] *Id.*

[34] Jakelin Caal Maquin, a seven-year-old Guatemalan girl, died of septic shock, fever and dehydration on December 8, 2018 after seeking asylum at the Antelope Wells designated point of entry and waiting some six hours before being transported the 90 miles to Lordsburg, New Mexico. Angela Kocherga, *Border Patrol Officials Probe Death of 7-Year Old*, Albuquerque J. (Dec. 14, 2018), https://www.abqjournal.com/1257643/7-year-old-migrant-girl-held-at-us-border-dies-in-custody.html. Felipe Gómez Alonzo, an 8-year old who attempted to enter the country near El Paso, was held for a week in CBP custody before his Christmas Eve death near Alamogordo. Maria Atencio, *Border Facilities Still Need Fixing After Second Migrant Child's Death, Say Democrats*, NBC News (Jan. 7, 2019), https://www.nbcnews.com/news/latino/border-facilities-still-need-fixing-after-second-migrant-child-s-n955876.

After the boy was separated from his mother, officials provided no information or updates regarding his health or when mother and son would see each other again. *Id*. ¶ 9. When the child was finally released from ORR custody, he was still physically ill. *Id*. ¶ 21. Since being reunited with his mother in Massachusetts, the boy has enrolled in the state insurance program and plans to attend school, but struggles emotionally and psychologically. *Id*. ¶¶ 22-24.

Another mother attempted to cross at ports of entry multiple times, only to be physically blocked and finally pushed so hard by CBP officers that she fell. Ramos Decl. ¶¶ 5-7 (Ex. 115). When she was taken into custody, officers separated her from her 4-year-old son and threatened to deport her. *Id*. ¶ 8. In custody, officers refused to provide the mother with basic medication to treat a fever, demanding instead that she provide proof of insurance. *Id*. ¶ 10. Another mother describes being trapped by CBP guards on a transport bus for four hours while children soiled themselves and succumbed to sickness. N.O.S. Decl. ¶ 14 (Ex. 109). Thereafter, the mother was separated from her 5-year-old daughter as she tried her best not to cry and to explain to her daughter that they would be apart for just a little while. *Id*. ¶¶ 19-21. In the end, she did not see her daughter for 2 months. By the time of reunification, the mother had lost 30 pounds and her daughter remains traumatized, scared, and constantly worried that they will be separated again. *Id*. ¶¶ 21-46. Another separated child arrived at her aunt's home in Rhode Island with welts and bruises on her legs and midsection. Roach Decl. ¶ 15 (Ex. 104). In addition to these physical harms, the child has had difficulty adjusting to life without her mother and rarely talks about her time at the border. *Id* ¶ 16. A woman separated from her 1-year-old son for three months says that after they were reunited, "he continued to cry" and would not let her go. When she removed his clothes, "he was full of dirt and lice. It seemed like they had not bathed him the 85 days he was away from us." ECF No. 15-3, Ex. 4.

Like Defendants' family separation and detention policies, their tactic of refusing to accept asylum claims at the southern border raises issues that touch both the States' standing and their merits claims. ECF No. 1 ¶¶ 369-71. Forcing migrants to wait in Mexico

or at the border while they attempt to enter the United States also inflicts significant trauma on families, many of whom are fleeing violence or dangerous conditions. Media reports have extensively documented the inhumane conditions at the border. Thousands of immigrants, many with young children, are forced to stay in a makeshift camp at a sports complex, a shelter at an abandoned concert venue in one of the most dangerous parts of Tijuana, and on plastic tarps in the streets waiting to be processed by CBP.[35] Children languishing at the border become ill and miss school, and families are not receiving basic health and social services that the States would otherwise provide, including mental health treatment.[36] In addition to adverse physical conditions, vulnerable adults and children are exposed to greatly increased risks of crime and exploitation as they wait at the border. *See E. Bay Sanctuary Covenant v. Trump*, No. 18-cv-06810-JST, 2018 WL 6053140, at *19 (N.D. Cal. Nov. 19, 2018), *appeal docketed*, No. 18-17274 (9th Cir. Nov. 27, 2018) (noting "extensive record evidence of the danger experienced by asylum seekers waiting to cross").

In short, the States' broad and varied harms are inextricably bound up with their challenges to Defendants' forcible separation of families, plans for indefinite family detention and efforts to evade state licensing oversight, and refusal to grant entry at the southern border. Under these circumstances, bifurcation is pointless and would only unnecessarily prolong this litigation with duplicate briefing on jurisdictional and merits issues. *See Mformation Techs., Inc. v. Research in Motion Ltd.*, No. C 08-04990 JW, 2012

---

[35] Catherine E. Shoichet & Leyla Santiago, *The Tear Gas is Gone. But in This Shelter at the Border, the Situation Is Getting Worse*, CNN (Nov. 29, 2018), https://www.cnn.com/2018/11/29/americas/mexico-border-tijuana-shelter/index.html.; Sarah Kinosian, *Migrants at Mexico Border Face an Uncertain Future on Their Own*, The Guardian (Dec. 1, 2018), https://www.theguardian.com/us-news/2018/dec/01/migrants-at-mexico-border-face-an-uncertain-future-on-their-own.

[36] UNICEF, *Statement on Situation of Migrant Children at Mexico-U.S. Border* (Nov. 28, 2018), https://www.unicef.org/press-releases/unicef-statement-situation-migrant-children-mexico-us-border (noting "limited access to many of the essential services [children] need for their wellbeing, including nutrition, education, psychosocial support and healthcare").

WL 1142537, at *7-8 (N.D. Cal. Mar. 29, 2012) (defendants fail to show that bifurcation would conserve judicial resources or litigation expenses, insofar as bifurcation would result in two trials rather than one). Defendants' breezy suggestion to the contrary should not be credited.

2. Bifurcation of Rule 12 Issues Will Not Lead to Efficiencies with *Ms. L.* Because the States' Claims Are Different and Do Not Impact Ongoing Reunification Efforts

Defendants argue that because this case was transferred from the Western District of Washington, it should be litigated in tandem with *Ms. L.* Mot. at 13:1-12. But Defendants offer no authority – and the States are aware of none – that approves the bifurcation of a motion to dismiss merely because similar legal issues are raised in a separate lawsuit between different parties. Defendants' repeated assertion that allowing this case to proceed on a standard schedule "risk[s] draining Defendants' resources currently dedicated" to *Ms. L.* is unsupported by a declaration or any specifics as to burden. Mot. at 12:22-26; *id.* at 15. To the contrary, cases addressing Defendants' unlawful policies are being litigated in a variety of venues, without apparent impact on *Ms. L.* For example, the Western District of Washington just found that Defendants' indefinite detention of asylees without providing bond hearings was unlawful. *See Padilla v. ICE*, Case No. 2:18-cv-00928 (W.D. Wash.), ECF No. 110 (granting preliminary injunction). Defendants have managed to litigate that companion case, which was filed near the time of this lawsuit, without seeking a stay or halting their efforts to comply with the *Ms. L.* injunction. Indeed, it appears most of the resources in *Ms. L.* are dedicated to accounting and reunification, which does not involve the attorneys who would be required to draft an answer and participate in case planning here. *See Ms. L.,* ECF No. 394-1 ("operational leads" for identifying expanded class members are not attorneys in this case). Moreover, any increased burden on Defendants due to the expanded class definition in *Ms. L.* is a result of Defendants' own conduct in initially misrepresenting the scope of the family separation policy, not the States' lawsuit. *See Ms. L.,* ECF No. 386 at 9.

The majority of Defendants' arguments incorrectly rest on the implicit assertion that the States are functionally members of the *Ms. L.* class. *See* Mot. at 13:12-21; *see also* Mot. at 1:14-16. This is wrong; the States' claims are distinct from those in *Ms. L. See* ECF Nos. 32 at 9:4-8 ("the States' claims in this matter are based on much broader allegations . . . than are pled in *Ms. L*, and the relief sought is concomitantly broader"); 88 at 4 ("the States have raised several claims that are distinct from those in *Ms. L.*"). Consistent with the interests they have at stake, the States' claims and requested relief are not limited to the family reunification issues addressed in *Ms. L.* Specifically, the States challenge Defendants' refusal to accept asylum seekers at Southwestern ports of entry and Defendants' proposals to indefinitely detain families at unlicensed locations within the States. Such claims are not being litigated in *Ms. L.* Likewise, due to their broader interests, the States' constitutional claims are premised on different facts than those litigated in *Ms. L.* For example, *Ms. L.*'s Fifth Amendment claim focuses on the liberty interest of separated parents. *Ms. L.*, ECF Nos. 1 at 7; 85 at 14; 244-1 at 14-15. By contrast, the States' claims emphasize the interests of all state residents, including children and relatives, in addition to addressing the trauma triggered by long-term detention of separated children and families. ECF No. 1 at 115. Complete relief cannot be afforded to the States via the *Ms. L.* class action because the States are in no fashion members of the *Ms. L.* class; there is no identity of parties, and injuries to the States' proprietary, sovereign, and quasi-sovereign interests cannot be addressed by a class of separated parents. For these reasons, the first to file rule is also inapplicable. *See* Mot. at 2:7-13; *see also Pacesetter Systems, Inc. v. Medtronic, Inc.*, 678 F.2d 93, 95 (9th Cir. 1982) (first to file rule applies "when a complaint involving the same parties and issues has already been filed in another district").

Further, the States have no interest in interfering with the *Ms. L.* injunction and they support family reunification. Other than generally hypothesizing that there could be risk of conflicting orders, Defendants do not explain how a complete stay of this case (except for a jurisdictional motion) is necessary. *See* Mot. at 7:14-19. It is not; indeed, the Court ruled on Defendants' Rule 12(b)(1) and 12(b)(6) motion in *Ms. L.* notwithstanding that cases

from other jurisdictions raised overlapping issues, and the States are not aware that the ruling disrupted this or any other case. *See* ECF No. 46 at 3-4 (listing overlapping cases). Any actual risk of conflicting orders can easily be mitigated by the parties and the Court. Bifurcation is unnecessary.

3.   An Indefinite Stay on Merits Issues Would Prejudice the States, Whose Interests and Claims Are Different from Those Raised in *Ms. L.*

The States will be prejudiced if the Court were to hold in abeyance all merits issues to be litigated at some uncertain future point. Contrary to Defendants' vague suggestions, there is no assurance that *Ms. L.* will proceed to the merits at any specific time, especially in light of this Court's recent order expanding the class definition in that case. *See Ms. L.*, ECF No. 386; *see also* Mot. at 1:21-24 (parties in *Ms. L.* continuously extend Defendants' time to respond to the complaint). Instead, following the expansion of the *Ms. L.* class, Defendants confirm that it could take them up to two years to complete the initial step of identifying additional impacted families.   *See Ms. L.*, ECF No. 394-1. Accordingly, Defendants' request to litigate the merits of this case alongside *Ms. L.* is essentially a request for indefinite stay of years. And yet, Defendants nowhere address the stay factors, nor do they even remotely establish why a stay is warranted here. It is not. The States' claims, interests, and harms are broader than those being litigated in *Ms. L.*, and the States deserve to have their claims heard on a timetable that is not subject to the preferences of litigants in another lawsuit.

Recent developments confirm that several of the States' claims implicate disturbing circumstances which have not been addressed – and likely will not be addressed – in *Ms. L.* In particular, serious concerns about Defendants' motives implicate the States' equal protection claim – a claim nowhere raised in *Ms. L.* It is now clear that top officials proceeded with family separation despite knowing it would harm children, and the agencies directly responsible for the policy had no plan in place to provide care for the thousands of children they separated from their parents. On February 7, 2019, Commander White told

21

lawmakers that he raised concerns about separating families to Trump appointees before the administration announced its controversial "zero tolerance" policy. "The concerns which I expressed were two: First, that this would be inconsistent with our legal requirement to act in the best interest of the child and would expose children to unnecessary risk of harm. Second, that it would exceed the capacity of the program," Commander White explained.[37] For these reasons, Commander White testified that neither he nor any career personnel at HHS would "ever" have supported the government policy that led to family separations.[38] On February 26, 2019, Scott Lloyd, former director of ORR, confirmed that Commander White had raised these concerns, but Mr. Lloyd never relayed them or raised any of his own.[39] Instead, both HHS and DHS were caught off guard when Attorney General Jeff Sessions released the "zero tolerance" memo in April, and neither agency took any steps in advance to plan for the well-being of separated parents and children.[40]

The States allege that family separation is part of a broader strategy to deter migration of families from certain Latin American countries, regardless of the humanitarian consequences. A recent Amnesty International report confirms that Defendants "implemented these interrelated policies in unison" because they knew that family separation; "closing the borders to asylum-seekers, and pushing them back into harm's way; and making life so intolerable in immigration detention facilities" would make

---

[37] C-Span, House Energy and Commerce Subcommittee (Feb. 7, 2019), https://www.c-span.org/video/?457545-1/gao-hhs-officials-testify-migrant-family-separation-policy.
[38] Id.
[39] PBS News Hour, *Trump administration officials face House questions over family separations* (Feb. 26, 2019), https://www.pbs.org/newshour/politics/watch-live-trump-administration-officials-face-house-questions-over-family-separations.
[40] Government Accountability Office, Unaccompanied Children: Agency Efforts to Reunify Children Separated from Parents at the Border (Oct. 9, 2018), https://www.gao.gov/reports/GAO-19-163/.

asylum-seekers "think twice before requesting protection in the United States."[41] The report found that "[t]he Trump administration is waging a deliberate campaign of human rights violations against asylum seekers, in order to broadcast globally that the United States no longer welcomes refugees" from El Salvador, Guatemala, and Honduras.[42]

It appears that Defendants are poised to reinstitute these policies, stating publicly that they may implement family separation again, disguising it as a "binary choice" posed to parents. Just this week, President Trump repeated the false claim that he was the one who *stopped* family separation.[43] At the same time, he acknowledged that Defendants were "looking into" reinstating a policy of child separation to deter migrant families from crossing the southern border.[44] Together, these facts support the States' claim that the government's actions violate equal protection, a claim was not raised in *Ms. L*.

The States should not have to wait indefinitely to move past the pleading phase in this case. The States' interests and claims are distinct from those in *Ms. L*., and recent developments make clear that such claims remain live and pressing. *See Ms. L*., ECF No. 386 at 11-12 (Court noting that "[e]very branch of government is now invested in the process" of determining scope and impact of family separation). The existence of a preliminary injunction in *Ms. L*. does not abrogate the States' claims or render them somehow unimportant and, indeed, harms to the States and their residents continue notwithstanding the preliminary relief granted there.

---

[41] Amnesty International, *USA: 'You Don't Have Any Rights Here,'* (Oct. 11, 2018) at 4, https://www.amnestyusa.org/wp-content/uploads/2018/10/You-Dont-Have-Any-Rights-Here.pdf.
[42] *Id*. at 5.
[43] Brian Naylor, *FACT CHECK: Trump Wrongly States Obama Administration Had Child Separation Policy* (Apr. 9, 2019), https://www.npr.org/2019/04/09/711446917/fact-check-trump-wrongly-states-obama-administration-had-child-separation-policy.
[44] *Id*.

## C. Defendants Fail to Show That an Indefinite Stay Is Warranted

Alternatively, and without analyzing any of the traditional stay factors, Defendants request the Court stay this entire case until *Ms. L.* proceeds to the merits. Mot. at 14-15. "[O]nly in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." *Landis v. North American Co.*, 299 U.S. 248, 255 (1936); *Washington v. Internet Order, LLC*, Case No. C14-1451 JLR, 2015 WL 918694, at *5 (W.D. Wash. Mar. 2, 2015) (denying stay where there is "no guarantee" that injunctive relief in parallel case will "match the relief" sought in the current case). This case is not that kind of "rare circumstance."

Traditional stay factors do not support delay of this proceeding pending resolution of *Ms. L.* In considering whether a stay is warranted, courts examine "possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law." *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962). "[I]f there is even a fair possibility that the stay . . . will work damage to someone else," a stay is inappropriate absent a strong showing by the moving party of "hardship or inequity." *Landis*, 299 U.S. at 255.

As Defendants acknowledge, this is their second attempt to unilaterally stay this case. *See* Motion at 4. Defendants' first request was unsuccessful, and this Court should reject this renewed attempt. *See* ECF No. 88. There is more than a "fair possibility" of harm to the States from a stay and Defendants have not shown any hardship beyond the ordinary burdens of litigation. Indeed, the Western District of Washington *expedited* these proceedings precisely because the evidence here, as well as findings in *Ms. L.*, demonstrate "immediate and extensive" harm caused by Defendants' family separation policy and related practices calling for "swift review and response." ECF No. 32 at 7:3-13. The court rejected Defendants' argument that proceeding to the merits would require them "to engage in extremely costly discovery." *See* ECF No. 32 at 9:9-15.

Further, to stay this case until *Ms. L.* is ready to be litigated on the merits would potentially delay proceedings for months – if not years – given that *Ms. L.* is nowhere near a ruling on the merits. *See* Mot. at 5:14-16 (*Ms. L.* parties routinely agree to extend time to respond to complaint in light of injunction proceedings in that case). "A stay should not be granted unless it appears likely the other proceedings will be concluded within a reasonable time in relation to the urgency of the claims presented to the court." *Leyva v. Certified Grocers of California, Ltd.*, 593 F.2d 857, 864 (9th Cir. 1979); *see also Dependable Highway Exp., Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066-67 (9th Cir. 2007) (because "stay is likely to do damage to [plaintiff], and it is unclear when the stay might lift, if at all," district court erred in issuing stay).

The States and their residents continue to suffer as a result of Defendants' unlawful policies, which are purposefully designed to cause trauma to children to deter other families from migrating. The States are shouldering additional burdens as Defendants' policies increase needs for services that the States provide. An indefinite stay is not warranted.

## CONCLUSION

For these reasons, the Court should deny Defendants' Motion, but allow them to file a Rule 12 motion or answer the Complaint within 21 days of the Court's Order.


Dated: April 12, 2019

> ROBERT W. FERGUSON
> Attorney General
>
> */s/ Laura K. Clinton*
> LAURA K. CLINTON, WSBA #29846
> MEGAN D. LIN, WSBA #53716
> Assistant Attorneys General
> COLLEEN M. MELODY, WSBA #42275
> Division Chief, Civil Rights Unit
> Attorneys for Plaintiff State of Washington

3:18-cv-01979-DMS

# **DECLARATION OF SERVICE**

I hereby certify that on April 12, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will serve a copy of this document upon all counsel of record.

DATED this 12th day of April, 2019.

*/s/ Laura K. Clinton*
LAURA K. CLINTON
Assistant Attorney General